**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                    No. CR 09-1253 JB

CARL ROMERO,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on: (i) the Defendant's Motion to Suppress Defendant's April 16, 2009 Statement and Memorandum in Support, filed November 9, 2009 (Doc. 30)("Statements Motion"); (ii) the Defendant's Motion to Suppress Evidence Due to Lack of Probable Cause in Search Warrant Affidavit, filed November 9, 2009 (Doc. 31)("Affidavit Motion"); and (iii) the Defendant's Motion to Suppress Evidence Due to Unconstitutional Consensual Entries to Personal Bedroom, filed November 9, 2009 (Doc. 33)("Bedroom Motion"). The Court held an evidentiary hearing on February 26, 2010. The primary issues are: (i) whether there was a substantial basis for the Magistrate Judge, who issued a search warrant to search Defendant Carl Romero's vehicle, to find that the warrant affidavit reflected probable cause; (ii) whether Romero's step-father voluntarily consented to a cursory search of his house, wherein Romero also resided; (iii) whether the consent Romero's step-father gave authorized the agents to enter and view Romero's personal bedroom; (iv) whether Romero's confessions were made in violation of his Fourth or Fifth Amendment rights; and (v) whether the agents had proper authorization to enter into Romero's bedroom a second time to seize certain items of evidence. The

Court holds: (i) that probable cause supported the warrant that agents used to seize and search Romero's vehicle; (ii) Romero's step-father voluntarily consented to the agents' search; (iii) Romero's step-father had apparent authority to consent to the agents' search of Romero's personal bedroom; (iv) Romero's confessions were made during a proper investigatory detention -- not during a custodial interrogation -- and the confessions therefore did not violate his Fourth or Fifth Amendment rights; and (v) the consent to search that Romero's step-father gave to the agents authorized the agents to re-enter Romero's bedroom and seize the evidence that the agents had seen during their initial entry.  The Court will therefore deny all three of Romero's motions to suppress, and will admit Romero's confessions and all evidence acquired during the consensual search of his house and warrant-authorized search of his vehicle.

## **FACTUAL BACKGROUND**

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263 (10th Cir. 1982), cert. denied, 461 U.S. 916 (1983).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a).  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269.

1.      Between 8:30 p.m. and 9:00 p.m. on April 10, 2009, Fabian Madrid and Naayaitch

Friday rode as passengers in a friend's vehicle to a Sonic drive-in in Española, New Mexico.  See Transcript of Hearing at 24:25-25:7 (taken February 26, 2010)(Scholl)("Tr.").[1]

2.      Madrid was one of Friday's best friends.  See Tr. at 24:20-24 (Scholl).

3.      While Madrid and Friday drank alcohol with other friends at the Sonic, Defendant Carl Romero, accompanied by Mario Sanchez and Lucas Willow, parked Romero's vehicle in the spot next to Madrid and Friday, and joined in the socializing.  See Tr. at 24:20-27:9 (Ortega, Scholl); Affidavit of Arlen E. Scholl ¶ 4, at 2 (executed April 16, 2009), filed December 7, 2009 (Doc. 40-2) ("Scholl's Aff.");  Government Exhibit 2.

4.      Romero was driving a green 1999 Chevrolet Cavalier that formerly belonged to Angela A. Tapia-Talache.  See Scholl's Aff. ¶¶ 13, 15, at 5-6; Tr. at 69:5-18.

5.      Madrid and Friday had never before met Romero, Willow or Sanchez.  See Scholl's Aff. ¶ 4, at 2.

6.      While everyone drank and socialized, Madrid interacted with an individual named Rick with whom Madrid had experienced a prior confrontation.  Rick displayed a black handgun, at which point Madrid hid behind a vehicle.  See Scholl's Aff. ¶ 5, at 2-3; Tr. at 26:15-25 (Scholl).

7.      One of the three individuals in Romero's vehicle offered Madrid  "their gun," which was "a long 'rifle type' gun in their car."  Scholl's Aff. ¶ 5, at 2-3; Tr. at 26:15-27:7 (Scholl).

8.      No shots were fired during Madrid's encounter with Rick.  See Scholl's Aff. ¶ 5, at 2-3.

9.      At approximately 10:45 p.m., Romero, Sanchez, Willow, Friday, and Madrid decided to leave the Sonic restaurant and go to Big Rock Casino located on the Santa Clara Pueblo near

_____

[1] The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Española.  See Scholl's Aff. ¶ 7, at 3.

10.     Friday rode with Romero, Willow, and Sanchez in Romero's vehicle to Big Rock, while Madrid traveled there in the vehicle of some female friends.  See Scholl Aff. ¶ 7, at 3.

11.     Romero, Friday, Madrid, Willow, and Sanchez met at Big Rock at approximately 11:00 p.m., and proceeded to the Sports Bar area, where they drank until approximately 11:30 p.m. See Scholl's Aff. ¶¶ 7-8, at 3.

12.     Security footage from Big Rock shows that Romero was wearing a red baseball cap while the five men were at the Sports Bar.  See Tr. at 22:1-10 (Scholl).

13.     Shortly after 11:30 p.m., Romero, Friday, Madrid, Willow, and Sanchez got into the Cavalier and left the Big Rock parking lot.  See Scholl's Aff. ¶ 8, at 3.

14.     At approximately 12:35 a.m. on April 11, 2009, the Cavalier returned to the Big Rock parking lot.  The vehicle was "driving erratically so it caught the attention of the casino security." Scholl's Aff. ¶ 9, at 3; Tr. at 27:12-28:4 (Scholl).

15.     A Big Rock video surveillance camera captured two of the individuals who had been in the Cavalier urinating in the parking lot.  See Scholl's Aff. ¶ 9, at 3-4.

16.     The five men -- including Romero and Friday -- appear in video footage heading toward the Sports Bar area of Big Rock and subsequently getting into the Cavalier and leaving the Big Rock parking lot; they also are visible inside the car in video surveillance footage of the Cavalier's return to the Casino parking lot.  See Scholl's Aff. ¶ 7-9, at 3-4.

17.     The Cavalier left the parking lot again at approximately 12:45 a.m. on April 11, 2009. See Scholl's Aff. ¶ 9, at 4.

18.     The five men drove around in the Cavalier "for awhile" until Madrid asked to be dropped off at a friend's house.  Romero, driving the vehicle, acquiesced to the request and dropped

-4-

Madrid off at the friend's house.  See Scholl's Aff. ¶¶ 10-11, 15 at 4-6.

19.     The four men remaining in the vehicle told Madrid they were "going to go to Buffalo Thunder Casino [which is] located on the Pojoaque Pueblo, New Mexico."  Scholl's Aff. ¶ 11, at 4.

20.     Madrid did not see Friday alive again after the vehicle left him at his friend's house.  See Scholl's Aff. ¶ 11, at 4.

21.     On April 11, 2009, at approximately 4:30 p.m., a person discovered Friday's deceased body with shotgun wounds to his chest and chin in an arroyo approximately two miles from where Romero had dropped off Madrid earlier that day.  See Scholl's Aff. ¶ 12, at 5.

22.     Federal Bureau of Investigation Special Agent Arlen B. Scholl was notified on April 11, 2009 that a body, which would ultimately be identified as Friday's, was found in an arroyo at the San Ildelfonso Pueblo in northern New Mexico.  See Tr. at 14:24-15:4 (Scholl).

23.     There was "virtually no blood" at the location where Friday's body was discovered. The clothing appeared to have been "tidied" up, and a bottle of vodka had been placed between Friday's legs.  Tire tracks were found coming "from the main dirt road into the wash to where the body was and then around the body and then back to the main road."  These facts led agent Scholl to believe that Friday's body had been placed at the location where it was found.  See Scholl Aff. ¶ 12, at 5; Tr. at 16:18-17:21 (Ortega, Scholl).

24.     A doctor at the New Mexico Office of the Medical Investigator in Albuquerque performed an autopsy on Friday's body on Sunday, April 12, 2009.  The autopsy revealed that Friday was killed by two shots from a relatively small shotgun.  See Tr. at 20:3-21:3 (Ortega, Scholl).

25.     On April 13, 2009, the Big Rock security supervisor informed the FBI that security department personnel remembered, after being dispatched to investigate an erratic driving incident,

seeing the five individuals on the surveillance video on the morning of April 11, 2009 in a vehicle bearing New Mexico license plate number 029NJK.  See Scholl's Aff. ¶ 9, at 3-4; Tr. at 27:19-28:17 (Scholl).

26.     After receiving the information from the Casino security supervisor, law-enforcement agents were able to match New Mexico license plate number 029NJK to a green 1999 Chevrolet Cavalier bearing Vehicle Identification Number 1G1JC1249X7192868, and determined that it was registered to Tapia-Talache, who resides at 345 Popay Avenue, Ohkay Owingeh Pueblo, New Mexico.  See Scholl's Aff. ¶ 13, at 5; Tr. at 28:12-17 (Scholl).

27.     Romero is a relative of Tapia-Talache, and he lists the same Popay Avenue address on his New Mexico Driver's License.  See Scholl's Aff. ¶ 13, at 5; Tr. at 67:8-25 (O. Martinez).[2]

28.     Scholl learned that, according to the Ohkay Owingeh Tribal Police Department's Incident Report, Romero had been arrested on February 20, 2009 for careless driving and driving under the influence.  The reporting officer found a loaded .410 shotgun in the back seat of Romero's vehicle.  See Scholl's Aff. ¶ 16, at 6; Tr. at 56:3-9 (Scholl).

29.     At the time of Romero's arrest for careless driving and driving under the influence, the .410 shotgun found in the vehicle was seized.  The shotgun was later released to Romero's mother.  See Scholl's Aff. ¶ 16, at 6.

30.     On April 14, 2009, law-enforcement officers saw a green Chevrolet Cavalier at 345 Popay Avenue, Ohkay Owingeh Pueblo.  See Scholl's Aff. ¶ 17, at 6.

31.     On April 16, 2009, the United States applied for a federal search warrant to search

---

[2] Scholl's affidavit indicates that Tapia-Talache is Romero's grandmother.  Martinez' testimony is in conflict by suggesting that Tapia-Talache is Romero's aunt.  Because the precise relationship between Romero and Tapia-Talache is immaterial, the Court credits neither witness' testimony and instead deems it sufficient to find that they are relatives.

a "green 1999 Chevrolet Cavalier bearing New Mexico License Plate 029NJK and Vehicle Identification Number 1G1JC1249X7192868."  Tr. at 30:8-31:9 (Ortega, Scholl); id. at 38:7-11 (Scholl); Government Exhibit 1 ("Warrant Application").

32.     As part of the Application for a Search Warrant, Scholl executed an Affidavit on April 16, 2009. See Tr. at 31:10-17 (Ortega, Scholl); Government Exhibit 2 ("Warrant Affidavit").

33.     Scholl's affidavit stated, in relevant part:

3.      On Saturday, April 11, 2009, at approximately 4:30pm, the deceased body of NAAYAITCH FRIDAY, age 26, was discovered in an arroyo on the San Ildefonso Pueblo located in Santa Fe County, New Mexico.  The body was discovered by an individual driving through the arroyo. . . .  An autopsy performed by the New Mexico Office of the Medical Investigator revealed that FRIDAY had been shot at close range in the chin and chest with a shotgun.

4.      A group of individuals, including FRIDAY and an associate . . . met at Sonic restaurant in Espanola, New Mexico around 9:30pm on Friday, April 10, 2009, and began to drink alcohol and socialize.  After hanging out for a while, a vehicle with three male occupants pulled into the parking space next to them and joined in the drinking and socializing.

5.      . . . ASSOCIATE observed the three males had a long "rifle type" gun in their car located along the outside of the driver's seat between the car door and the driver's seat. . . . [T]he car containing the long rifle was the green Chevrolet Cavalier.

* * * *

9.      At approximately 12:35am on Saturday, April 11, 2009, the green Chevrolet Cavalier returned to the Big Rock Casino parking lot. . . . The five males [in the car], who had previously come to the casino, including FRIDAY and ASSOCIATE, are seen in the vehicle on the video surveillance.  The security officers recorded a New Mexico license plate of 029NJK and documented the contact.

10.     According to ASSOCIATE, the group of five males cruised around for a while and then proceeded to the San Ildefonso Pueblo.  ASSOCIATE requested to be dropped off at a friend's house located in El Rancho, New Mexico, which is located within the boundaries of the San Ildefonso Pueblo.  ASSOCIATE was extremely intoxicated at this point and does not know what time he was dropped off.

11.     The other four males, including FRIDAY, dropped ASSOCIATE off and

proceeded to leave his friend's house. . . .  ASSOCIATE did not see FRIDAY alive again.

12.     The deceased body of Friday was discovered approximately two miles from the friend's house where ASSOCIATE had been dropped off. . . .  The area from the friend's house to the location where FRIDAY's body was discovered is located within the boundaries of the San Ildelfonso Pueblo.

13.     The green 1999 Chevrolet Cavalier bearing New Mexico license plate 029NJK . . . is registered to Angela A. Tapia-Talache . . . .  Also residing at the above listed address is CARL ROMERO . . . .  ROMERO lists this address on his New Mexico Driver's License.

* * * *

15.     On April 14, 2009, a photographic lineup containing photographs of males, all about the same approximate age and physical appearance was shown to ASSOCIATE.  ASSOCIATE immediately selected the person in the photographic lineup, known as CARL ROMERO, . . . as being the driver of the vehicle the night of Friday, April 10, 2009.  ASSOCIATE was 100% sure that ROMERO was the driver.

16.     According to an Incident Report from the Ohkay Owingeh Tribal Police Department, ROMERO was arrested on February 20, 2009 . . . .  The reporting officer found a loaded .410 shotgun in the back seat of the vehicle.  When the officer asked ROMERO why he had a loaded gun in the car he stated that "some guys were picking on his friends, so he went for the gun for protection and was going to shoot them if they came back."  The shotgun was seized and later released to his mother.

* * * *

20.     Based on the above, the affiant believes probable cause exists that there may be evidence of a crime . . . in a vehicle known as a 1999 Green Chevrolet Cavalier, New Mexico License Plate 029NJK . . . .

Scholl Aff. ¶¶ 3-20, at 1-7.

34.     It became clear during the hearing that the ASSOCIATE referenced in Scholl's affidavit was Madrid.  See Tr. at 57:16-24 (Ortega).

35.     The affidavit sought to search the vehicle in which Romero, Friday, Madrid, Willow, and Sanchez traveled on April 10-11, 2009.  See Scholl's Aff. ¶¶ 2, 7-10, at 1-4; Tr. at 54:5-19

(Scholl).

36.     On April 16, 2009, the Honorable Richard L. Puglisi, Chief United States Magistrate Judge for the District of New Mexico, issued the Search and Seizure Warrant that Scholl requested. See Government Exhibit 3 ("Search Warrant").

37.     FBI and Bureau of Indian Affairs ("BIA") agents went to 345 Popay Avenue -- the address where Romero was ultimately located -- to execute the search warrant on the Chevrolet Cavalier.  See Tr. at 39:6-9 (Ortega, Scholl); id. at 149:14-150:5 (Ortega, Scholl); id. at 170:25-171:9 (Bustamante, Scholl); id. at 95:25-96:24 (Buie); id. at 107:13-15 (Buie); id. at 176:7-179:24 (Fischer).

38.     The group of agents participating in the execution of the search warrant included: Scholl, FBI Special Agents Mark Buie, Richard Grout, and Nancy Duncan, and BIA Special Agent Carleen Fischer.  See Tr. at 68:13-69:5 (Ortega, O. Martinez); id. at 93:5-12 (Bustamante, Buie); id. at 143:11-21 (Ortega, Scholl); id. at 176:7-21 (Fischer).

39.     When the FBI agents communicated with Fischer about what was going to occur in the execution of the warrant, they indicated to her that they were going to retrieve the vehicle.  There was no indication that they intended to speak to or gain entry to the property to access Romero.  See Tr. at 185:22-186:10 (Fischer).

40.     The residence in which Romero was located is one of two residences on the property at 345 Popay Avenue, Ohkay Owingeh Pueblo.  See Tr. at 94:6-16, 120:13-17 (Buie); id. at 176:22-177:6 (Fischer).

41.     The Cavalier was parked between the two residences located on the property where the agents executed the search warrant.  See Tr. at 145:1-5 (Scholl).

42.     At the time agents arrived at 345 Popay Avenue to execute the search warrant for the

Cavalier, Orlando Martinez, Romero's step-father, resided at that address.  He had done so for approximately three years.  See Tr. at 67:8-21 (Ortega, O. Martinez).

43.     Romero resides at the house with O. Martinez and has his own bedroom inside.  See Tr. at 72:16-23 (Ortega, O. Martinez).

44.     O. Martinez owns the house and had access to the entire house at the time of the search.  See   Tr. at 72:11-23 (Ortega, O. Martinez).

45.     Although O. Martinez owns the house and has access to the entire house, he generally does not enter Romero's private room.  See Tr. at 72:16-23 (Ortega, O. Martinez).

46.     The back part of the house, where Romero resided, was "kind of a private room for [Romero]," which he sometimes locks; Martinez did not generally enter that back bedroom.  Tr. at 72:11-23 (Ortega, O. Martinez); id. at 84:11-16 (Bustamante, O. Martinez).

47.     When Romero would leave home, he would sometimes lock the door on his room; when he locked the door, other family members no longer had access to the room.  See Tr. at 84:5-16 (Bustamante, O. Martinez).

48.     When the agents executing the search warrant knocked on the door of the residence at the rear of the property at 345 Popay Avenue, O. Martinez answered.  See Tr. at 67:22-68:25 (Ortega, O. Martinez); id. at 95:25-96:13 (Ortega, Buie); id. at 115:14-15 (Bustamante, Buie); id. at 118:10-22 (Bustamante, Buie); id. at 164:14-18 (Bustamante, Scholl).

49.     It is regular practice for law-enforcement officers to be armed and wear body armor during their shifts.  See Tr. at 95:4-5; 116:8-12 (Buie).

50.     The agents were wearing full body armor when O. Martinez answered the door.  See Tr. at 95:2-19 (Ortega, Buie).

51.     Three Chevy Tahoes were parked in close proximity to the residence.  See Tr. at

-10-

76:21-77:5 (Bustamante, O. Martinez).

52.     O. Martinez recognized the agents as FBI and BIA by their badges.  See Tr. at 77:6-8
(Bustamante, O. Martinez).

53.     O. Martinez noticed that all of the agents were armed when he answered the door.
All of the agents had their weapons holstered except Grout, who carried an M4.  The M4 could not
be holstered because it was too large, but it was slung over his shoulder and hung at his side.  See
Tr. at 77:21-79:3 (Bustamante, O. Martinez); id. at 95:4-21 (Ortega, Buie); id. at 114:22-115:10
(Bustamante, Buie); id. at 119:21-120:6 (Bustamante, Buie); id. at 125:20-23 (Bustamante, Buie);
id. at 187:2-17 (Bustamante, Fischer).[3]

54.     The agents were aware that they did not have an arrest warrant for Romero, but, as
a secondary objective for their visit, they were hoping to speak to him if they encountered him while
executing the search warrant.  See Tr. 117:1-118:19 (Buie).

55.     When the agents asked O. Martinez whether Romero was at the residence,
O. Martinez responded that Romero was not at home.  See Tr. at 96:25-97:3 (Ortega, Buie); id. at
121:22-122:7 (Bustamante, Buie).[4]

--------------------------------------------------

[3] The agents' and O. Martinez' testimony conflict whether the agents held their weapons at
the time O. Martinez opened the door.  See Tr. at 78:19-79:3 (Bustamante, O. Martinez)(O. Martinez
describing the weapons as "drawn out to the side [and] . . . out," but not pointed at anyone); id. at
88:13-20 (Bustamante, O. Martinez)(O. Martinez describing the weapons as "off to the side and
pointing downwards," and "drawn down and ready in case they needed to defend themselves"); id.
at 114:22-115:10 (Buie, Ortega)(Buie describing the weapons as "holstered" except for Grout's M4
which was too long to be holstered).  The Court first notes that Fischer's independent testimony
corroborates Buie's testimony.  Moreover, the Court finds the agents more credible on this factual
issue than O. Martinez based on their respective demeanors and some inconsistencies in
O. Martinez' story.  The Court thus credits the agents' testimony on this factual issue, and finds that
their sidearms were holstered and Grout's M4 was slung over his shoulder.

[4] During the hearing on this motion, O. Martinez testified that, in response to the officer's
questions, he told the officers he did not know if Romero was home.  See Tr. at 69:23-70:19

56.     O. Martinez identified himself as Romero's step-father to the agents.  <u>See</u> Tr. at 72:11-15 (O. Martinez, Ortega); <u>id.</u> at 69:19-20 (O. Martinez, Ortega); <u>id.</u> at 70:1-11 (O. Martinez, Ortega)("A:  They asked for Carl Romero.  I said, no, I wasn't -- that I was his stepdad.").

57.     Buie requested permission from O. Martinez to enter the residence.  Although he did not express it to O. Martinez, his purpose was to conduct a "security sweep" to determine if anyone else was inside and thereby to ensure the agents' safety.  <u>See</u> Tr. at 71:17-22 (Ortega, O. Martinez); <u>id.</u> at 80:15-18, 84:21-85:1 (Bustamante, O. Martinez); <u>id.</u> at 97:4-18 (Ortega, Buie); <u>id.</u> at 118:20-119:13 (Bustamante, Buie).

58.     O. Martinez was not told that it is necessary for agents to enter a residence when executing a warrant for the vehicle, nor was he told that it was standard procedure for agents to conduct security sweeps of premises before executing a search warrant, or that the sweep was to ensure the agents' personal safety.  <u>See</u> Tr. at 80:15-18 (Bustamante, O. Martinez); <u>id.</u> at 85:25-86:9 (Ortega, O. Martinez); <u>id.</u> at 97:4-14, 98:3-18 (Ortega, Buie).[5]

59.     O. Martinez felt nervous, surprised, and intimidated by the agents' presence.  <u>See</u> Tr. at 70:24-25 (O. Martinez); <u>id.</u> at 79:13-19 (Bustamante, O. Martinez).

_____

(O. Martinez).  Buie, however, testified that O. Martinez responded that Romero was not at home. <u>See</u> Tr. at 96:25-97:3 (Ortega, Buie); <u>id.</u> at 121:22-122:7 (Bustamante, Buie).  This inconsistency is not particularly relevant to the issues that the Court must decide.  Nevertheless, the Court finds Buie's testimony more credible on this factual issue.  Their respective demeanors while testifying indicated to the Court that Buie was more confident in his recollections than O. Martinez.

[5] The testimony of O. Martinez and Buie conflict concerning whether O. Martinez was advised that the security sweep was for the purpose of the agents' personal safety.  O. Martinez asserts that he was not so advised, and Buie's testimony is to the contrary.  There is no testimony suggesting that O. Martinez asked why the entry was necessary before granting consent.  Both witnesses suggested that O. Martinez was cooperative and freely acquiesced to the agent's request to enter the residence.  In light of the agents' admitted failure to also advise O. Martinez that the purpose for the search was to safely execute the warrant or that it was standard to conduct security sweeps prior to warrant execution, the Court credits O. Martinez' testimony on this factual issue.

60.     O. Martinez' compliance was the result, at least in part, of his ability to see the agents' weapons.  See Tr. at 70:24-25 (O. Martinez); id. at 79:13-19 (Bustamante, O. Martinez).

61.     O. Martinez described his interactions with the agents as "tense," but noted that the agents were neither rude nor insolent towards him.  See Tr. at 75:8-14 (Ortega, O. Martinez).

62.     The agents' actions were not coercive.

63.     O. Martinez agreed to allow the agents inside the residence, and the agents then conducted a "security sweep" of the residence.  Tr. 97:15-18 (Ortega, Buie).

64.     O. Martinez did not give any indication which a reasonable police officer would have thought indicated a lack of voluntary consent.  See Tr at 70:24-73:3 (Ortega, O. Martinez); id. at 78:7-82:3 (Bustamante, O. Martinez); id. at 84:25-85:1 (O. Martinez)("A: They asked if they could enter the house, and I said they could."); id. at 97:4-98:18 (Ortega, Buie)("A. [O. Martinez] was very cordial and cooperative and he didn't raise any objection at all.  He just . . . allowed [the agents to enter] and said 'sure.'").[6]

65.     The "security sweep" consisted of agents walking through the premises to establish that there were no persons hiding therein who could ambush or otherwise endanger the agents while executing the warrant on the vehicle.  See Tr. at 72:3-4 (Ortega, O. Martinez); id. at 78:7-12, 84:21-85:1 (Bustamante, O. Martinez); id. at 97:4-98:6 (Ortega, Buie); id. at 125:7-16 (Bustamante, Buie).

66.     Security sweeps like the one conducted at the Martinez residence are standard safety

_____

[6] O. Martinez indicated at the hearing that he felt "nervous, surprised, and intimidated" by the agents' presence, and that his compliance was a result, at least in part, of his ability to see the agents' weapons.  See Tr. at 70:24-25 (O. Martinez); id. at 79:13-16 (Bustamante, O. Martinez). As the Court notes, O. Martinez did not give any indications which a reasonable police officer would have thought indicated lack of consent.  O. Martinez' internal thoughts and feelings are irrelevant as long as he objectively manifested consent and the agents' actions were, from an objective standpoint, non-coercive.  See United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *6 n.6 (D.N.M. Feb. 19, 2010).

procedures that FBI agents employ when executing search warrants.  See Tr. at 98:7-14 (Ortega, Buie).

67.     The security sweep was not conducted pursuant to a warrant, but was instead based upon O. Martinez's acquiescing to the agents' request to enter the residence.  See Tr. at 119:3-12 (Bustamante, Buie); id. at 71:17-20 (Ortega, O. Martinez).

68.     As part of the security sweep, the agents called out who they were and why they were there, opened doors, and looked in and entered rooms throughout the residence.  See Tr. at 106:24-107:12 (Buie); id. at 119:14-22 (Bustamante, Buie); id. at 135:25-136:11 (Buie).

69.     During the execution of a security sweep, it is a regular practice for agents to open doors to rooms within a building.  See Tr. at 137:4-6 (Ortega, Buie).

70.     The agents did not have a specific conversation with O. Martinez about searching specific bedrooms, nor did O. Martinez limit the scope of the agents' search in any particular way, nor did O. Martinez tell the agents that any kind of arrangement existed which gave Romero exclusive access to any rooms.  See Tr. at 121:22-122:4 (Bustamante, Buie); id. at 124:12-14 (Buie).

71.     Two agents stayed with O. Martinez while the sweep of the house and interview of Romero were taking place.  See Tr. at 73:4-22 (Ortega, O. Martinez).

72.     The agents did not force O. Martinez to remain at his residence, but O. Martinez nevertheless went to work late on April 16th, 2009.  See Tr. at 73:11-22 (Ortega, O. Martinez).

73.     The agents believed that O. Martinez gave consent allowing them to walk through the house without limitations, and believed the consent extended to opening doors and entering the back bedrooms.  See Tr. at 124:11-24 (Bustamante, Buie); id. at 137:7-13 (Ortega, Buie).

74.     Romero's room is at the rear of the property.  See Tr. at 72:3-10 (Ortega, O. Martinez).

-14-

75.     The agents opened Romero's bedroom door.  See Tr. at 98:22-100:4 (Buie); id. at 122:8-123:16; id. at 123:15-124:6 (Bustamante, Buie); id. at 135:25-137:3 (Ortega, Buie).

76.     The agents did not knock on or otherwise request separate permission from O. Martinez to open Romero's bedroom door.  See Tr. at 124:7-14 (Bustamante, Buie).

77.     Romero's bedroom door was not locked, but rather, opened freely when the agents manipulated the door handle.  Buie did not see the lock on the door.   See Tr. at 122:8-123:5 (Bustamante, Buie).

78.     The lock on Romero's door is not clearly visible to the casual observer.  See Tr. at 122:13-123:9 (Bustamante, Buie); id. at 136:15-137:6 (Ortega, Buie).[7]

79.     Romero did not give consent to the agents before they opened his bedroom door.  The agents did not knock or otherwise request permission from him to open the door.  See Tr. at 124:15-24 (Bustamante, Buie).

80.     Romero did not consent to the officers entering his bedroom.  See Tr. at 124:7-24 (Bustamante, Buie).

81.     Romero did not consent to the protective sweep of his room, nor did the agents seek permission from Romero to "sweep" his room.  See Tr. at 124:7-24 (Bustamante, Buie); id. at 172:13-20 (Bustamante, Scholl).

82.     After opening the bedroom door, agents discovered Romero, evidently asleep, in that room.  See Tr. at 98:19-100:4 (Ortega, Buie); id. at 123:15-124:6 (Bustamante, Buie); id. at 137:14-19 (Ortega, Buie).

_____

[7] Neither party sought to introduce a picture of the door or otherwise show the Court the lock that Romero contends is on his bedroom door.  The Court has no reason to doubt that some locking devise exists, but the Court credits Buie's testimony that he did not see it when doing his sweep through the house.  The Court thus concludes that the lock is not clearly visible.

83.     Buie and Grout stood in the threshold to Romero's room.  Buie had his hand on his weapon, making it visible, and Grout's M4 was also visible to Romero.  See Tr. at 124:18-22 (Buie); id. at 125:17-126:1 (Bustamante, Buie).

84.     In Romero's room, the agents saw a shotgun and a red baseball cap.  See Tr. at 101:7-15 (Ortega, Buie); id. at 132:22-133:1 (Bustamante, Buie); id. at 139:16-21 (Ortega, Buie).

85.     The shotgun and red baseball cap were pertinent to the agent's investigation, because they knew from the autopsy and the photographs of Friday that the killer used a small caliber shotgun to kill Friday and Romero had been seen wearing the red baseball cap at the Sports Bar at Big Rock with Friday.  See Tr. at 101:12-102:6 (Ortega, Buie).

86.     At some point, the agents entered Romero's bedroom to turn on the lights.  The officers allowed Romero to get dressed, but briefly patted down the clothes for weapons first.  See Tr. at 128:11-24 (Buie, Bustamante); id. at 138:4-11 (Ortega, Buie).

87.     Agents requested that Romero leave the bedroom and exit the residence so that they could speak to him.  See Tr. at 103:11-104:1 (Ortega, Buie).

88.     Romero complied with the agents' request to go outside without objection or significant delay.  See Tr. at 85:5-7 (Bustamante, O. Martinez); id. at 103:22-104:3 (Ortega, Buie); id. at 129:13-21 (Bustamante, Buie).

89.     The sweep of Romero's house took about five minutes to complete.  See Tr. at 73:23-74:5 (Ortega, O. Martinez); id. at 82:18-21 (Bustamante, O. Martinez); id. at 98:19-99:7 (Ortega, Buie); id. at 100:22-101:4 (Ortega, Buie); id. at 106:24-107:12 (Ortega, Buie); id. at 148:8-11 (Ortega, Scholl); id. at 178:18-179:14 (Ortega, Fischer).

90.     Romero was free to leave the "scene at any time," because he was not in custody, but Romero would not have been permitted to wander the property unescorted.  Tr. at 126:23-24

-16-

(Bustamante, Buie); id. at 129:24-130:5 (Bustamante, Buie).

91.     After Romero exited the front door of the residence, Scholl approached Romero and asked to speak with him.  Scholl told Romero that he was not under arrest.  See Tr. at 72:24-73:3 (Ortega, O. Martinez); id. at 148:12-149:1 (Ortega, Scholl).

92.     Romero could have refused to talk to Scholl.  See Tr. at 129:24-130:1 (Buie).

93.     Romero walked unrestrained to Scholl's vehicle and, in compliance with Scholl's request, sat inside.  See Tr. at 130:8-10 (Bustamante, Buie); id. at 148:22-149:5 (Scholl).

94.     Before getting inside Scholl's vehicle, Grout put away the M4 rifle.  See Tr. at 167:20-168:11 (Bustamante, Scholl).

95.     Romero sat in the front passenger's seat of Scholl's vehicle, while Scholl sat in the driver's seat and Grout sat in the back seat.  See Tr. at 105:21-106:3 (Ortega, Buie); id. at 149:6-13 (Bustamante, Scholl).

96.     While Romero, Scholl, and Grout sat in the vehicle, the front two windows were down.  The back door was open for part of the time they were in the vehicle.  See Tr. at 105:18-106:3 (Ortega, Buie); id. at 149:6-13 (Ortega, Scholl).

97.     Romero was very cordial and spoke very matter-of-factly when talking to Scholl and Grout; none of them ever raised their voices.  See Tr. at 159:2-8 (Ortega, Scholl).

98.     While speaking to Romero in the vehicle, Scholl asked Romero some questions about his activities and whereabouts on the evening of April 10, 2009 and the morning of April 11, 2009.  See Tr. at 149:14-152:19 (Ortega, Scholl).

99.     During this line of questioning, Romero told Scholl that he shot Friday.  Scholl asked Romero to repeat this statement while the agents recorded it.  See Tr. at 152:13-155:11, 155:12-22 (Ortega, Scholl).

100.    Romero told Scholl that the shotgun which he used to kill Friday was in his room. See Tr. at 156:5-9 (Scholl).

101.    One of the agents asked Romero if they could reenter his bedroom to seize the shotgun and clothing, to which Romero agreed. He stated: "[Y]eah, it's evidence." Tr. at 156:10-13 (Ortega, Scholl).

102.    The tow truck did not arrive until approximately thirty minutes after the security sweep. Scholl's conversation with Romero occurred during that interim period. See Tr. at 106:9-17 (Ortega, Buie); id. at 130:16-132:16 (Bustamante, Buie).

103.    Although the precise time at which Scholl began interviewing Romero is unclear, the interview took no more than thirty minutes. See Tr. at 170:16:24 (Scholl)("[W]e got there . . . about 12:55 in the afternoon. The . . . taped portion of the interview shows end interview time of 1:32 p.m."); id. at 180:18-24 (Fischer)(estimating the interview length as 20 to 30 minutes).

104.    After Romero made these statements and gave the agents verbal consent to search his bedroom, Scholl arrested Romero and placed him in Fischer's vehicle. See Tr. at 155:12-156:3 (Ortega, Scholl); id. at 180:5-17 (Ortega, Fischer).

105.    After placing Romero in Fischer's vehicle, Scholl presented and read to Romero FBI D26 -- a standard consent-to-search form -- which indicated that agents wished to search for and seize the shotgun and ammunition in Romero's personal room at 345 Popay Avenue. See Tr. at 156:10-159:10 (Ortega, Scholl).

106.    The consent-to-search form contains: (i) an affirmation that the person granting consent has been advised of his or her right to refuse consent; (ii) an affirmation that permission has been granted voluntarily; (iii) an authorization for agents to take any items which they determine may be related to their investigation, and; (iv) a place for the consenting person to sign and date the

consent form.  See Tr. at 158:11-22 (Ortega, Scholl); Government Exhibit 4.

107.    Romero signed and dated the consent form in Scholl's presence, authorizing agents to search his "personal room at 345 Popay Ave."  Tr. at 107:19-108:3 (Ortega, Buie); id. at 156:10-157:1, 158:23-159:1 (Ortega, Scholl); Government Exhibit 4.

108.    When Romero signed the form, he had a calm and cooperative demeanor, was sober, and understood Scholl's explanation of the consent form.  See Tr. at 159:2-16 (Ortega, Scholl).

109.    Romero consented to the search of his personal room of his own free will, and was not forced or otherwise coerced.  See Tr. at 159:17-19, id. at 158:1-160:5 (Ortega, Scholl).

110.    At no time during Romero's interactions with Scholl and Grout did anyone raise his voice; the interview was cordial and calm.  See Tr. at 159:2-8 (Ortega, Scholl).

111.    Romero verbally gave the agents consent to search his room after his confession but before the agents placed him under arrest.  Romero did not sign the consent-to-search form, however, until after he had been handcuffed and placed in Fischer's vehicle.  See Tr. at 155:4-156:19 (Ortega, Scholl).

112.    So far as the evidence discloses, no agent read Romero his Miranda[8] rights at any time during the events recited in this opinion.

113.    As a result of the consent-to-search form that Romero signed after he was taken out of the residence, agents searched Romero's bedroom.  See Tr. at 107: 16-108:3 (Ortega, Buie); id. at 110:11-17 (Ortega, Buie).

114.    Two male FBI agents re-entered the house approximately forty minutes to one hour after agents escorted Romero out of the residence.  See Tr. at 74:6-75:1 (O. Martinez).

---

[8] Miranda v. Arizona, 384 U.S. 436 (1966).

115.    The agents seized a .410 gauge shotgun, ammunition, and various articles of clothing -- including a red hat -- from Romero's bedroom.  The seized items: (i) were documented; (ii) were transported to the Albuquerque, New Mexico FBI evidence room; (iii) were taken into evidence, and; (iv) currently remain in the FBI evidence room's custody.  See Tr. at 110:18-111:11 (Ortega, Buie); id. at 159:20-160:10 (Ortega, Scholl).

116.    After his arrest and detention in Fischer's vehicle, Leslie Martinez, Romero's mother, arrived on the scene and approached Fischer's vehicle.  See Tr. at 180:5-181:12 (Ortega, Fischer).

117.    L. Martinez asked Fischer whether she could speak to Romero.  See Tr. at 181:5-14 (Ortega, Fischer).

118.    In response to her request, Fischer and Duncan obtained permission from the other agents for L. Martinez to speak with Romero.  See Tr. at 181:13-20 (Ortega, Fischer).

119.    L. Martinez spoke to Romero.  See Tr. at 181:21-22 (Ortega, Fischer).

120.    Fischer overheard conversations between L. Martinez and Romero that took place inside or near Fischer's vehicle.  See Tr. at 181:23-182:12 (Ortega, Fischer).

121.    During one of these conversations, Fischer overheard L. Martinez ask Romero whether he had taken someone's life, to which Romero did not initially respond.  See Tr. at 181:25-182:12 (Ortega, Fischer).

122.    Fischer overheard L. Martinez again ask Romero whether he had taken someone's life.  Romero responded in the affirmative.  L. Martinez then walked away.  See Tr. at 182:13-24 (Ortega, Fischer).

123.    L. Martinez returned, and Fischer overheard her asking Romero whether he was going to say that he was sorry, to which Romero responded: "What's sorry going to do?  Sorry's not going to change anything."  Tr. at 182:20-183:5 (Ortega, Fischer).

124.    Following the exchange between L. Martinez and Romero, L. Martinez again stepped away from the vehicle and approached her mother -- Romero's grandmother -- who had just then arrived at the scene in a white pickup.  Fischer overheard L. Martinez tell her mother that Romero had "killed somebody."  Tr. at 182:20-183:12 (Ortega, Fischer).

125.    Romero's vehicle was seized and taken off of the property.  See Tr. at 183:21-24 (Ortega, Fischer).

126.    Romero's vehicle was searched in Albuquerque the following day, yielding three expended .410 shotgun shell casings, but no materials testing positive for blood.  See Tr. at 160:13-18 (Scholl).

## PROCEDURAL BACKGROUND

A federal Grand Jury indicted Romero with: (i) one count of Assault with a Dangerous Weapon, in violation of 18 U.S.C. §§ 1153 and 113(a)(3); (ii) one count of Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C. §§ 1153 and 113(a)(6); (iii) one count of Use of a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i); (iv) one count of First Degree Murder, in violation of 18 U.S.C. §§ 1153 and 1111; and (v) one count of Use of a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(C)(i).  See Indictment at 1-3, filed May 12, 2009 (Doc. 13).  Romero filed three separate motions to suppress. The first, filed November 9, 2009, challenges the admissibility of Romero's April 16, 2009 statements to government agents and asks the Court for an order suppressing them.  Romero contends that those statements were involuntary and that officers obtained them during a custodial interrogation without first notifying him of his rights under Miranda v. Arizona.  See Statements Motion at 3-5.  The United States responded on December 2, 2009.  See United States' Response to Motion to Suppress Defendant's Statements at 5-10, filed December 2, 2009 (Doc. 39)

("Statements Response").  The United States argues that the Court should not suppress Romero's statements because they were made during a voluntary police-citizen encounter -- or, in the alternative, during a limited-purpose seizure -- and that the statements were voluntarily made.  See Statements Response at 5-10.

Romero also filed his second motion on November 9, 2009.  The second motion seeks an order suppressing any and all evidence seized from the Cavalier.  See Affidavit Motion ¶ 1, at 1. It also asks the Court to suppress all other evidence obtained by the police during the investigation of Romero's vehicle on April 16, 2009.  See id. ¶¶ 2-5, at 1-2.  Romero asserts that the affidavit supporting the search warrant that the agents executed on the Cavalier lacked probable cause, rendering the search of the vehicle unconstitutional and all of the other evidence fruit of the poisonous tree.  See Affidavit Motion ¶¶ 15-21, at 5-6.  Specifically, he asserts that the warrant affidavit presented a theory -- that "it is probable that the murder either occurred in the green Chevrolet Cavalier or the victim's body was transported to its discovered location in the vehicle" -- and that the affidavit does not provide probable cause to believe that those precise events took place. Affidavit Motion ¶¶ 15-21, at 5-6.  See Defendant's Memorandum in Support of Motion to Suppress Evidence Due to Lack of Probable Cause in Search Warrant Affidavit at 1-5, filed November 9, 2009 (Doc. 32).  The United States opposes this motion, arguing that the judge who issued the search warrant had substantial basis to find probable cause.  See Response to Motion to Suppress Evidence Due to Lack of Probable Cause in Search Warrant Affidavit at 8-10, filed December 7, 2009 (Doc. 40)("Affidavit Response").  The United States further argues that, if the Court finds that there was a constitutional violation, the evidence seized should be admissible under

the independent-source doctrine.  See id. at 10-14.[9]  In his reply, Romero reiterates much of his prior argument, and stresses that the United States cannot reach outside its warrant affidavit for facts that further support a finding of probable cause.  See Defendant's Reply to Government's Response to Defendant's Motion to Suppress Evidence Due to Lack of Probable Cause in Search Warrant Affidavit at 3-4, filed January 11, 2010 (Doc. 46).

Romero's third motion, also filed on November 9, 2009, requests suppression of evidence acquired as a result of allegedly unconstitutional entries into his personal bedroom.  See Bedroom Motion ¶¶ 1-5, at 1-2.  Romero contends that government agents lacked proper consent to search his personal bedroom, and that their initial entry violated the Fourth and Fifth Amendments.  See Bedroom Motion at 4.  Romero further asks the Court to suppress any fruit of the poisoned search, including evidence uncovered in all subsequent searches and any statements made by Romero in response to agents' questioning.  See Bedroom Motion at 4.  In response, the United States relies on the protective-sweep concept enunciated in Maryland v. Buie, 494 U.S. 325 (1990), arguing that the agents had reasonable suspicion that criminal activity was afoot and thus had authority to conduct a protective sweep of the house at which they found the Cavalier.  See Response to Motion to Suppress Evidence Due to Unconstitutional Entries to Bedroom, filed December 7, 2009 (Doc. 41)("Bedroom Response").  The United States then asserts that Romero consented to the agents' entry into his bedroom, and that such consent was freely and voluntarily given.  See Bedroom Response at 7-9 (citing Schneckloth v. Bustamonte, 412 U.S. 218 (1973), and United States v. Peña, 143 F.3d 1363 (10th Cir. 1998)).  The United States supplemented its response on February 24,

_____

[9] The United States also cites to Wong Sun v. United States, 371 U.S. 471 (1963), and Brown v. Illinois, 422 U.S. 590 (1975), suggesting it might rely on attenuation of the taint, but its brief contains no substantial analysis of the attenuation doctrine.  See Affidavit Response at 10-14.

2010, to argue that, if the Court found a constitutional violation, the Court should still deny Romero's motion to suppress under the inevitable-discovery doctrine. <u>See</u> Supplemental Response to Motion to Suppress Evidence Due to Unconstitutional Entries into Bedroom, filed February 24, 2010 (Doc. 53)("Supp. Bedroom Response"). It asserts that, based on what the agents had discovered in their investigation, and what they observed in Romero's bedroom, they would have acquired a search warrant and used it to search Romero's bedroom, thus finding the same evidence. <u>See</u> Supp. Bedroom Response at 5-7.[10]

During the hearing, four witness testified for the United States: (i) Scholl, who sought the search warrant and interviewed Romero following his discovery at the residence; (ii) O. Martinez, Romero's step-father and the individual who permitted the agents to enter the residence; (iii) Buie, who performed the security sweep of O. Martinez' residence; and (iv) Fischer, who participated in the execution of the search warrant, but not in the security sweep of O. Martinez' residence. Mr. Bustamante reiterated his argument that Scholl's Affidavit was "at best vague" and does not specifically allege why any evidence of a crime could be found in the Cavalier. Tr. at 63:4-11, 11:18-24, 12:8-12 (Bustamante). Mr. Bustamante contended that O. Martinez' testimony was unclear whether he gave the agents consent to search his residence at 345 Popay Avenue and further that O. Martinez' testimony shows that he did not have authority to consent to a search of Romero's bedroom. <u>See id.</u> at 209:8-12 (Bustamante); <u>id.</u> at 212:4-12 (Bustamante). Mr. Bustamante further argued that, upon opening the door to Romero's bedroom and finding him sleeping therein, the

---

[10] In his reply brief, Romero points out that the United States failed to address several of his arguments, such as O. Martinez' lack of apparent or actual authority to consent to the search and the inapplicability of the good-faith exception to the exclusionary rule. <u>See</u> Defendant's Reply to Government's Response to Defendant's Motion to Suppress Evidence Due to Unconstitutional Consensual Entries to Personal Bedroom at 2-7, filed January 11, 2010 (Doc. 47).

agents should have requested permission to enter the bedroom, because finding someone asleep in a bedroom should lead an officer to believe that individual has control over the room.  See id. at 209:22-210:89 (Bustamante).  The other arguments made by the attorneys did not substantially differ from the arguments set forth in their briefs.

### RELEVANT LAW REGARDING FOURTH-AMENDMENT SEARCHES

The Fourth Amendment to the United States Constitution "protects '[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures.'"  United States v. Thompson, 524 F.3d 1126, 1132 (10th Cir. 2008)(quoting U.S. Const. amend. IV).  It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "The security of one's privacy against arbitrary intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a free society."  Wolf v. Colorado, 338 U.S. 25, 27 (1949), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643 (1961).

"[T]he Fourth Amendment protects people, not places," and the Supreme Court of the United States has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a "constitutionally protected area."  Katz v. United States, 389 U.S. 347, 351 (1967).  The proper inquiry is whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable.  See id. ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.  But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."); id. at 361 (Harlan, J., concurring)("My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a

person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'").

There is no doubt, however, that a citizen has a reasonable expectation of privacy, and a particularly strong one, in his own home.   The "chief evil" from which the Fourth Amendment protects citizens is unwanted police entry into the home, and the "principal protection" is "the Fourth Amendment's warrant requirement."  United States v. Thompson, 524 F.3d at 1132.  See Kyllo v. United States, 533 U.S. 27, 31 (2001)("'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'")(quoting Silverman v. United States, 365 U.S. 505, 511 (1961)); Payton v. New York, 445 U.S. 573, 586 (1980)("[S]earches and seizures inside a home without a warrant are presumptively unreasonable.").  There is also a recognized, albeit lesser, expectation of privacy associated with a motor vehicle.  See United States v. Mercado, 307 F.3d 1226, 1228 (10th Cir. 2002)(citing California v. Carney, 471 U.S. 386, 390-93 (1985), and Carroll v. United States, 267 U.S. 132, 153 (1925)).

### 1.    Search Warrants Require Probable Cause.

The Supreme Court requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant.  See Illinois v. Gates, 462 U.S. 213, 239 (1983).  A magistrate judge must consider the totality of the circumstances described in the warrant affidavit to determine probable cause, which exists when there is "a 'fair probability' that contraband or other evidence will be found in a particular place."  United States v. Biglow, 562 F.3d 1272, 1280-81 (10th Cir. 2009)(quoting Illinois v. Gates, 462 U.S. at 238). A magistrate judge's decision to issue a search warrant may not be solely a ratification of the law-enforcement officials' conclusion that a suspect has committed a crime; rather, affidavits supporting

a search-warrant request must provide the magistrate judge with a substantial basis on which to issue a warrant. See United States v. Bigelow, 562 F.3d at 1281; United States v. Prince, 593 F.3d 1178, 1186 (10th Cir. 2010)("An affidavit submitted in support of a search warrant must provide the magistrate with a substantial basis for determining the existence of probable cause.")(internal quotation marks omitted). In other words, the magistrate judge must perform his or her own unbiased and independent review of the facts presented. See United States v. Leon, 468 U.S. 897, 914 (1984).

To assure that warrants are not based on bare conclusions, the Supreme Court has mandated the courts to "conscientiously review the sufficiency of affidavits on which warrants are issued." Illinois v. Gates, 462 U.S. at 239. See United States v. Biglow, 562 F.3d at 1281. A magistrate judge's finding of probable cause is nevertheless given great deference, with the court's role in reviewing the probable-cause finding limited to the sufficiency of the warrant affidavit; the Supreme Court prohibits after-the-fact *de novo* scrutiny of the probable-cause determination. See United States v. Biglow, 562 F.3d at 1281 (quoting Illinois v. Gates, 462 U.S. at 238-40, and Massachusetts v. Upton, 466 U.S. 727, 733 (1984)).

### 2.    **Warrantless Searches: Limited Fourth Amendment Exceptions.**

Not all searches require a warrant. The Supreme Court has instructed that, when assessing the reasonableness of a warrantless search, a court must begin "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'" Arizona v. Gant, 129 S. Ct. 1710, 1716 (2009)(citing Katz v. United States, 389 U.S. at 357). See Payton v. New York, 445 U.S. at 586. As the United States Court of Appeals for the Tenth Circuit stated in United States v. Cos, 498 F.3d 1115 (10th Cir. 2007): "A warrantless

search of a suspect's home is per se unreasonable under the Fourth Amendment unless the government can show that it falls within 'one of a carefully defined set of exceptions.'"  498 F.3d 1115, 1123 (quoting Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971)).  See United States v. Thompson, 524 F.3d at 1132.

### a.    Consensual Searches.

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d at 1366 (quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,' and (2) the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366.  The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the threatening presence of several officers; (ii) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, or, conversely, the officer's pleasant manner and tone of voice; (iii) the prolonged retention of a person's personal effects such as identification, or, conversely, the prompt return of the defendant's identification and papers; (iv) the absence of other members of the public, or, conversely, whether the stop occurs in a public location such as the shoulder of an interstate highway, in public view; (v) the officer's failure

to advise the defendant that [he or] she is free to leave; . . . (vi) the display of a weapon[;] and (vii) physical touching by the officer.

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(quotations, alterations, and citations omitted).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010); United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 2006); United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest that coercive law-enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.  Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm [] is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

-29-

### b.    Third-Party Consent.

A third-party's consent can sometimes justify police entry and search of a suspect's property. The Tenth Circuit has ruled that, when a third party who possesses either actual or apparent authority to consent to a search grants law-enforcement officers such consent, the search is lawful despite the lack of a search warrant. See United States v. Cos, 498 F.3d at 1124; United States v. Kimoana, 383 F.3d 1215, 1221 (10th Cir. 2004). Like consent originating from the defendant or suspect, third-party consent must be freely and voluntarily given, as determined from the totality of circumstances. See United States v. Sanchez, 608 F.3d at 689. Additionally, for the consent to be valid, a consenting third-party "must have had actual or apparent authority to do so." Id. (quoting United States v. Thompson, 524 F.3d at 1132)(internal alterations omitted). "It is the government's burden to establish by a preponderance of the evidence that the consenter had [authority to consent to the search of a suspect's bedroom]." United States v. Rith, 164 F.3d 1323, 1329 (10th Cir. 1999) (quoting United States v. McAlpine, 919 F.2d 1461, 1463 (10th Cir. 1990)). See United States v. Cos, 498 F.3d at 1124.

### (i)    Actual third-party authority.

The Tenth Circuit has held that "a third party has [actual] authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." United States v. Rith, 164 F.3d at 1329. See United States v. Matlock, 415 U.S. 164, 172 n.7 (1974); United States v. Cos, 498 F.3d at 1125; United States v. Dozal, 173 F.3d 787, 792 (10th Cir. 1999). Third-party consent cases are based on the relationship between a consenter and the property searched. See United States v. McAlpine, 919 F.2d 1461, 1464 (10th Cir. 1990). "Mutual use of property by virtue of joint access is a fact-intensive inquiry," and where a court finds that a third party residing full-time on the premises enters "the premises or

room at will, without the consent of the subject of the search," joint access exists with respect to that third-party.  United States v. Rith, 164 F.3d at 1329-30.  "[C]ontrol for most purposes of property," on the other hand, "is a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party."  Id. at 1330.  The government bears the burden of establishing that one who consented to the search of a property had actual authority to do so.  See Illinois v. Rodriguez, 497 U.S. 177, 181 (1990); United States v. Rith, 164 F.3d at 1328.[11]

The relationship between a third-party and the defendant objecting to a search may "bear on the nexus between the consenter and the property."  United States v. McAlpine, 919 F.2d at 1464. In the Tenth Circuit, certain relationships between the third-party and a defendant give rise to a presumption that the third-party has control for most purposes.  See United States v. Rith, 164 F.3d at 1330.  If the relationship between the defendant and the third party "creates [] a presumption of control [for most purposes] and is unrebutted, the third party has authority to consent to a search of the property."  Id.  The Tenth Circuit has ruled that husband-wife and parent-child relationships support the presumption of control for most purposes, while landlord-tenant relationships tend to rebut it.  See id. at 1330-31.  In United States v. Rith, the Tenth Circuit recognized that parent-child relationships give rise to such a presumption, even where the "child" is legally an adult.  Id. at 1327, 1330.  Thus, if an adult defendant's parent, with whom the defendant lives, gives officers consent to search the premises, the officers are authorized to search the adult defendant's room unless there

_____

[11] Some earlier decisions use the term "common" authority to refer to what is now called "actual" authority.  Compare Illinois v. Rodriguez, 497 U.S. at 177, with United States v. Rith, 164 F.3d at 1330.

exist facts to rebut the presumption that the parent has the power to grant such authority.[12]

Even where a relationship gives rise to a presumption of control over the property, the presumption can be "rebutted by facts showing an agreement or understanding between the defendant and the third party that the latter must have permission to enter the defendant's room." United States v. Rith, 164 F.3d at 1331.  Factors which may rebut the presumption of control for most purposes include: (i) whether the defendant paid rent to the third party; (ii) a lock on the bedroom door; and (iii) an explicit or implicit agreement that the third party never enter a particular area.  See id. (citing Stoner v. California, 376 U.S. 483, 489-90 (1964); United States v. Morning, 64 F.3d 531, 536 (9th Cir. 1995); United States v. Kinney, 953 F.2d 863, 866 (4th Cir. 1992); and United States v. DiPrima, 472 F.2d 550, 551 (1st Cir. 1973)).

### (ii)    Apparent third-party authority.

If a third party lacks actual authority to grant consent to the search of property or premises occupied by a defendant, authority may nevertheless exist under the doctrine of apparent authority. A third-party's "[a]pparent authority arises from the reasonable, albeit erroneous, belief that the third party has the authority to provide valid consent."  United States  v. Sanchez, 608 F.3d at 689.  See United States v. Thompson, 524 F.3d at 1133.  "The apparent authority inquiry is an objective one:

---

[12] Although the Court has found no relevant authority in the Tenth Circuit, other jurisdictions have recognized a step-father's authority to grant consent to a government agent's entry and search of premises that a stepchild occupies.  See Johnson v. Weaver, 248 Fed. Appx. 694, 697-98 (6th Cir. 2007)(finding the defendant's adult step-son, who lived in a house on the defendant's farm, had apparent authority to grant officers consent to search the defendant's barn, because "there is every reason to suppose that mature family members possess the authority to admit police to look about the family residence, since in common experience family members have the run of the house.")(quoting United States v. Clutter, 914 F.2d 775, 777 (6th Cir. 1990)); United States v. Austin, 81 F.3d 161 (Table), 1996 WL 109500, at *4 (6th Cir. Mar. 11, 1996)(analogizing the relationship between Austin and his mother and stepfather to an informal relationship supporting third-party consent, and distinguishing from an arms-length rental agreement not supporting third-party consent).

we must determine whether 'the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting [individual] had authority over the premises[.]'" United States v. Cos, 498 F.3d at 1128 (quoting Illinois v. Rodriguez, 497 U.S. at 188)(internal quotation marks and citations omitted).  A third party has apparent authority "if the officer has a reasonable belief that the third party has '(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it.'"  United States v. Cos, 498 F.3d at 1128 (quoting United States v. Rith, 164 F.3d at 1329).  "Even where actual authority is lacking . . . a third party has apparent authority to consent to a search when an officer reasonably, even if erroneously, believes the third party possesses authority to consent."  United States v. Andrus, 483 F.3d 711, 716 (10th Cir. 2007)(holding that defendant's father had apparent authority to consent to search of defendant's computer).  "[T]o satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable." United States v. Andrus, 483 F.3d at 716.  The "reasonableness" requirement allows for officers to be mistaken in their assessment of a situation when executing their duties, as long as their mistakes are "those of reasonable men, acting on facts leading sensibly to their conclusions of probability." Id. at 186 (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)).

Officers, however, are not at liberty to rely on apparent authority when "ambiguous facts related to authority" are present.  United States v. Kimoana, 383 F.3d at 1222.  In such circumstances, agents are required to "investigate further before relying on the consent" or the government will have failed to meet its burden to demonstrate apparent authority.  Id. (finding that consent given by third party was valid where third party told officers that motel room was not his, but officers knew that the third party had a key to the room and stayed there with relatives).  For

instance, "a third party's mere presence on the premises to be searched is not sufficient to establish

that a man of reasonable caution would believe that she had 'mutual use of the property by virtue

of joint access, or . . . control for most purposes over it.'"   United States v. Cos, 498 F.3d at 1129

(quoting United States v. Rith, 164 F.3d at 1329).

### 3.   The Plain-View Doctrine.

Evidence or items of contraband discovered in plain view by an officer who is lawfully on

the premises are admissible as evidence regardless whether the officer was executing a valid search

warrant.  See Georgia v. Randolph, 547 U.S. 103, 137 (2006).  Evidence which is recovered during

"a truly cursory inspection -- one that involves merely looking at what is already exposed to view,

without disturbing it -- is not a 'search' for Fourth Amendment purposes, and therefore does not

even require reasonable suspicion."  Arizona v. Hicks, 480 U.S. 321, 328 (1987).  As such, a visual

inspection of what is in plain view does not constitute a search.  See United States v. Nicholson, 144

F.3d 632, 636 (10th Cir. 1998).   An officer, therefore, does not violate a person's Fourth

Amendment rights if the officer is not executing a search warrant, but discovers evidence in plain

view, so long as the officer is lawfully on the premises.

### RELEVANT LAW REGARDING FOURTH-AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided

interactions between police and citizens into three categories: (i) consensual encounters;

(ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).

A consensual encounter occurs when a police officer approaches a person to ask questions under

circumstances where a reasonable person would feel free to refuse to answer and to end the

encounter.   See id.  For example, officers generally may "go to a person's home to interview him,"

United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police

officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 W. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 2.3(b), at 475 (3d ed. 1996). Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing." <u>Oliver v. Woods</u>, 209 F.3d at 1186.

1.      **<u>Investigative Detentions and Reasonable Suspicion</u>.**

An encounter that is not consensual may nevertheless be justified as an investigative detention. An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." <u>Oliver v. Woods</u>, 209 F.3d at 1186 (quoting <u>Adams v. Williams</u>, 407 U.S. 143, 146 (1972)). Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment. First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." <u>Oliver v. Woods</u>, 209 F.3d at 1186 (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417-18 (1981)). Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, <u>Terry v. Ohio</u>, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," <u>United States v. Holt</u>, 264 F.3d 1215, 1229 (10th Cir. 2001)(en banc).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." <u>United States v. Winder</u>, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting <u>United States v. Vercher</u>, 358 F.3d 1257, 1261 (10th Cir. 2004)). This standard is met by information "falling

'considerably short' of a preponderance standard." <u>United States v. Winder</u>, 557 F.3d at 1134.  A recent Tenth Circuit case, <u>United States v. Ceballos</u>, 355 Fed. Appx. 226 (10th Cir. 2009), provides an example of the government's burden.  In <u>United States v. Ceballos</u>, the police officer observed a young girl walking down the street at night.  <u>See</u> 355 Fed. Appx. at 227-28.  A truck pulled up alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead and the girl continued on her walk.  <u>See</u> <u>id.</u>  Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk.  <u>See</u> <u>id.</u> The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused.  <u>See</u> <u>id.</u>  Not investigating any particular crime or suspected-crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled up behind the truck.  <u>Id.</u>  Upon talking to Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, he did not have a driver's license, and he had a gun and other items in his vehicle.  <u>See</u> 355 Fed. Appx. at 227-29.  The Tenth Circuit found that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed, and that the officer's "subjective characterization of his actions is irrelevant."  <u>Id.</u>  The Tenth Circuit explained:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian. Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night.  He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street.  Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride.  She refused, telling him she lived up the street.  Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking.  He parked in a dark location and turned off his lights.

* * * *

> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos. Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home. The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

Id. at 228-30. The Tenth Circuit did not require the officer to identify the particular crime of which he or she had reasonable suspicion, or even to acknowledge that he or she had reasonable suspicion. The Court of Appeals was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian." Id. at 229. The Tenth Circuit demanded only that an officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur.

Vondrak v. City of Las Cruces, 535 F.3d 1198 (10th Cir. 2008), provides another example. In Vondrak v. City of Las Cruces, Vondrak sued the City of Las Cruces under 42 U.S.C. § 1983 for violating his Fourth-Amendment right to be from unreasonable police seizure. See 535 F.3d at 1200. The Las Cruces Police Department had set up a sobriety checkpoint on a street corner in Las Cruces, New Mexico. See id. at 1200-01. At approximately 10:10 p.m., when Vondrak stopped at the checkpoint, an officer asked him if he had consumed any alcohol that evening. See id. at 1201. Vondrak responded that he had consumed one beer approximately three or four hours ago. See id. Another officer approached Vondrak's car and confirmed his answer, asking: "You've admitted to drinking today?" Id. Vondrak responded: "I had one beer three hours ago." Id. Based on those answers, the officer asked Vondrak to exit the vehicle and complete a field sobriety test. See id. at 1201-02. Vondrak failed the field sobriety test and was arrested, but later was shown to have had a blood alcohol concentration of 0.00 at the time of his arrest. See id. at 1202.

As the Tenth Circuit explained, although the brief stop at a properly established sobriety checkpoint does not require individualized suspicion, an officer must have reasonable suspicion to ask an individual to exit his or her vehicle for further testing.  See Vondrak v. City of Las Cruces, 535 F.3d at 1206-07.  The question, therefore, was whether Vondrak's answer to the officers' questions "arguably" created reasonable suspicion for the officers to believe that Vondrak might be intoxicated.  Id. at 1206 ("[T]he sole issue regarding the illegal arrest claim is whether McCants had reasonable suspicion -- or, for qualified immunity purposes, "arguable reasonable suspicion" -- to subject Vondrak to the field sobriety tests.").  The district court found that it did not, but the Tenth Circuit reversed.

> Vondrak's statement that he "had one beer three hours ago" provided McCants with reasonable suspicion to conduct the field sobriety tests, or at the very least provided her with "arguable reasonable suspicion" entitling her to qualified immunity.  See United States v. Slater, 411 F.3d 1003, 1004, 1006 (8th Cir. 2005)("Jones's admission that he had been drinking ['a couple drinks'] earlier that evening gave Officer Perry reasonable suspicion to extend the stop while Jones completed the sobriety tests."); see also Miller v. Harget, 458 F.3d 1251, 1259 (11th Cir. 2006) ("[W]hen Officer Harget smelled alcohol coming from the vehicle Mr. Miller had been driving, he had reasonable suspicion to detain Mr. Miller in order to investigate."); United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999)("The detection of alcohol on Neumann's breath provided Kayras with a reasonable suspicion to further detain Neumann and expand the scope of the investigation."); United States v. Caine, 517 F. Supp. 2d 586, 589 (D. Mass.2007)(finding reasonable suspicion where the defendant's eyes were glassy and bloodshot, and she had admitted drinking earlier that night); Griffin v. City of Clanton, 932 F. Supp. 1359, 1366 (M.D. Ala. 1996)(finding reasonable suspicion where "Officer Bearden smelled alcohol on Griffin's breath" and "Griffin admitted that he had consumed a few drinks").  Admittedly, this is a close case.  McCants' only factual basis for conducting the field sobriety tests was Vondrak's admission to drinking one beer several hours earlier, and the specificity of Vondrak's statement makes it less suspicious than in many of the cases cited above.  Nevertheless, given that Vondrak admitted consuming alcohol, McCants had the reasonable suspicion necessary to perform the field sobriety tests -- or, at the very least, the arguable reasonable suspicion entitling her to qualified immunity.

Vondrak v. City of Las Cruces, 535 F.3d at 1207.  Although the Tenth Circuit would not commit

to the conclusion that Vondrak's statement created reasonable suspicion, see id. ("Vondrak's statement . . . provided . . . reasonable suspicion . . . , or at the very least provided . . . 'arguable reasonable suspicion' entitling her to qualified immunity."), the fact that the statement was, by itself, "arguably" sufficient to create reasonable suspicion shows what the burden on the government is.

### 2.  **Arrests.**

A seizure that exceeds the investigative detention's limited scope or duration may nevertheless be justified as an arrest. An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest. United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994). See Florida v. Royer, 460 U.S. 491, 499 (1983).  Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause.

### RELEVANT FIFTH AMENDMENT LAW

The self-incrimination clause of the Fifth Amendment states: "No person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  Statements made by a defendant during a custodial interrogation by a law-enforcement officer are generally not admissible as evidence against that defendant if the declarant has not received the warnings that Miranda v. Arizona requires.  See Dickerson v. United States, 530 U.S. 428, 444 (2000); United States v. Chee, 514 F.3d 1106, 1112 (10th Cir. 2008).  The requirements of Miranda v. Arizona, however, are limited.  "Police officers need not administer Miranda warnings to everyone they question." United States v. Jones, 523 F.3d 1235, 1239 (10th Cir. 2008).  Rather, "Miranda applies only to 'custodial interrogation[s].'" United States v. Jones, 523 F.3d at 1239 (quoting Miranda v.

-39-

Arizona, 384 U.S. at 444).

In other words, "Miranda rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" United States v. Chee, 514 F.3d at 112 (quoting United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)). Any questioning by law-enforcement officers "reasonably likely to elicit an incriminating response" constitutes an interrogation. Rhode Island v. Innis, 446 U.S. 291, 301 (1980). See United States v. Medrano, 356 Fed. Appx. 102, 107 (10th Cir. 2009); United States v. Parra, 2 F.3d 1058, 1068 (10th Cir. 1993). The "in custody" requirement is satisfied only when a suspect's "freedom of action is curtailed to the degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984)(quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). See United States v. Jones, 523 F.3d at 1239. Further, "'the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. Rogers, 391 F.3d 1165, 1171 (10th Cir. 2004)(quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). In determining the custodial nature of an interrogation, the Court must "determine whether 'a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest.'" United States v. Chee, 514 F.3d at 1112 (quoting Berkemer v. McCarty, 468 U.S. at 442)(alterations omitted).

The Tenth Circuit, in recognizing that an examination of the totality of the circumstances is fact intensive, has instructed district courts to consider a number of non-exhaustive factors in determining whether a custodial interrogation took place. See United States v. Jones, 523 F.3d at 1240. Those factors include: (i) the degree to which the suspect is informed that he or she may end the interview at will or is not required to answer questions; (ii) whether the nature of the interview

is likely to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory questioning; and (iii) whether the police dominate the encounter with the suspect.   See id. (quoting United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993)).  Police domination of the encounter is indicated by: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple officers; (iv) displaying of weapons by an officer; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an officer's request is compulsory.  See United States v. Jones, 523 F.3d at 1240.  The Tenth Circuit was deliberate in emphasizing, however, that courts must consider the circumstances surrounding the police-citizen encounter as a whole, rather than exclusively relying on some enumerated factors while ignoring others.  See id.

### RELEVANT LAW OF THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the police will generally be prohibited from using that evidence in a criminal prosecution of that person. See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process.")(internal citations omitted); United States v. Calandra, 414 U.S. 338, 347 (1974) ("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation and a causal nexus between the violation and the evidence sought to be excluded.  See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once the

defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the government to prove that an exception to the exclusionary rule applies.  See id.

### 1.      Judicial Rationale of the Exclusionary Rule.

The exclusionary rule introduces into the criminal justice system a tension between the court's need to find the truth by using all relevant evidence and the societal desire to deter illegal police conduct by excluding otherwise probative evidence.  An illegal search often results in reliable, probative, and otherwise-unobtainable evidence of an individual's guilt.  Sometimes the result of applying the exclusionary rule is that all evidence in a case is suppressed, even though the defendant's guilt is almost certain, because the unconstitutional search taints all of the evidence.  In such circumstances, the individual often cannot be convicted of the crime of which he is clearly guilty.  The Supreme Court has found, however, that limiting the powers of law enforcers and the concomitant decrease in their effectiveness is a price that each citizen must pay for the Fourth Amendment's protections.  As Justice Stevens noted in his concurring and dissenting opinion in United States v. Leon, 468 U.S. 897 (1984): "It is of course true that the exclusionary rule exerts a high price -- the loss of probative evidence of guilt.  But that price is one courts have often been required to pay to serve important social goals."  468 U.S. at 979 (Stevens, J., concurring and dissenting).  See Kolender v. Lawson, 461 U.S. 352, 355 (1983)("The price of [law-enforcement] effectiveness, however, is intrusion on individual interests protected by the Fourth Amendment.").

> [The exclusionary] rule is based upon very strict requirements designed to narrow the occasions upon which officers can make searches and seizures without judicial warrant.  Unquestionably its application will now and then permit a guilty person to escape conviction because of hasty or ill-advised action on the part of enforcement officers.  But the same may be said of the requirements of the Fourth Amendment . . . .  The framers of the Fourth Amendment must have concluded that reasonably strict search and seizure requirements were not too costly a price to pay for protection against the dangers incident to invasion of private premises and papers by officers, some of whom might be overzealous and oppressive.

United States v. Rabinowitz, 339 U.S. 56, 67-68 (1950)(Black, J., dissenting), overruled in part by Chimel v. California, 395 U.S. 752 (1969).  The Constitution of the United States and the case law interpreting it reveal that the government's right to interfere in the lives of its citizens is highly circumscribed.  For the present time, the Supreme Court has determined that the purpose of the exclusionary rule "is to deter -- to compel respect for the constitutional guaranty in the only effectively available way -- by removing the incentive to disregard it."  Elkins v. United States, 364 U.S. 206 (1960).

2.      **Distinction between Finding of a Constitutional Violation and Applying of the Exclusionary Rule.**

"Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct."  United States v. Leon, 468 U.S. at 906 (citing Illinois v. Gates, 462 U.S. 212, 223 (1983))(internal quotes omitted).  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  Herring v. United States, 129 S. Ct. 695, 702 (2009).  Thus, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence," but "when police mistakes are the result of negligence . . . , rather than systemic error or reckless disregard of constitutional requirements," suppression is not automatic, and "any marginal deterrence" from suppression is often insufficient.  Id. at 702, 704.

3.      **Exclusionary Rule Prohibits Indirect Uses of Tainted Evidence.**

If officers acquire evidence in the process of violating one's constitutional rights, they are forbidden from using that evidence in a criminal prosecution against the individual, unless an

-43-

exception to the exclusionary rule applies.  See United States v. Calandra, 414 U.S. at 347 ("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  The exclusionary rule demands exclusion of evidence that was obtained as a but-for result of the illegal search unless the evidence is so far removed from the constitutional violation that the "taint" of the violation no longer clings to it.  Wong Sun v. United States, 371 U.S. 471, 484 (1963)("The exclusionary prohibition extends as well to the indirect as the direct products of such invasions.").

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

Wong Sun v. United States, 371 U.S. at 485 (quoting Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920)).  See United States v. Olvares-Rangel, 458 F.3d 1104, 1109 (10th Cir. 2006).  The exclusionary rule is simply stated, but courts have been hashing out its scope for many years.

### 4.    Relevant Exceptions to the Exclusionary Rule.

The exclusionary rule has exceptions.  If illegally obtained evidence is somehow purged of the taint of the unconstitutional conduct, it can be admitted.  "The Government can establish that a particular item of evidence has been purged of the primary taint by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct."  United States v. Olvares-Rangel, 458 F.3d at 1109.  See United States v. Torres-Castro, 470 F.3d at 999 ("[T]he government may avoid suppression by demonstrating that the evidence would have been inevitably discovered, that it was discovered by independent means, or that it was so attenuated from the

illegality as to dissipate any taint from the Fourth Amendment violation.").

### a. Attenuation of the Taint.

When determining whether evidence constitutes fruit of the poisonous tree subject to the exclusionary rule, a court must determine, based upon the unique facts of each case, "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  United States v. King, 990 F.2d 1552, 1563 (10th Cir. 1993) (quoting Wong Sun v. United States, 371 U.S. at 448).  See United States v. Carson, 793 F.2d 1141, 1156-57 (10th Cir. 1986)("The issue is not whether the officers 'would not have requested consent but for the first illegal search,' but rather whether the officers exploited the fruits of their illegal activity in such a way that Carson's consent to the search was involuntary under the Fourth Amendment.").  In Brown v. Illinois, the Supreme Court listed three factors for courts to consider when analyzing fruits of the poisonous tree and determining whether the causal chain is sufficiently attenuated: (i) the time elapsed between the constitutional violation and the acquisition of evidence; (ii) the presence of intervening facts, and (iii) the purpose and flagrancy of the official misconduct. See 422 U.S. at 603-04.  See also United States v. Torres-Castro, 470 F.3d at 999 ("In considering whether evidence seized is so attenuated from the illegality as to dissipate any taint, we balance the 'temporal proximity of the Fourth Amendment violation,' any 'intervening circumstances,' and the 'purpose and flagrancy of the official misconduct.'")(quoting United States v. King, 990 F.2d at 1563-64).

The Tenth Circuit has stated that "[t]he implication of the Supreme Court's decision in Brown v. Illinois is that in order for incriminating statements to be purged of the taint of an underlying Fourth Amendment violation, [the] defendant's consent must meet the voluntariness

standard of the Fourth Amendment." United States v. Carson, 793 F.2d at 1151.  Furthermore, "[i]f Government officials use the fruits of their illegal conduct to 'cajole' the consent [to search] an unwitting citizen, then the evidence [obtained in that search] is obtained by exploitation of the primary illegality and is not obtained by means sufficiently distinguishable from the illegality to be purged of the primary taint."  Id. at 1157.  At least in the context of the officers' motivation for requesting consent to search, "the inquiry turns on whether the evidence is obtained by means, although influenced by prior illegal police actions, which are different enough from the prior illegality to be 'sufficiently distinguishable.'"  Id. at 1149 (emphasis added).

### b.      The Inevitable-Discovery Doctrine.

Another exception to the exclusionary rule is the inevitable-discovery doctrine.  The doctrine permits courts to admit unconstitutionally obtained evidence "if an independent, lawful police investigation inevitably would have discovered it."  United States v. Owens, 782 F.2d 146, 152 (10th Cir. 1986).  See United States v. Torres-Castro, 470 F.3d at 999. "Inevitable discovery analysis thus requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred."  United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).   The inevitable-discovery doctrine "applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct"; "it is possible for an investigation that begins after the violation to be independent of the illegal investigation."  United States v. Larsen, 127 F.3d 984, 986-87 (10th Cir. 1997).  See United States v. Cunningham, 413 F.3d at 1204 n.1 (stating that there is no conflict between the rules set forth in United States v. Larsen and United States v. Cunningham).  "[A]s long as it can be shown by demonstrated historical

facts that an independent and untainted discovery would inevitably have occurred, the evidence will be admissible." United States v. Griffin, 48 F.3d at 1151 (internal citations and quotations omitted).

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway." 782 F.2d at 152-53. The Tenth Circuit considered whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine. Rejecting the government's position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit found:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine. First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers. In fact, such an intrusion would have been a significant invasion of his privacy. Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable. The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it. Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband. Alternatively, a friend could have returned to claim the closed bag.

United States v. Owens, 782 F.2d at 153. United States v. Owens suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation.

      **c.**     **The Good-Faith Exception.**

Another exception to the exclusionary rule is the investigating officer's "good-faith." In United States v. Leon, the Supreme Court faced the question whether to create an exception to the

exclusionary rule when a police officer obtained evidence through the use of a warrant that he mistakenly thought probable cause supported.  See 468 U.S. at 905.  The Supreme Court noted that excluding evidence which was obtained pursuant to a warrant that the officer reasonably thought to be valid would not deter police misconduct, because the affected officer had taken all steps in his power to comply with the Fourth Amendment.  See 468 U.S. at 918-19.  It further noted that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter is the issuing judge and that such exclusion would not have a significantly deterrent effect on judicial conduct.  See 468 U.S. at 916-17.  The Supreme Court thus concluded that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause, as long as police were acting in good-faith reliance on that warrant.  See 468 U.S. at 922-23.

The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant.  See United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000).

> [T]he suppression of evidence obtained pursuant to a warrant should be ordered only in those unusual cases in which exclusion will further the purposes of the exclusionary rule[.]  Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter.

United States v. Tuter, 240 F.3d at 1298-99.  Furthermore, there is a presumption that, "when an officer relies upon a warrant, the officer is acting in good faith." United States v. McKneely, 6 F.3d 1447, 1454 (10th Cir. 1993).

The Tenth Circuit has outlined four situations in which an officer's reliance upon a warrant would be improper.

First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard for the truth."   Second, the exception does not apply when the "issuing magistrate wholly abandon[s his] judicial role."   Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."   Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.

United States v. Danhauer, 229 F.3d at 1007(quoting United States v. Leon, 468 U.S. at 922-23) (internal citations omitted).  See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008). If any of these situations is present, the good-faith exception should not be applied, and the evidence should be excluded.

### (i)      Warrants based on illegally obtained information.

When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception.  Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed.  If the remaining content of the warrant affidavit establishes probable cause, the search pursuant to that warrant was appropriate, and the evidence need not be excluded:

When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid.

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005).  See United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996)("In our review, we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable cause."); United States v.

Snow, 919 F.2d 1458, 1460 (10th Cir. 1990)("An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid."). The apparent rationale for this rule is that one officer cannot execute a warrant "in good faith" if it contains information that he or a fellow officer obtained illegally. See United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)("Leon's good-faith exception applies only narrowly, and ordinarily only where an officer relies, in an objectively reasonable manner, on a mistake made by someone other than the officer.").

### (ii)    Herring v. United States.

Recently, the Supreme Court decided a case that may have changed the standard for the good-faith exception to the warrant requirement. In Herring v. United States, officers arrested Herring pursuant to an arrest warrant listed in the Dale County warrant database. See 129 S. Ct. at 698. In the search incident to that arrest, officers found drugs and a gun on Herring's person. See id. Herring was then indicted on federal gun and drug-possession charges. See id. at 699. It turned out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had not been updated to reflect that recall. See 129 S. Ct. at 698. Asserting that the evidence found during the search was fruit of an unlawful arrest, Herring sought to suppress it. See id. at 699. The district court denied Herring's motion to suppress, and the United States Court of Appeals for the Eleventh Circuit affirmed. See id.

The Supreme Court also affirmed the district court's denial of Herring's motion to suppress, based primarily on the good-faith exception to the exclusionary rule. The Supreme Court agreed with the Eleventh Circuit that, although the failure of the police to update the warrant database to reflect the fact that Herring's warrant was withdrawn was negligent, it was not reckless or deliberate.

See Herring v. United States, 129 S. Ct. at 700.  The Supreme Court reiterated its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." Herring v. United States, 129 S. Ct. at 701 (citing United States v. Leon, 468 U.S. at 922).  Tracing the history of cases applying and declining to apply the exclusionary rule, the Supreme Court distilled a general principle: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 129 S. Ct. at 702.

The Supreme Court in Herring v. United States then held that, as long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled.  Herring v. United States, 129 S. Ct. at 703-04. Thus, it appears that, if the police make a negligent administrative error which results in a warrant not being withdrawn when it should have been, and evidence is obtained incident to an arrest made in reasonable reliance on that warrant, the good-faith exception to the exclusionary rule will apply.

In United States v. McCane, 573 F.3d 1037 (10th Cir. 2009), the Tenth Circuit described Herring v. United States as extending the exception to "good faith reliance upon the negligent mistake of a fellow law enforcement employee." 573 F.3d at 1043. "In Herring[ v. United States], the [Supreme] Court applied the good-faith exception where, in making an arrest, police relied upon a record-keeping error in the police computer database indicating there was an active warrant for the arrestee." 573 F.3d at 1043  "[T]he good-faith inquiry 'is confined to the objectively

ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances." Id. at 1044 (quoting Herring v. United States, 129 S. Ct. at 703). As the Supreme Court stated: "[E]vidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional." United States v. Herring, 129 S. Ct. at 701. See United States v. McCane, 573 F.3d at 1044 ; United States v. Harrison, 566 F.3d 1254, 1256 (10th Cir. 2009)("An officer who knows or should have known that a search warrant was invalid may not rely upon the good faith exception to immunize his subsequent seizure of evidence."); United States v. Otero, 563 F.3d 1127, 1133 (10th Cir. 2009).

## ANALYSIS

Romero's three motions present a series of issues regarding the Fourth and Fifth Amendment. Rather than taking those issues in the order of Romero's motions, however, the Court will address them chronologically. The Court will first analyze whether the warrant that the agents used to search Romero's vehicle was valid. It will then determine whether the agents' initial entry into O. Martinez' house violated Romero's Fourth Amendment rights and then whether the agents' entry into Romero's bedroom violated his Fourth Amendment rights. After the Court makes that determination, the Court will determine whether the agents' extraction of Romero from his bedroom, and their subsequent conversation with him in the police vehicle, violated Romero's constitutional rights under the Fourth or Fifth Amendment. Finally, the Court will determine whether the agents' re-entry into Romero's home violated Romero's Fourth-Amendment rights.

## I.   PROBABLE CAUSE SUPPORTED THE AFFIDAVIT FOR THE SEARCH WARRANT OF ROMERO'S VEHICLE.

Romero asserts that the affidavit upon which the magistrate judge based his probable-cause

determination was insufficient to establish probable cause.  Specifically, he asserts that it lacked sufficient facts to support a finding that there was a fair probability that either the murder occurred in or the victim's body was transported to its discovery location in, Romero's vehicle.  See Affidavit Motion ¶¶ 15-21, at 5-6.  The United States responds that the proposition that either Friday's murder occurred in, or his body was transported to its discovery location in, Romero's vehicle was but one of Scholl's opinions of what may have occurred and where evidence may be found, and was not the sole focus of the Application for a Search Warrant or Scholl's supporting affidavit.  See Affidavit Response at 7, 9.  The United States points out that the Application for Search Warrant states that the vehicle was believed to conceal evidence of a crime, contraband, fruits of crime, or other illegally possessed items or property designed, intended for use, or used in committing a crime, and that the Affidavit for Search Warrant provided a sufficient factual basis to seize and search Romero's vehicle to locate such evidence.  See Affidavit Response at 7.  The Court believes the affidavit supplies probable cause to believe evidence of the alleged crime would be found within the car, and that, even if it did not, the good-faith exception to the exclusionary rule would apply.

The Court finds that Scholl's affidavit established probable cause.  "Probable cause exists when 'the facts presented in the affidavit would warrant a man of reasonable caution to believe that evidence of a crime will be found at the place to be searched.'"  United States v. Harris, 369 F.3d 1157, 1165 (10th Cir. 2004)(quoting United States v. Hernandez-Rodriguez, 352 F.3d 1325, 1330 (10th Cir. 2003)).  That standard is met here.  Scholl submitted a twenty-paragraph affidavit is support of the application for a search warrant.  The affidavit states that Friday's body was found dead in an arroyo in the San Ildelfonso Pueblo.  It states that Friday was apparently shot in the chest and chin with a shotgun.  It states that an eye-witness saw Friday and Romero together late at night

-- and into the wee hours of the morning -- before Friday's body was found the next day.[13]  It also says that the witness saw both Romero and Friday together inside a green 1999 Chevrolet Cavalier and saw a weapon matching the general description of the murder weapon inside the vehicle. Finally, it states that, the last time the eye-witness saw Friday alive, Friday was inside the Cavalier and on the San Ildelfonso Pueblo, where his body was ultimately found.  There is thus substantial reason to believe -- two gunshot wounds -- that Friday was murdered, that it occurred relatively near to his ride in the Cavalier, and therefore that evidence of the murder might be found therein.  The affidavit also ties a gun that might be the murder weapon to the Cavalier, and the Cavalier to the victim.  The Court concludes that, based on the content of Scholl's affidavit, there existed "a fair probability that contraband or evidence of a crime" could be found in Romero's vehicle.  Illinois v. Gates, 462 U.S. at 238.

Romero takes a creative tact to attacking the search warrant in this case, but one that the Court ultimately rejects.  He argues very specifically that the affidavit "lacked sufficient factual basis for a fair probability that 'it is probable that the murder either occurred in the green Chevrolet Cavalier or the victim's body was transported to its discovery location in the vehicle.'"  Affidavit Motion ¶ 16, at 5.  He argues that, because the evidence does not support the theory that Scholl proposes in his affidavit, the affidavit as a whole fails to establish probable cause.  Romero has failed, however, to provide any authority for the proposition that a magistrate judge must limit his or her probable-cause analysis to whether there exists probable cause to support the agent's theory why evidence might be found in a particular place.  Such a proposition would appear at odds with

---

[13] The Court has considered Madrid's "veracity and basis of knowledge," United States v. Danhauer, 229 F.3d at 1006, and notes that he is an apparent eye-witness to most of the facts set forth in Scholl's affidavit.  The Court thus gives Madrid's information significant weight.

the magistrate judge's role of reviewing the facts, and making a neutral, detached, and independent determination whether there exists "a fair probability that contraband or evidence of a crime" could be found in the place to be searched.  Illinois v. Gates, 462 U.S. at 238.  In this case, because Judge Puglisi believed that Scholl's affidavit contained enough facts that "a man of reasonable caution" could "believe that evidence of a crime [would] be found at the place to be searched," United States v. Harris, 369 F.3d at 1165, he issued the warrant.  The Court finds no flaw in Judge Puglisi's decision; he had "a substantial basis for concluding that probable cause existed."  Illinois v. Gates, 462 U.S. 213, 238-39.

Moreover, even if the affidavit was not sufficient to create probable cause, the Court would apply the good-faith exception.  In cases where law-enforcement officers obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant.  See United States v. Leon, 468 U.S. at 918-19; United States v. Tuter, 240 F.3d at 1300; United States v. Danhauer, 229 F.3d at 1007.  Scholl testified that he believed the warrant was valid, and the record indicates that he and the other agents acted on this good-faith belief when executing the warrant.  Such reliance is unreasonable only if there does not exist even "a minimal nexus between the place to be searched and the suspected criminal activity[.]"  United States v. Gonzales, 399 F.3d 1225, 1231 (10th Cir. 2005). See United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997).  "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter."  United States v. Tuter, 240 F.3d at 1298-99.  The Court finds that the agents in this case were acting in objective good faith, and obtained a warrant from a detached and neutral magistrate.  Insofar as they executed the warrant to search Romero's Cavalier, they were acting within the warrant's scope.  The agents'

-55-

conduct was not "deliberate, reckless, []grossly [negligent], or [evidence of] recurring or systemic negligence" such that exclusion of evidence procured while executing the search warrant would have meaningful deterrent effect.  Herring v. United States, 129 S. Ct. at 702, 704.  There is, in essence, nothing to deter.  The Court thus finds that, if the warrant affidavit were somehow deficient, the good-faith exception to the exclusionary rule applies to the evidence found while executing that warrant.[14]

## II.    O. MARTINEZ CONSENTED TO THE AGENTS' ENTRY AND HAD AUTHORITY TO GRANT CONSENT TO SEARCH ROMERO'S PRIVATE ROOM.

The next time in which Romero asserts that his constitutional rights were violated is when officers entered his private bedroom during a security sweep before they executed the Search and Seizure Warrant on his Cavalier.  See Bedroom Motion ¶¶ 10-13, at 4.  Romero does not directly challenge whether O. Martinez' consent to the agents' search was voluntary.  See Defendant's Memorandum in Support of Motion to Suppress Evidence Due to Unconstitutional Consensual Entries to Personal Bedroom at 2-3 ("Orlando Martinez . . . consented for the agents to walk through

_____

[14] The Court notes that, in Romero's reply brief, he cites several cases in which the relevant court finds no probable cause to support an arrest.  See Defendant's Reply to Government's Response to Defendant's Motion to Suppress Evidence Due to Lack of Probable Cause in Search Warrant Affidavit at 5-6 (Doc. 46)(citing Sibron v. New York, 392 U.S. 40 (1968); United States v. Di Re, 332 U.S. 581 (1948); and United States v. Anderson, 981 F.2d 1560 (10th Cir. 1992)).  The standard of probable cause for searches is different than that for seizures.  An officer has probable cause to arrest when "the facts and circumstances are such that a reasonable officer would believe that an offense has been or is being committed," and that the subject of the arrest is the one who committed or is committing it.  United States v. Anderson, 981 F.2d 1560, 1566 (10th Cir. 1992).  Probable cause for a search exists where the circumstances give rise to "a fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  This case involves a search and not an arrest.  Any factual similarity between this case and the cases Romero cites are essentially irrelevant.  In other words, the United States need not show that the agents had probable cause to arrest Romero to justify their warrant-authorized search of Romero's vehicle.  The Court need not determine whether there would exist probable cause to issue an arrest warrant for Romero before his April 16, 2009 confession.

his residence.  Orlando Martinez allegedly gave consent.").  Rather, Romero's primary argument is that O. Martinez did not have authority to allow the agents to enter Romero's private bedroom. See id. at 3-7.  The United States disagrees, raising the "protective sweep" doctrine of Maryland v. Buie, pointing to consent form that Romero signed after his arrest, and asserting in the alternative that the evidence would nevertheless have been inevitably discovered.  The Court finds that O. Martinez had apparent authority to allow the agents to sweep the house and that authority extended to Romero's bedroom.  The Court thus denies this motion.

### A.   MARTINEZ' CONSENT TO SEARCH THE RESIDENCE AT 345 POPAY AVENUE WAS VOLUNTARY.

The agents did not have a search warrant for the residence at 345 Popay Avenue.  The United States must therefore show that O. Martinez' consent to the agents' request to search the residence was voluntary.  For O. Martinez' consent to have been voluntary, the United States must show that: (i) his consent was unequivocal, specific, and intelligently given; and (ii) the officers did not use any implied or express duress or coercion in obtaining his consent.  See United States v. Sanchez, 608 F.3d at 690.  In determining whether consent is freely or voluntarily given, courts in the Tenth Circuit are advised to consult this non-exhaustive list of factors:

> (i) the threatening presence of several officers; (ii) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, or, conversely, the officer's pleasant manner and tone of voice; (iii) the prolonged retention of a person's personal effects such as identification, or, conversely, the prompt return of the defendant's identification and papers; (iv) the absence of other members of the public, or, conversely, whether the stop occurs in a public location such as the shoulder of an interstate highway, in public view; (v) the officer's failure to advise the defendant that [he or] she is free to leave; . . . (vi) the display of a weapon[;] and (vii) physical touching by the officer.

United States v. Sedillo, 2010 WL 965743, at *12 (quotations, alterations, and citations omitted).

See United States v. Fox, 600 F.3d at 1258; United States v. Ledesma, 447 F.3d at 1314; United

States v. Anderson, 114 F.3d at 1064.

The Court finds that O. Martinez' consent was freely and voluntarily given.  O. Martinez opened the door on April 16, 2009 to four government agents wearing bullet-proof vests, weighing in favor of finding O. Martinez' consent involuntary.  See Tr. at 68:22- 69:25 (O. Martinez); id. at 95:25-96:13 (Buie).  On the other hand, although O. Martinez felt the situation was "tense," the record indicates that the agents were professional, and did not use aggressive language or tone of voice to suggest that compliance with their request to enter was compulsory.  See id. at 76:8-79:3 (O. Martinez); id. at 97:4-18 (Buie); id. at 115:22-116:10 (Buie); id. at 118:20-119:13 (Buie).  Both O. Martinez and Buie testified that O. Martinez freely cooperated with the agents' request to search the residence, even though O. Martinez was not told that the search was necessary to ensure the agents' safety while executing their search warrant.  See id. at 85:25-86:9 (O. Martinez); id. at 97:4-14 (Buie); id. at 98:3-18 (Buie).  The agents did not demand or retain O. Martinez' personal effects, which weighs in favor of finding the consent voluntary.  Although the record does not allege that the agents advised O. Martinez that he was be free to leave, neither did the agents attempt to detain O. Martinez or to otherwise keep him from going to work on April 16.  See Tr. at 74:11-22 (Ortega, O. Martinez).  Finally, while the agents were armed, they had their weapons holstered or otherwise stowed at all times during the encounter; they were not brandishing their weapons in a manner that would intimidate O. Martinez.  See id. at 115:22-116:10 (Bustamante, Buie).  The Court thus finds, after analyzing the non-exhaustive factors enumerated as relevant by the Tenth Circuit, that O. Martinez' consent to search his residence was voluntarily, freely, and intelligently given.

Moreover, the Court finds that the agents involved in the search did not use any implied or express duress or coercion in obtaining his consent.  See United States v. Sanchez, 608 F.3d at 690 (holding that the government must: "(1) 'proffer clear and positive testimony that consent was

unequivocal and specific and intelligently given,' and (2) the officers must have used no 'implied

or express duress or coercion.'" to show that an individual's consent to a search was voluntary). The

agents were armed, but the record does not indicate that they used or displayed their weapons in a

way that might intimidate O. Martinez into consenting to a search. See id. Buie testified that the

agents were following normal practice in coming to the residence armed, see Tr. at 116:23-117:12

(Buie, Bustamante), and that the agents, other than Grout, kept their weapons holstered throughout

their encounter with O. Martinez, see id. at 95:25-96:13 (Buie). Grout's weapon was too large to

holster, so it was slung over his shoulder instead. See id. at 114:8-115:3 (Buie, Bustamante).

Having a holstered or slung weapon does not -- without more -- render a law-enforcement officer's

request for entry coercive, or nearly every such request would be coerced; for law-enforcement

officers, firearms are standard equipment. See United States v. Sanchez, 608 F.3d at 690; United

States v. Drayton, 536 U.S. at 205 ("The presence of a holstered firearm thus is unlikely to

contribute to the coerciveness of the encounter absent active brandishing of the weapon[.]"). There

were five agents present, which may have contributed to the coerciveness of the situation, but the

presence of several agents in and of itself does not render a citizen's consent coerced. See United

States v. Thompson, 524 F.3d at 1134 ("[T]he presence of more than one officer increases the

coerciveness of an encounter, but that alone does not render consent per se involuntary.")(internal

quotations omitted); United States v. Miles, 16 Fed. Appx. 845, 850 (10th Cir. 2001)("There is

nothing unusual or inherently coercive about the presence of three uniformed and armed officers.").

Finally, although the agents did not expressly advise O. Martinez that he could refuse, the Supreme

Court has clearly held that agents need not advise an individual of his or her right to refuse to

consent to a search for that individual's consent to be valid. See Schneckloth v. Bustamonte, 412

U.S. at 232. The Court finds that O. Martinez' consent to the agents' search was not coerced or

given under duress.

The record does not show, nor does O. Martinez assert, that the agents conducted themselves in an unprofessional manner.  See Tr. at 77:21-79:3 (O. Martinez); United States v. Peña, 143 F.3d at 1367 (finding that an individual voluntarily consented to a search when law-enforcement officials conducted themselves in a professional manner).  Nor does O. Martinez allege that the agents did not allow him to leave his residence, even though they accompanied him while he was there.  See United States v. Drayton, 536 U.S. at 205 (noting that the mere presence of officers by exits of a factory does not pose a reasonable threat that workers within the factory would be detained there).  In sum, the Court finds that the United States has established that O. Martinez' consent was unequivocal, specific, and intelligently given, without express or implied coercion on the part of the agents.  O. Martinez' consent to search his residence was, therefore, voluntary.

**B.    O. MARTINEZ HAD APPARENT AUTHORITY TO CONSENT TO THE AGENT'S INITIAL SEARCH OF ROMERO'S ROOM.**

The crux of Romero's arguments is that, regardless whether O. Martinez consented to the search of the house in which the agents found Romero, the agents' entry into Romero's private bedroom was unauthorized and a violation of the Fourth Amendment.  He argues that O. Martinez had neither "mutual use of the [bedroom] by virtue of joint access" or "control for most purposes over it."  Bedroom Motion at 4.  Romero's analysis is incorrect.  The Court concludes that O. Martinez had authority to grant the agents consent to search Romero's room.[15]

---

[15] The Court is unpersuaded by the United States' argument based on the "protective sweep" principle articulated in Maryland v. Buie.  See Bedroom Response at 5-7.  The Tenth Circuit has firmly stated that a protective sweep must be executed incident to a valid arrest.  See United States v. Torres-Castro, 470 F.3d 992, 996 (10th Cir. 2006)("Following Buie, we held that such 'protective sweeps' are only permitted incident to an arrest.").  First, the Court notes that it is unaware of any binding authority stating that officers can use the protective-sweep doctrine to enter the home in the first instance.  In Maryland v. Buie, for example, officers made an arrest inside the home before

A third-party, such as O. Martinez, can grant law-enforcement officers consent to search a person's property when that third-party possesses either actual or apparent authority to consent. <u>See United States v. Sanchez</u>, 608 F.3d at 689; <u>United States v. Cos</u>, 498 F.3d at 1124; <u>United States v. Kimoana</u>, 383 F.3d at 1221. "It is the government's burden to establish by a preponderance of the evidence that the consenter had [authority to consent to the search of a suspect's bedroom]." <u>United States v. Rith</u>, 164 F.3d 1323, 1329 (10th Cir. 1999)(quoting <u>United States v. McAlpine</u>, 919 F.2d 1461, 1463 (10th Cir. 1990)). <u>See United States v. Cos</u>, 498 F.3d at 1124.

## 1. **O. Martinez Lacked Actual Authority to Consent to the Agents' Search.**

"[A] third party has [actual] authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." <u>United States v. Rith</u>, 164 F.3d at 1329. <u>See United States v. Matlock</u>, 415 U.S. at 172 n.7; <u>United States v. Cos</u>, 498 F.3d at 1125; <u>United States v. Dozal</u>, 173 F.3d at 792. "Mutual use of property by virtue of joint access" is generally found where a third party, residing full-time on the premises, enters "the premises or room at will, without the consent of the subject of the search."

---

executing the protective sweep -- they were already inside the house. <u>See</u> 494 U.S. at 328-29 (explaining that the sweep at issue occurred after execution of an arrest warrant, when the officers were already inside the house). Moreover, the agents' entry in this case was not incident to an arrest. The United States relies on <u>United States v. Torres-Castro</u> to suggest that the sweep can occur before the arrest, <u>see</u> Bedroom Response at 6, but the Court finds that case inapplicable. While the Tenth Circuit in <u>United States v. Torres-Castro</u> stated that "a search may precede an arrest and still be incident to that arrest," 470 F.3d at 997, the Tenth Circuit expressly limited pre-arrest protective sweeps to cases in which officers had a legitimate basis to arrest the individual before executing the search, <u>see id.</u> at 998 ("[T]o determine whether a search is incident to an arrest, we ask only (1) whether 'a legitimate basis for the arrest existed before the search,' and (2) whether 'the arrest followed shortly after the search.'")(quoting <u>United States v. Anchondo</u>, 156 F.3d 1043, 1045 (10th Cir. 1998)). Here, the agents had no basis to arrest Romero when they executed the security sweep, nor does the United States contend that they had probable cause to arrest him at that time. It was not until after the security sweep, seeing items in Romero's room, extracting Romero from the house, and questioning Romero that they had probable cause to arrest. The protective-sweep doctrine is thus inapplicable to the agents' initial entry into Romero's bedroom.

United States v. Rith, 164 F.3d at 1329-30.  "[C]ontrol for most purposes of property," on the other hand, "is a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party."  Id. at 1330.

In the Tenth Circuit, certain relationships between the third-party and a defendant give rise to a presumption that the third-party has control for most purposes.  See United States v. Rith, 164 F.3d at 1330.  If the relationship between the defendant and the third party "creates [] a presumption of control [for most purposes] and is unrebutted, the third party has authority to consent to a search of the property."  Id.  The parent-child relationship -- even where the child is an adult -- creates a presumption that the parent has control for most purposes over the areas of the house where the child lives.  Id. at 1327, 1330-31.  Thus, if an adult defendant's parent, with whom the defendant lives, gives officers consent to search the premises, the officers are authorized to search the adult defendant's room unless the defendant rebuts the presumption.  The defendant can rebut the presumption "by facts showing an agreement or understanding between the defendant and the third party that the latter must have permission to enter the defendant's room."  United States v. Rith, 164 F.3d at 1331.  Factors a court must consider in determining if the defendant has rebutted the presumption include: (i) whether the defendant paid rent to the third party; (ii) a lock on the bedroom door; and (iii) an explicit or implicit agreement that the third party never enter a particular area.  See id. (citing Stoner v. California, 376 U.S. 483, 489-90 (1964); United States v. Morning, 64 F.3d 531, 536 (9th Cir. 1995); United States v. Kinney, 953 F.2d 863, 866 (4th Cir. 1992); and United States v. DiPrima, 472 F.2d 550, 551 (1st Cir. 1973)).

In this case, O. Martinez, who consented to the search, is Romero's step-father.  Although the Tenth Circuit has not decided whether the step-father/step-son relationship creates the same

presumption as the father/son relationship, other courts have found that it does.  See, e.g., United States v. Austin, 1996 WL 109500, at *4.  The Court agrees with this conclusion.  A step-parent often has as much dominion and control over the day-to-day life of a child as a birth-parent does.  This control is not always present, of course, especially where the child's birth parent re-married after the child reached adulthood.  Without more information about the relationship between the step-child and step-parent, however, the Court believes the same presumption should maintain.  The Court thus concludes that O. Martinez' relationship with Romero created a presumption that O. Martinez had authority to grant the agents consent to search Romero's bedroom.

O. Martinez lacked actual authority to allow the officers to search Romero's room.  Although the presumption exists, and although O. Martinez voluntarily consented to the agents' search of the house, facts exist that would rebut the Rith presumption of actual authority.  First, O. Martinez testified during the hearing that he never went into Romero's room.  See Tr. at 72:11-23 (Ortega, O. Martinez).  He did not, however, testify that there was any sort of implicit agreement that he would not go into Romero's room without prior authorization; on the contrary, he stated that he had full access to the house and could go where he pleased.  See id. at 72:11-23 (Ortega, O. Martinez).  More importantly, however, there existed a locking mechanism on Romero's door that would allow him to exclude others from his private room.  See id. at 72:11-23 (Ortega, O. Martinez); id. at 84:5-16 (Bustamante, O. Martinez).[16]  Under the Tenth Circuit's law, the presence of such a lock

---

[16] O. Martinez gave the following responses to Mr. Bustamante's questions:

Q:   And that was your perception of the living arrangements and other people's perceptions, correct?  That was Carl's room?

A:   That was Carl's room.

Q.  And in fact, when Carl would leave the home, sometimes he would lock it.  Is

is a fact that may rebut the presumption that O. Martinez had control for most purposes over Romero's room.  See United States v. Rith, 164 F.3d at 1331 (stating that the presumption may be rebutted by, for example, "a lock on the bedroom door or an agreement, explicit or implicit, that the third party never enter a particular area.").

The only other evidence the United States presented that would meet their burden to show that O. Martinez had actual authority to grant them consent to search Romero's room is O. Martinez' statements that he generally has access to the whole house.   See Tr. at 72:11-23 (Ortega, O. Martinez).[17]   The Court finds that this testimony does not show, by a preponderance of the

_____

that true?

A.  That's true.

Q.  Okay.  And when he locked that room, nobody had access to it, correct?

A.  That's correct.

Tr. at 84:5-16 (Bustamante, O. Martinez).  Buie, however, did not recall any lock.  He stated: "I'm not saying there wasn't.  It wasn't locked.  I think we just tried the handle and it opened. . . . I don't remember seeing any other lock there."  Id. at 122:18-22 (Buie).  See id. at 122:16-123:11 (Bustamante, Buie).  No party sought to introduce a picture of Romero's door to demonstrate the existence or non-existence of a visible locking device.  The Court thus credits both parties' testimony and finds that there was a lock, but it was not obvious and the agents did not see it.

[17] O. Martinez' testimony was:

Q.  Okay.  Now, you said, sir, that you owned -- or you own that residence with your wife Leslie?

A.  Yes.

Q.  Okay.  Did you have access to the entire house?

A.  Yes, we do.

Tr. at 72:11-23 (Ortega, O. Martinez).

evidence, that O. Martinez had actual authority.  In addition to testifying that he had access to the whole house, he also testified that Romero's door has a lock and, when Romero lock the door, nobody can access Romero's room.  See Tr. at 84:5-16 (Bustamante, O. Martinez).  O. Martinez also testified that he generally does not enter Romero's room.  See Tr. at 72:11-23 (Ortega, O. Martinez).  The Court concludes that the United States' evidence did not establish that O. Martinez had actual authority to consent to the search.

## 2. O. Martinez Had Apparent Authority to Consent to the Agents' Search.

O. Martinez had apparent authority, however, over Romero's room.[18]  "Apparent authority arises from the reasonable, albeit erroneous, belief that the third party has the authority to provide valid consent.  This inquiry is an objective one, based on the 'facts available to the officer at the moment.'"  United States v. Sanchez, 608 F.3d at 689 n.1 (quoting Illinois v. Rodriguez, 497 U.S. at 188).  At the time of the security sweep, the agents were aware that O. Martinez was the occupant of the house on 345 Popay Avenue -- the house they desired to enter.  They also had reason to believe that another person -- Romero -- might reside at that address.  See Scholl Aff. ¶ 13, at 5 ("Also residing at the above listed address is CARL ROMERO . . . .").  They knew, however, that O. Martinez was Romero's step-father.  See Tr. at 70:1-11 (Ortega, O. Martinez)("A: They asked for Carl Romero.  I said, no, I wasn't -- that I was his stepdad."); id. at 70:19-20 (Ortega, O. Martinez); id. at 72:11-15 (Ortega, O. Martinez).  See also United States v. McAlpine, 919 F.2d at 1464 ("[T]hird-party consent cases focuses on the relationship between the consenter and the

---

[18] Romero contests O. Martinez' apparent authority, but does not provide any substantive legal argument in that regard.  See Defendant's Memorandum in Support of Motion to Suppress Evidence Due t Unconstitutional Consensual Entries to Personal Bedroom at 5 (Doc. 34)("Also, Mr. Martinez lacked apparent authority to consent to a search of Mr. Romero's personal bedroom.")(citing United States v. Cos, 498 F.3d at 1131-33).

property searched."); United States v. Rith, 164 F.3d at 1330 n.3 ("[T]he character of the

relationship between the consenter and the defendant may bear upon the nexus between the

consenter and the property.")(internal citations omitted).  In other words, the facts of which the

officers were aware established that O. Martinez had authority to grant them consent to search the

entire house, including Romero's bedroom.  See United States v. Sanchez, 608 F.3d at 689 n.1;

United States v. Thompson, 524 F.3d. at 1132-33 ("Apparent authority exists when officers

reasonably, even if erroneously, believe that the person consenting to the search has the authority

to do so."); United States v. Rith, 164 F.3d at 1331 n.5 (suggesting that, if parents lack actual

authority, the next step is to conduct an apparent-authority analysis).[19]

---

[19] The Tenth Circuit sometimes discusses a parent's authority to consent to the search of an
adult child's room in the language of presumptions.  See United States v. Rith, 164 F.3d at 1330
("Relationships which give rise to a presumption of control of property include parent-child
relationships . . . .").  It has said that the parent's status as parent and homeowner, without more,
creates a presumption of authority to consent to a search the adult child's room.  See id.  Thus,
where there are no facts to rebut the presumption, searches of an adult child's private room, made
pursuant to a parent's consent, is reasonable under the Fourth Amendment.  See, e.g., id. at 1330-31
& n.5.  The Tenth Circuit has not used the presumption language in the context of apparent authority
analysis, but the Court believes that the principle should work the same in that context.  The
reasonableness of law-enforcement conduct under the Fourth Amendment has always been assessed
under an objective standard, taking into account the facts known to the officers at the time of the acts
of which the defendant complains; apparent authority is no exception.  See United States v. Sanchez,
608 F.3d at 689 n.1 ("Apparent authority arises from the reasonable, albeit erroneous, belief that the
third party has the authority to provide valid consent.  This inquiry is an objective one, based on the
'facts available to the officer at the moment.'").  Law-enforcement officers are allowed to rely on
the parent's status as a parent when there are no facts that would tend to undermine the parent's
authority to consent to a search of the adult child's room.  The result should be the same when the
facts undermining the parent's actual authority exist, but the officer is unaware of them.  An agents'
actions are no less objectively reasonable because facts exist about which the agent does not know.
The Court believes this distinction -- whether there exist no facts undermining the parent's authority
or that such facts exist, but are not known to the officer -- is essentially the difference between a
parent's actual authority and the parent's apparent authority.  See W. LaFave, Search & Seizure: A
Treatise on the Fourth Amendment § 8.4 (4th ed. 2004)(suggesting that, "if the searching officers
were . . . unaware" that the child had exclusive use of his room, "the apparent authority doctrine
could be employed to justify the search on the ground that the police reasonably believed the parents
had the authority over their own home which they claimed to have.")(footnotes omitted).

The facts that existed to rebut the presumption of actual authority -- that there existed a lock on Romero's bedroom door and that O. Martinez never went into Romero's bedroom -- were not known to the agents.  So far as they were aware, O. Martinez had dominion over the whole house, could grant them consent to search the entire house, and granted them such consent.  Again, O. Martinez' consent was without reservations or provisos, i.e., he did not allow the agents to search everywhere except Romero's room.  See Tr. at 121:22-122:4 (Bustamante, Buie); id. at 122:13-22 (Bustamante, Buie); id. at 124:12-14 (Buie).  He allowed them to search the house.  The evidence also discloses that the agents were unaware that there was any locking mechanism on Romero's door.  Buie testified that he turned the door knob and the door opened -- he did not recall seeing a locking device on the door.  See id. at 124:7-14 (Bustamante, Buie).  See also id. at 98:22-100:4 (Buie); id. at 122:8-123:16 (Bustamante, Buie); id. at 123:15-124:6 (Bustamante, Buie); id. at 135:25-137:3 (Ortega, Buie).  In other words, the agents "reasonably, although erroneously, believe[d] that [O. Martinez] ha[d] the authority to consent to [their] entry." United States v. Gutierrez-Hermosillo, 142 F.3d 1225, 1230 (10th Cir. 1998).  See United States v. Kimoana, 383 F.3d at 1221.  Those facts show that the agents had good reason to believe that O. Martinez could grant them consent to search the entire house.  The Court concludes that O. Martinez had apparent authority to grant the agents consent to search Romero's bedroom and that the agents' initial entry into Romero's bedroom did not violate Romero's constitutional rights.

### 3.      There Were No Ambiguous Facts that Might Have Necessitated Further Inquiry by the Agents.

Moreover, the record discloses no "ambiguous facts related to authority" that might have rendered the agents' reliance on apparent authority unreasonable.  United States v. Kimoana, 383 F.3d at 1222.  Finding Romero asleep in the back bedroom was not sufficient, without more, to

cause a reasonable law-enforcement agent to question O. Martinez' authority, as Romero suggests. There is nothing about Romero being asleep that would draw into question O. Martinez' authority, as Romero's step-father, to consent to a search of Romero's room.   Nor was the bedroom door locked, which might suggest that O. Martinez did not have authority to consent to a search of the bedroom.   See United States v. Rith, 164 F.3d at 1331 (indicating that a lock on a door to a defendant's room would rebut a presumption that a third-party had control for most purposes over the room).   The information available to the agents would lead them reasonably to believe that O. Martinez had authority to grant them consent to search.

This case is not like United States v. Cos, in which the Tenth Circuit found that the officers needed to inquire further before their belief that the occupant had authority to consent to search would be reasonable.   In United States v. Cos, the officers knocked on Cos' door, looking for Cos, and a young woman answered.   See 498 F.3d at 1117-18.   The young lady was in Cos' home with three children; Cos was not present.   See id.   Officer Pryde asked the young lady the following series of questions: (i) "Are you guys the only ones at home?"; (ii) "Is Jose [Cos] here?"; (iii) "Has he ever been here?"; and (iv) "Can we take a look?"   United States v. Cos, 498 F.3d at 1118.   The Tenth Circuit noted that Pryde "did not ask [the young lady] who she was or what relationship she had to Mr. Cos or his apartment."   Id.   Officers then walked into Cos' home, searched it, and found a firearm.   See id. at 1118-19.   Officers arrested Cos for being a felon in possession of a firearm.

A federal Grand Jury indicted Cos for being a felon in possession.   See id. at 1119.   He moved to have the gun suppressed as the fruit of an unlawful search of his home, arguing that the young lady that consented to the officers' entry did not have actual or apparent authority to grant that consent.   See id.   The district court agreed, and the Tenth Circuit affirmed.   In United States v. Cos, the only facts upon which the officers could rely was that the young lady answered the door

at 3:00 p.m. in the afternoon and that there were children present.  See id. at 1129.  The Tenth

Circuit concluded that, "[e]ven if accompanied by young children, a third party's mere presence on

the premises to be searched is not sufficient to establish that a man of reasonable caution would

believe that" the third party could consent to the search.  Id. at 1129.

The Tenth Circuit contrasted the presence-plus-children fact-pattern in United States v. Cos

with situations in which it had found apparent authority:

> [W]e recently held that a defendant's father had apparent authority to consent to the
> search of a computer located in the defendant's bedroom.  Andrus, 483 F.3d at 721.
> We reasoned that the officers knew that the defendant's father owned the home and
> lived there with family members; that the father paid the internet and cable bill; that
> even though the computer was located in the defendant's bedroom, the defendant's
> father had access to the room at will; and finally, that "the officers saw the computer
> in plain view on the desk in [the defendant's] room and it appeared available for use
> by other household members."  Id.  Similarly, in Kimoana, we based our holding that
> a third party had apparent authority to consent to the search of a motel room on the
> fact that a police officer knew that the third party had a key to the room and that he
> had told the officer that he had stayed there with his cousins.  And in Gutierrez-
> Hermosillo, 142 F.3d at 1231, we concluded that the defendant's fourteen-year-old
> daughter, who answered the door of a motel room, had apparent authority to consent
> to the search of a motel room because border patrol agents had questioned the
> defendant on the previous day and knew that he and his daughter were traveling
> together.

United States v. Cos, 498 F.3d at 1129-30.  In this case, the agents were aware that O. Martinez was

an occupant, and likely the owner, of the house on 345 Popay Avenue.  They also knew that Romero

was O. Martinez' step-son.  The agents inquired about O. Martinez' identity and relationship with

Romero.  Unlike mere presence, O. Martinez' position as an adult family member and step-parent

of the only other occupant of which the agents were aware was not an ambiguous fact regarding O.

Martinez' authority to grant consent to search.  The officers knew who O. Martinez was and

reasonably believed that he could grant them consent to search the whole house.  O. Martinez did

not put any conditions on his consent or suggest that, while he had no problem with the agents

searching his areas, he could not vouch for Romero.  His consent was unequivocal.

This case is more like <u>United States v. Kimoana</u>, where the Tenth Circuit found apparent authority to search a hotel room from the officers' knowledge of two facts: (i) the third party was the cousin of the registered occupant; and (ii) the third party had stayed overnight in the room and had a key.  <u>See</u> 383 F.3d at 1223-24.  At that point, the Tenth Circuit concluded that the officers had no duty to inquire further, and the Court finds the same is true in this case.  <u>See id.</u> at 1222-23 ("[T]he officers' reliance on Nick's apparent authority was justified.").  Here, the agents knew that O. Martinez was Romero's father, and that O. Martinez lived in the house and exercised control over it.  Especially given the presumption of authority that the parent/child relationship creates, <u>see</u> <u>United States v. Rith</u>, 164 F.3d at 1330, the agents were reasonable in believing that O. Martinez could grant consent to search.[20]

### III.   ROMERO MADE HIS APRIL 16, 2009 STATEMENTS VOLUNTARILY, AND THE AGENTS DID NOT VIOLATE HIS FOURTH OR FIFTH AMENDMENT RIGHTS.

Romero asks the Court to exclude "any and all evidence and [Romero's] statements . . . as inadmissible," Statements Motion at 5, because Romero's statements to the agents were made in violation of the Fifth Amendment, <u>see</u> Statements Motion ¶¶ 6-10, at 2-3.  Romero also argues that removing him from his bedroom and temporarily detaining him on the premises of his house violated the Fourth Amendment.  <u>See</u> Defendant's Reply to Government's Response to Defendant's Motion to Suppress Evidence Due to Unconstitutional Consensual Entries to Personal Bedroom at 7-9 (Doc. 47).  The Court ultimately concludes that both arguments lack a sound basis in law or in

---

[20] This analysis does not entirely dispose of Romero's motion related to entry into his bedroom, because the Court must also determine whether the second entry, allegedly pursuant to Romero's consent, was constitutional.  The Court, however, is analyzing the issues in chronological order, so the Court will return to that issue after it has determined whether Romero's confessions violate his constitutional rights or are otherwise inadmissible.

the facts of the case and will deny Romero's motions.

### A. ROMERO CONFESSED DURING A <u>TERRY</u>-STOP[21] BASED ON REASONABLE SUSPICION, SO THERE IS NO FOURTH AMENDMENT VIOLATION.

Although Romero challenges the admissibility of his confession under the Fifth Amendment, he also appears to challenge the constitutionality of the agents' requests that he leave his bedroom and, eventually, that he speak to them outside. <u>See</u> Bedroom Motion at 6-7. Moreover, the United States responds only to Romero's Fourth Amendment challenges in its various response briefs. The Court will thus analyze Romero's encounter with the agents under the Fourth Amendment. No Fourth-Amendment violation, however, occurred.

There are three categories of police-citizen interactions: (i) consensual encounters; (ii) investigative stops; and (iii) arrests. <u>See</u> <u>Oliver v. Woods</u>, 209 F.3d at 1186. A consensual encounter occurs when a law-enforcement officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter. <u>See</u> <u>id.</u> Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing." <u>Oliver v. Woods</u>, 209 F.3d at 1186. In determining whether a seizure has occurred, a court should consider:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of a person's personal effects; (6) a request to accompany the officer to the police station; (7) interaction in a small, enclosed, or non-public place; and (8) absence of other members of the public.

<u>United States v. Fox</u>, 600 F.3d at 1258 (quoting <u>United States v. Rogers</u>, 556 F.3d 1130, 1137-38 (10th Cir. 2009)). An investigative detention occurs when an officer stops, and briefly detains a

---

[21] <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

person, "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. at 146 ). Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment. First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. at 417-18). Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. at 20, because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d at 1229. An arrest is a seizure that is "characterized by highly intrusive or lengthy search or detention." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d at 1363). The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest. United States v. Melendez-Garcia, 28 F.3d at 1052-53. See Florida v. Royer, 460 U.S. at 499. Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, probable cause must support an arrest.

The agents' encounter with Romero was not consensual. A police-citizen encounter is only consensual where it occurs under circumstances where a reasonable person would feel free to end the encounter. See Oliver v. Woods, 209 F.3d at 1186. "The critical inquiry is whether 'the police conduct would have communicated to a reasonable person that [he] was not at liberty to ignore the police presence and go about [his] business.'" United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010)(quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)). Although the agents characterized their conduct as "asking" Romero to come outside, see Tr. at 103:11-104:1 (Ortega,

Buie), surrounding circumstances suggest that a reasonable person in Romero's position would not feel free to disengage from the police-citizen encounter. Romero was awakened in his bedroom by two federal agents, one of whom had a large gun slung over his shoulder. While the agents did not use aggressive language or tone, did not physically touch Romero, did not brandish their weapons, and did not retain Romero's personal effects, the agents' mere presence in Romero's bedroom would suggest to a reasonable person that something is amiss. Romero's sleepy state of mind in the first moments after he wakes would give the agents' suggestions more force. Moreover, the agents were with Romero in a small, enclosed, non-public place where members of the public could not see them. As polite as the agents might have been in this situation, it is unlikely that a person would feel free to ignore the agents' directives. The agents continued to show distrust of Romero and control of the situation when they patted-down his clothing before allowing him to dress. This encounter implicated the Fourth Amendment.[22]

The agents' brief detention and interview of Romero was a <u>Terry</u>-based detention supported by reasonable suspicion. "For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop." <u>United States v. Winder</u>, 557 F.3d at 1134 (quoting <u>United States v. Vercher</u>, 358 F.3d at 1261). This standard is met by information "falling 'considerably short' of a preponderance standard," <u>United States v. Winder</u>, 557 F.3d at 1134, and is satisfied under the facts of this case. The agents were sweeping the house out of concern that someone inside might be connected to the vehicle they planned to seize and thus might be dangerous to the agents.

---

[22] Although the Court finds that the agents' encounter with Romero implicated the Fourth Amendment, the Court also notes that, so far as the record reflects, Romero never asked the agents why they were in his room or suggested that O. Martinez could not grant them consent to be there.

They opened a door and saw Romero.  Romero was seen with Friday the night before Friday turned up dead and was the owner of the vehicle that the agents sought to seize.  They thus had reason to believe he might be upset by the execution of the Search and Seizure Warrant.  Moreover, the agents saw a shotgun in plain view.  That gun could pose a risk to them while they sought to seize Romero's vehicle and also fit the general description of the weapon used to kill Friday.  The agents thus had "some minimal level of objective justification" for believing Romero might be connected to Friday's murder and for believing Romero might pose some danger to them while they seized the Cavalier.  A brief seizure of Romero, both for officer safety and for the purpose of questioning Romero, was justified under the circumstances.

The seizure of Romero did not rise to the level of an arrest.  Although Scholl questioned Romero, the encounter was not  "characterized by highly intrusive or lengthy search or detention." Oliver v. Woods, 209 F.3d at 1186.  The detention took approximately thirty minutes, during which time Scholl sought to confirm or dispel his reasonable suspicion that Romero might be Friday's killer.  For two reasons the detention was not longer than was necessary, given its purpose.  The detention had two purposes: (i) to confirm or dispel Scholl's reasonable suspicion; and (ii) to ensure officer safety while seizing Romero's vehicle.  Scholl interviewed Romero for no more than thirty minutes, at the end of which Romero had confessed, confirming Scholl's suspicion and resulting in Romero's arrest.  Moreover, the tow truck that was used to haul away Romero's vehicle did not complete its work until approximately the time that Romero confessed and was taken into custody. The seizure was thus commensurate with the time taken to complete the objectives that made that seizure necessary.  Also, none of the factors that generally turn a Terry-stop into an arrest were present in this case.  The agents kept their weapons holstered or slung during the encounter, Buie told Romero that he was not under arrest, Romero was not handcuffed, and the period of the

detention was not excessive.  In other words, the seizure was "reasonably related in scope to the circumstances" which justified the seizure in the first place.  Terry v. Ohio, 392 U.S. at 20.

The agents were also justified in removing Romero from his bedroom for the purpose of the investigative detention.  The Supreme Court has recognized that "there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention."  Florida v. Royer, 460 U.S. at 504.  See United States v. Charley, 396 F.3d 1074, 1080 n.4 (9th Cir. 2005)("Our view that there may be certain, case-specific circumstances where law enforcement officers can move a suspect from one location to another without crossing the line between an investigative stop and an arrest finds support in a leading treatise on the Fourth Amendment.")(citing United States v. Montano-Gudino, 309 F.3d 501, 504 (8th Cir. 2002); United States v. Gori, 230 F.3d 44, 56 (2d Cir. 2000); United States v. Vega, 72 F.3d 507, 515-16 (7th Cir. 1995); United States v. Bueno, 21 F.3d 120, 124 (6th Cir. 1994); United States v. Nurse, 916 F.2d 20, 24-25 (D.C. Cir. 1990); United States v. Kapperman, 764 F.2d 786, 792 (11th Cir. 1985); United States v. Petty, 601 F.2d 883, 886, 889 (5th Cir. 1979); United States v. Self, 410 F.2d 984, 986 (10th Cir. 1969); and 4 W. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.2(g) (4th ed. 2004)).  Officer-safety concerns justified moving Romero from his bedroom to question him.  If for no other reason, Romero's bedroom contained a shotgun, and the agents did not know whether the gun was loaded.  The evidence did not disclose the precise dimensions of Romero's room, but it seems likely that, if the interview went poorly, Romero could have lunged for the weapon, and possibly used it to injure or kill the agents who were interviewing him.  The agents were thus reasonable in their belief that the interview was better had while seated in the front seat of one of the agent's vehicles.  The Court thus concludes that asking Romero to leave his room and sit in the agent's vehicle did not constitute a violation of Romero's Fourth Amendment rights.

## B.   THERE WAS NO CUSTODIAL INTERROGATION, SO THE OFFICERS DID NOT NEED TO GIVE ROMERO HIS MIRANDA WARNINGS.

Romero argues that his confession was taken in violation of the Fifth Amendment, because he was not properly advised of his Miranda rights.  See Statements Motion ¶¶ 2-10, at 2-3.  The United States argues that Scholl's interview of Romero was not a custodial interrogation.  See Statements Response at 5-10.  "Miranda rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'"  United States v. Chee, 514 F.3d at 112 (quoting United States v. Perdue, 8 F.3d at 1463).  While the Court finds that the agents engaged in interrogation, the Court concludes that, at the time of that questioning, Romero was not "in custody."

The questions that Scholl was asking Romero constituted interrogation.  The Supreme Court has determined that interrogation includes any questioning by law-enforcement officers "reasonably likely to elicit an incriminating response."  Rhode Island v. Innis, 446 U.S. at 301 ("[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.")(footnote omitted).  See United States v. Parra, 2 F.3d at 1068; United States v. Medrano, 356 Fed. Appx. at 107.  Scholl knew that Romero was one of the last people to see Friday alive and Scholl was asking questions about what happened on the night of Friday's death.  Given that the agents had seen the supposed murder weapon in Romero's bedroom, they had a sound reason to believe that Romero was a likely suspect in that murder.  The questions were thus "reasonably likely to elicit an incriminating response" and constituted interrogation.

Romero was not, however, in custody at the time that he was questioned.[23]  See United States v. Chee, 514 F.3d at 112 ("Miranda rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'")(emphasis added); United States v. Perdue, 8 F.3d at 1463 ("[T]wo requirements must be met before Miranda is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'")(emphasis added).  The in-custody requirement is satisfied only when a suspect's "freedom of action is curtailed to the degree associated with formal arrest."  Berkemer v. McCarty, 468 U.S. at 440 (quoting California v. Beheler, 463 U.S. at 1125).  See United States v. Jones, 523 F.3d at 1239.  "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person

---

[23] This holding is not inconsistent with the Court's prior holding that the agents' conduct constituted a Terry-stop.  The Tenth Circuit has acknowledged that, "[g]enerally, 'Miranda warnings are . . . not implicated in the context of a valid Terry stop.'"  United States v. Eckhart, 569 F.3d 1263, 1276 (10th Cir. 2009)(quoting United States v. Perdue, 8 F.3d 1455, 1464 (10th Cir. 1993)).  The Tenth Circuit has recognized an exception to this principle only where the officers "take highly intrusive steps to protect themselves from danger."  United States v. Eckhart, 569 F.3d at 1276 (quoting United States v. Perdue, 8 F.3d at 1465).  The Tenth Circuit has suggested that handcuffing the suspect, placing the suspect in a police cruiser, or drawing weapons might be such "highly intrusive steps."  United States v. Eckhart, 569 F.3d at 1276 ("The officers here did not take highly intrusive measures against Cardenas.  Cardenas was never handcuffed or placed in a police cruiser and no weapons were drawn.").  See United States v. Perdue, 8 F.3d at 1464-65 (holding that, although the stop was a Terry-stop and not an arrest, that Perdue was in custody, because he "was forced out of his car and onto the ground at gunpoint[, and] was then questioned by two police officers while police helicopters hovered above.").  In this case, the agents took no such "highly intrusive steps," so there is no inconsistency in finding that a Terry-stop occurred and yet there was no custodial interrogation.  The closest the agents came to the criteria the Tenth Circuit has set forth was asking Romero to sit in the front seat of the agents' vehicle while they talked to him.  The Court does not believe asking a person to sit in the front seat of a law-enforcement vehicle, with the windows down, so the agents may talk with the person, is what the Tenth Circuit had in mind when it referred to placing a suspect in a police cruiser.  Given the context of the Tenth Circuit's statement, the Court believes that the Tenth Circuit in United States v. Eckhart was referring to agents putting a suspect in the back seat of a police vehicle, where the suspect could not then open the door and leave, as a "highly intrusive step" by the police that would implicate Miranda.

being questioned." United States v. Rogers, 391 F.3d at 1171 (quoting Stansbury v. California, 511 U.S. at 323).  In determining the custodial nature of an interrogation, the court must "determine whether 'a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest.'"  United States v. Chee, 514 F.3d at 1112 (quoting Berkemer v. McCarty, 468 U.S. at 442)(alterations omitted).  The Court does not believe the Scholl's questioning of Romero in a parked government vehicle impeded Romero's "freedom of action . . . to the degree associated with a formal arrest." Berkemer v. McCarty, 468 U.S. at 440.

The totality of circumstances, including those factors that the Tenth Circuit has set down, weigh against finding that Romero was in custody.  See United States v. Jones, 523 F.3d at 1240. Those factors are: (i) the degree to which the suspect is informed that he or she may end the interview at will or is not required to answer questions; (ii) whether the nature of the interview is likely to create a coercive environment from which a suspect would not feel free to leave, such as where there is prolonged accusatory questioning; and (iii) whether the law-enforcement agents dominate the encounter with the suspect.  See id. (quoting United States v. Griffin, 7 F.3d at 1518). Two of those three factors weigh in favor of finding that Romero was not in custody.

The first factor weighs somewhat in favor of finding custody.  Romero was not explicitly told that he could end the interview at any time or refuse to answer the questions.  On the other hand, the agents asked Romero to talk to them, they did not order him to do so.  Scholl expressly told Romero that he was not under arrest, see Tr. at 72:24-73:3 (Ortega, O. Martinez); id. at 148:12-149:1 (Ortega, Scholl), which would imply to many people that they were not absolutely required to answer the agents' questions.  Romero was not, however, instructed that he did not need to answer the questions posed, so the Court finds that this factor weighs in favor of finding custodial interrogation.

The second factor, on the other hand, weighs against finding custody. There was nothing excessively coercive -- other than the presence of the agents in the general vicinity -- about the circumstances of the questioning. Romero sat in Scholl's vehicle with two of the agents. Romero had been informed that he was not under arrest before he sat down in the vehicle. He sat down in the front seat, not in the back seat as one would expect if he or she was under arrest. For part of the questioning, the back door of the vehicle was open, suggesting that the encounter was somewhat informal. Both front windows were rolled down during Romero's interview, which further supports the impression that the interview was informal. There was no prolonged, accusatory questioning involved. As Scholl recalled events, he did nothing more than ask Romero to recount the events of the evening in which Friday was murdered, and Romero began giving a narrative. See id. at 149:14-152:19 (Ortega, Scholl). At one point, Romero made a statement that did not square with the other information Scholl had collected, so Scholl presented that inconsistency to Romero. See id. at 152:16-24 (Ortega, Scholl). At that point, Romero made his confession. See id. at 152:16-153:9 (Ortega, Scholl). Under this set of facts, the Court does not believe that "the nature of the interview" was "likely to create a coercive environment." United States v. Jones, 523 F.3d at 1240.

The third factor -- whether the agents dominate the encounter -- requires more analysis, but ultimately weighs against finding that Romero was in custody when he made his confession. The factors a court weighs in determining whether agents dominated the encounter are these: (i) separating the suspect from others who could lend moral support; (ii) isolating the suspect in nonpublic questioning rooms; (iii) the threatening presence of multiple agents; (iv) displaying of weapons by an agent; (v) physical contact with the suspect; and (vi) use of language or vocal tones which suggest that compliance with an agent's request is compulsory. See United States v. Jones, 523 F.3d at 1240. Although Romero was separated from others who could lend moral support, and

several agents were present in the area around Romero's home, the remaining factors all weigh against finding police domination. Romero was removed from his room and the house, but not from the front of his house; he was not taken to a police station. Romero was not in a non-public questioning room. Rather, he was in the front seat of a law-enforcement vehicle with both front windows rolled down. His words and those of the agents inside could be heard by those outside, and they were not hidden from the public's view. Romero would not have been left with the impression that he could call for help and nobody would hear, as he might if he were in a windowless interrogation room. The agents did not "display" their weapons to Romero; rather, the testimony was that all weapons were holstered or otherwise stowed such that an observer would not think the agents intended to use them.[24] There is no evidence that any agent physically touched Romero from the point that the agents entered his bedroom until the point at which they placed him under arrest based on his confession. Finally, the only testimony on the issue -- and, the Court finds, the preponderance of the evidence -- establishes that the interview was conducted in a conversational tone of voice and not one which might suggest that compliance with the agents requests was compulsory. In sum, the weight of the factors that the Tenth Circuit has articulated demonstrate that this interview was not a police-dominated encounter.

The Tenth Circuit is deliberate in emphasizing that courts must consider the circumstances surrounding the police-citizen encounter as a whole rather than exclusively relying on some enumerated factors while ignoring others. See United States v. Jones, 523 F.3d at 1240. Even

---

[24] While a holstered weapon might still be intimidating in some respects, the Court believes it should not weigh that factor heavily in analyzing the coerciveness of a police-citizen encounter. Firearms are standard issue equipment for law-enforcement agents and more-or-less always present. The Court believes the holstered sidearm is bound up in the nature of a law-enforcement agent and does not make the encounter any more intimidating than the mere presence of the agent.

considering all of the circumstances as a whole, however, the Court finds that this interrogation was

not custodial.  It might have been intimidating to be awakened by FBI agents searching the house,

but there was a cooling-down period between the time Romero was awakened and when Scholl

asked to speak with him.  Scholl expressly told Romero that he was not under arrest, and the

interview seemed to be relatively laid-back and non-confrontational.  The entire conversation took

place sitting in the front-seat of a vehicle with the windows open and, at least half the time, with one

of the back doors open.  Scholl's conduct was apparently limited to eliciting Romero's narrative and,

when that narrative was inconsistent with the information Scholl had acquired elsewhere, asking

Romero to explain the inconsistency.  The Court concludes that "a reasonable person in the

[Romero]'s position" would not have "understood the situation as the functional equivalent of

formal arrest," United States v. Chee, 514 F.3d at 1112 (quoting Berkemer v. McCarty, 468 U.S. at

442)(alterations omitted), and thus finds that Scholl's questioning of Romero was not a "custodial

interrogation."  The Court finds no Fifth Amendment violation.  The Court thus denies Romero's

motion to suppress his confession to Scholl.

## IV.   ROMERO'S CONSENT TO SEARCH HIS BEDROOM WAS VOLUNTARILY GIVEN, AND, EVEN IF IT WERE NOT, THE INEVITABLE-DISCOVERY RULE WOULD APPLY.

Finally, Romero challenges the agents' second entry into his bedroom -- which occurred after

he confessed to Friday's murder -- during which the agents seized the shotgun, clothing, and other

items of physical evidence.[25]  He asserts that such entry was a search under the Fourth Amendment,

---

[25] The Tenth Circuit has recognized that it is unclear whether an officer who was lawfully inside a home and spotted items of contraband in plain view may leave the home and then return to seize those items in a second, unauthorized entry.  See Harris v. Ford, 369 Fed. Appx. 881 (10th Cir. 2010)("Mr. Harris cites no case in support of his claim that Officer Ford violated a clearly established right when he exited and re-entered Mr. Harris's home to photograph items and seize them.  No other party cites a case on point.  We can find no such case either.").  The Tenth Circuit

and thus was invalid unless the agents had probable cause and a warrant.  The United States argues that the consent-to-search form that Romero executed after his arrest sufficed to grant the agents authority to re-enter the bedroom.  The Court finds that Romero's consent was freely and intelligently given.  Moreover, even if it were not, the Court would find that the inevitable-discovery rule applies and that it should therefore not exclude the evidence.

First, the United States cannot rely on the limited consent that O. Martinez granted to the agents.  "The scope of a search is generally defined by its expressed object."  Florida v. Jimeno, 500 U.S. 248, 251 (1991).  See United States v. Anderson, 114 F.3d 1059, 1065 (10th Cir. 1997)("The scope of a search is generally defined by its expressed object and is limited by the breadth of the consent given.");  United States v. Collamore, 330 Fed. Appx. 708, 714 (10th Cir. 2009)("In determining the scope of a defendant's consent, we ask what a reasonable person would have understood under the circumstances presented.").  "Whether a search remains within the boundaries of the consent is a question of fact to be determined from the totality of the circumstances, and a trial court's findings will be upheld unless they are clearly erroneous."  United States v. Pikyavit, 527 F.3d 1126, 1129 (10th Cir. 2008)(quoting United States v. Kimoana, 383 F.3d at 1223).  While the agents did not inform O. Martinez that they wanted to do a security sweep for officer-safety purposes, the agents asked O. Martinez if they could enter to perform a brief "walk-through" of his house.  Tr. at 97:4-98:2 (Ortega, Buie).  It was that request to which he consented.  The agents' admitted purpose was to check each room and confirm that there was nobody dangerous inside who

---

gave no guidance whether a re-entry for the sole purpose of seizing items that could have been seized in a prior, authorized entry was a constitutional violation.  See id. (holding only that such a re-entry did not violate a "clearly established right").  Because the Court can resolve the issues addressed in this motion using established Fourth Amendment principles, the Court will not resolve the constitutional question left open in Harris v. Ford.

might attack them as they sought to seize the Cavalier; they achieved that objective. See Tr. at 97:4-18 (Ortega, Buie); id. at 118:20-119:13 (Bustamante, Buie).  The agents entered and left with Romero within the span of about ten minutes. See id. at 73:23-75:5 (Ortega, O. Martinez).  The second challenged entry happened approximately thirty minutes later.  Given these facts, the Court concludes the second entry was outside the scope of O. Martinez' limited consent.[26]

### A.    ROMERO'S CONSENT WAS VOLUNTARY.

Romero's consent, however, was valid.  First, the Court notes that Romero signed a consent-to-search form.  The form is very simple and states the following:

1.    I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of:
- personal room at 345 Popay Ave., San Juan Pueblo, NM
- Items to be seized include shotgun & ammunition[27]

2.    I have been advised of my right to refuse consent.

3.    I give this permission voluntarily.

4.    I authorize these agents to take any items which they determine may be related to their investigation.

Consent to Search Form (dated April 16, 2009)(Government Exhibit 4).  The form also contains Romero's signature and Scholl's signature.  The consent-to-search form does not completely resolve the question whether the search was voluntary, but it is a factor weighing strongly in favor of finding

---

[26] During this thirty-minute time period, two or three female agents stayed with O. Martinez and thus were apparently present in his livingroom during Scholl's and Grout's interview with Romero. See Tr. at 73:23-75:5 (Ortega, O. Martinez).  Nobody challenges those limited entries into O. Martinez' house as violating Romero's rights, and no evidence was found during them.  The Court thus does not analyze whether O. Martinez' consent extended to these agents' decision to stay with O. Martinez.

[27] These two bullet points are hand-written on the form.  It is not clear whether it is the handwriting of Scholl or Romero.  Both Scholl and Romero signed the form.

that the search was voluntary.  See United States v. Romero, 247 Fed. Appx. 955, 961-62 (10th Cir. 2007)("Consent is a factual issue to be determined by the totality of the circumstances, not by per se rules.  In other words, no one factor -- including the execution of a consent-to-search form -- is dispositive.").  At the very least, the form is evidence that the agents informed Romero of his right to refuse to consent to the second search of his room.

The remaining factors also weigh in favor of finding Romero's consent was voluntary.  The only factors weighing against finding the consent voluntary are that there were several agents present in the vicinity -- two of whom were in the vehicle where Romero sat -- and that Romero had just confessed to a very serious crime and been placed under arrest.[28]  The Court does not ignore the importance of those factors on the mental state of Romero, but the balance of factors still appears to weigh in favor of finding Romero's consent was voluntary.  In addition to being expressly informed that he could refuse consent, the evidence showed that the conversation that Romero had with Scholl and Grout was congenial.  Neither Scholl nor Grout used aggressive language or tone of voice suggesting that Romero was required to consent.  Neither Scholl nor Grout was in possession of Romero's personal effects, such as his identification or other papers.[29]  Next, Romero was not in a private, isolated place when Scholl asked him to sign the consent to search; rather, he was in full view of the public through the windows of the agent's vehicle.  Finally, none of the

---

[28] Scholl's testimony indicates that Romero verbally gave the agents consent to search his room after his confession but before the agents placed him under arrest.  Romero did not sign the consent-to-search form, however, until after he had been handcuffed and placed in Fischer's vehicle. See Tr. at 155:4-156:19 (Ortega, Scholl).

[29] The Court realizes that this factor arose in cases dealing with consent to search automobiles and thus is a poor fit for determining whether consent to search a bedroom is voluntary. The Court thus does not weigh this factor heavily under these circumstances, but notes that it weighs in favor of finding Romero's consent was voluntarily given.

agents displayed their weapons or physically touched Romero, other than as necessary to place him under arrest for the crime to which he confessed.  See United States v. Fox, 600 F.3d at 1258; United States v. Ledesma, 447 F.3d at 1314; United States v. Anderson, 114 F.3d at 1064; United States v. Sedillo, 2010 WL 965743, at *12.[30]

Other considerations that the Tenth Circuit has identified also weigh in favor of finding Romero's consent was voluntarily given.

> In determining whether a consent to search was free from coercion, a court should consider, *inter alia*, physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances.  An officer's request for consent to search does not taint an otherwise consensual encounter "as long as the police do not convey a message that compliance with their request is required."

United States v. Peña, 143 F.3d at 1367.  Here, there was no evidence of physical mistreatment, violence, threats, threats of violence, promises or inducements, or deception or trickery.  Romero

---

[30] As the Court understands the facts, Romero was placed in custody before the agents obtained his written consent to the search, but his consent to search preceded any Miranda warnings. The Tenth Circuit has held several times, however, that a consent to search is not an interrogation that necessitates Miranda warnings.  See United States v. Curls, 219 Fed. Appx. 746, 754-55 (10th Cir. 2007)(declining to address the defendant's arguments that he was arrested and in custody, and thus that Miranda warnings were required before a valid consent-to-search, because "[Tenth Circuit] precedent establishes that the officers' request for his consent to search [does] not constitute an interrogation requiring the Miranda warnings."); United States v. McCurdy, 40 F.3d 1111, 1118 (10th Cir. 1994)(holding, after the United States had conceded that the defendant was in custody for Fifth Amendment purpose, that "[a]n officer's request to search a defendant's automobile does not constitute interrogation invoking a defendant's Miranda rights."); United States v. Rodriguez-Garcia, 983 F.2d 1563, 1568 (10th Cir. 1993)("We hold that a consent to search is not the type of incriminating statement which the Fifth Amendment was designed to address.  Consenting to a search is not 'evidence of a testimonial or communicative nature' which would require officers to first present a Miranda warning."); United States v. Gay, 774 F.2d 368, 379 (10th Cir. 1985)(holding that asking a suspect for consent to search did not constitute an interrogation because "[s]uch a request generally cannot be said to lead to an incriminating response").  The Court thus concludes that the lack of Miranda warnings before asking Romero to sign the consent-to-search form did not violate Romero's constitutional rights.

confessed to a killing, apparently without remorse but also apparently without reservation.  Scholl

testified that the conversation during which Romero confessed was cordial and congenial.  See Tr.

at 159:2-8 (Ortega, Scholl).  He also testified that, once he identified an inconsistency in Romero's

story and asked him about it, Romero was very forthcoming.  See id. at 152:16-153:5 (Ortega,

Scholl).  The consent-to-search form explains that Romero may refuse to consent, yet Romero

signed the form.  The Court finds no sound reason to find duress or coercion in obtaining Romero's

consent to the search of his room.

### B.   IF THE AGENTS' SECOND ENTRY VIOLATED THE FOURTH AMENDMENT, THE INEVITABLE-DISCOVERY DOCTRINE APPLIES, AND THE COURT NEED NOT SUPPRESS THE EVIDENCE SEIZED.

Even if the second entry into Romero's bedroom constituted a violation of Romero's Fourth

Amendment rights, the Court would not exclude the evidence because law-enforcement officers

would have inevitably discovered that evidence.  The inevitable-discovery doctrine is an exception

to the exclusionary rule.  The doctrine allows a court to admit unconstitutionally obtained evidence

"if an independent, lawful police investigation inevitably would have discovered it."  United States

v. Owens, 782 F.2d at 152.  "Inevitable discovery analysis thus requires the court to examine each

of the contingencies involved that would have had to have been resolved favorably to the

government in order for the evidence to have been discovered legally and to assess the probability

of the contingencies having occurred."  United States v. Cunningham, 413 F.3d at 1203.  The

inevitable-discovery doctrine "applies whenever an independent investigation inevitably would have

led to discovery of the evidence, whether or not the investigation was ongoing at the time of the

illegal police conduct"; "it is possible for an investigation that begins after the violation to be

independent of the illegal investigation."  United States v. Larsen, 127 F.3d at 986-87.  "[A]s long

as it can be shown by demonstrated historical facts that an independent and untainted discovery

would inevitably have occurred, the evidence will be admissible." <u>United States v. Griffin</u>, 48 F.3d at 1151 (internal citations and quotations omitted).

The Court can say that a preponderance of the evidence demonstrates that an independent and lawful police investigation would have uncovered the evidence in Romero's bedroom. The alleged constitutional violation was the agents' second entry into Romero's house and bedroom, after they had already seen the evidence they desired to seize and obtained Romero's confession to Friday's murder. The Court thus envisions the facts as they would exist if that potential constitutional violation had not occurred.

If the agents had not sought Romero's consent to search, the next logical step would have been to return to Judge Puglisi and seek another search warrant. The affidavit for that search warrant would have contained the same information currently contained in Scholl's affidavit and two very important new facts. First, it would have stated that investigating agents personally saw a weapon fitting the description of the murder weapon in Romero's bedroom. Second, and more importantly, it would have stated that Romero confessed to the killing and admitted that the shotgun in his bedroom was the murder weapon. These facts would have established probable cause to issue a search warrant for Romero's bedroom. With Romero in custody, he would be unable to tamper with the condition of his room, thus decreasing the likelihood that the shotgun, ammunition, and other evidence would be gone by the time the agents obtained and executed the search warrant. The only reason those items might be missing by the time the agents returned is if Romero's mother or O. Martinez concealed them to protect their son/step-son. The Court is hesitant to assume that a person will commit the crime of obstruction of justice, even if it is to protect his or her child. Thus, although the Tenth Circuit has warned of the "danger of admitting unlawfully obtained evidence on the strength of [a] judge's speculation that it would have been discovered legally anyway," <u>United</u>

<u>States v. Owens</u>, 782 F.2d at 152-53, the Court believes this situation is one where, absent Romero's allegedly flawed consent, officers would have inevitably discovered and seized the evidence in Romero's bedroom. The Court will therefore deny all three of Romero's motions to suppress.

**IT IS ORDERED** that the Defendant's Motion to Suppress Defendant's April 16, 2009 Statement and Memorandum in Support (Doc. 30); the Defendant's Motion to Suppress Evidence Due to Lack of Probable Cause in Search Warrant Affidavit (Doc. 31); and the Defendant's Motion to Suppress Evidence Due to Unconstitutional Consensual Entries to Personal Bedroom (Doc. 33) are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Gregory J. Fouratt
  United States Attorney
Roberto D. Ortega
Rumaldo R. Armijo
  Assistant United States Attorneys
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Edward O. Bustamante
Edward O. Bustamante, Esq.
Albuquerque, New Mexico

     *Attorney for the Defendant*