**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                        No. CR 09-1253 JB

CARL ROMERO,

      Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on Defendant Carl Romero's Objections to Presentence Report and Motion to Vacate Count 5, 18 U.S.C. § 924(c)(1)(A)(C)(i) Firearm Count or in the Alternative Motion for Variance, filed Oct. 31, 2011 (Doc. 132)("Objections to PSR"). The Court held a sentencing hearing on November 10, 2011. The primary issues are whether: (i) the Court should strike ¶¶ 21-24 of the Presentence Report, disclosed May 11, 2011 ("PSR"); (ii) Romero is entitled to a reduction for having accepted responsibility for his conduct, notwithstanding that he proceeded to trial in this matter; and (iii) whether the Court should vacate Count 5 of the Indictment, filed May 12, 2009 (Doc. 13), because Romero was not found guilty of first-degree murder, the underlying crime of violence in relation to which Romero was charged with using a firearm, as indicated in Count 5. The Court will overrule his objections. The Court may consider a wide array of information pertinent to a defendant's background and characteristics when sentencing the defendant. Although ¶¶ 21-24 of the PSR do not relate to the crimes of which Romero was convicted, the Court finds that this information is relevant to determining a proper sentence for Romero. Further, Romero has not disputed the factual information set forth in these paragraphs. Romero is not entitled to a reduction for having accepted responsibility of his conduct,

because Romero put the Plaintiff United States of America to its burden of proof at trial.  Lastly, Romero need not have been indicted for the crime of violence during and in relation to which he used a firearm for him to be culpable under 18 U.S.C. § 924(c)(1)(A)(C)(i), the crime which Romero is charged with in Count 5 of the Indictment.

## FACTUAL BACKGROUND

On April 11, 2009, a body was found in an arroyo on the San Ildelfonso Pueblo Indian Reservation, in Santa Fe County, New Mexico.  See PSR ¶ 7, at 4.  The body was later determined to be that of Naayaitch Friday, and postmortem examinations found that Friday died from gunshot wounds to his chest and head.  See id. ¶ 9, at 4.  The medical examiner found twenty-one shotgun shell pellets in Friday's chest wall, lung, and left back.  The examiner found twenty-pellets in Friday's chin and sinuses, and two fragments of shotgun shell wadding in Friday's chin.  See id. ¶ 9, at 4.

On April 16, 2009, Federal Bureau of Investigation ("FBI") agents arrived at Romero's residence to execute a search warrant on Romero's vehicle which had been connected to the occurrences surrounding Friday's death.  See id. ¶ 10, at 5.  Romero's step-father permitted the agents to enter the residence, where the agents found Romero asleep in a back bedroom with a long barreled weapon on a dresser.  The agents informed Romero that they were there to search his vehicle, and Romero agreed to exit the residence.  See PSR ¶ 10, at 5.

Outside, Romero voluntarily agreed to allow the FBI agents to interview him.  When the agents questioned Romero regarding the occurrences on the night of April 10, 2009, Romero told the agents that he had been out drinking and driving with his friends, Lucas Willow and Mario Sanchez, around Espanola, New Mexico.  See id. ¶ 13, at 5.  Romero told the agents that, while "hanging out" at a Sonic Drive-In, Romero and his friends met Fabian Madrid and Naayaitch Friday,

whom Romero had not previously met.  id. ¶ 14, at 5.  The five men proceeded to socialize at the Sonic Drive-In and left approximately an hour later for the Big Rock Casino.  Romero informed the agents that, after the Casino, Romero drove Madrid and Friday to a residence and left them there. FBI agents at this point in the conversation, confronted Romero with some evidence, and told him that they did not believe he was being honest about dropping off both Madrid and Friday.  Romero initially acted surprised when the agents told him that Friday was found dead a couple miles from where Romero asserted he had dropped off Friday.  Eventually, Romero confessed to shooting Friday.  See id. ¶ 14, at 6.  Several witnesses observed Romero shoot Friday.  See id. ¶¶ 16-17, at 6-7.

The FBI's investigation into Romero's involvement in the death of Friday led FBI agents to Bonnie Maestas.  Maestas informed the FBI agents that, on April 9, 2009, she had been hanging out with Romero and several other friends at a friend's house in Santa Clara Pueblo, New Mexico.  See PSR ¶ 21, at 7.  Maestas had known Romero for approximately one year at that time and considered him an acquaintance.  See id. ¶ 21, at 8.  Maestas reported that Romero was talking about the Northside Gang at the friend's house and that Romero asserted he was a member of the gang.  See id. ¶ 21, at 7.  Maestas made a joking comment about the Northside Gang, stating that the Westside Gang was better than the Northside Gang.  When Maestas left for the night with another friend, Romero followed them outside.  When Maestas and her friend reached their vehicles, they heard a car door slam shut and observed Romero holding a shotgun with the barrel pointing up.  Romero began yelling at Maestas about her having disrespected his gang and pointed the shotgun at Maestas, who was standing about twenty feet away.  Romero yelled at Maestas, saying "keep talking shit Bonnie" and "what are you gonna do now?"  id. ¶ 21, at 8.  As Romero was yelling, others from inside the friend's house came outside and attempted to calm him down.  After a brief period,

Romero pointed the shotgun in the air and fired a shot -- all that were present took cover, and then Maestas and her friend quickly entered their vehicles and left the residence.  As she was driving away, Romero fired another shot, but Maestas does not know if it was fired at the air or at one of their vehicles.  Neither Maestas nor her friend contacted the police regarding the incident.  See PSR ¶ 22, at 8.

On April 15, 2010, the Bureau of Indian Affairs provided the FBI with an envelope addressed to James Naranjo, of Espanola, with Romero's return address.  The PSR contains excerpts from the letter; Romero is requesting a favor from the recipients, addressed as "Creeper & Bubba." Id. ¶ 22, at 8.  The United States Probation Office ("USPO") reports that Romero was incarcerated at the Sandoval County, New Mexico detention center, awaiting trial, when he sent the letter.  FBI agents later determined that the letter was a solicitation for Creeper and Bubba to murder the persons to which Romero refers to in the letter.  Id. ¶¶ 23 - 24, at 9.

## PROCEDURAL BACKGROUND

Romero was indicted on five Counts by a grand jury on May 12, 2009.  All five Counts relate to Romero's attack on Naayaitch Friday, an Indian, on or about April 11, 2009, in Indian Country. Count 1 in the Indictment, Count 3 in the Court's Final Jury Instructions (Given)(without citations), Instruction No. 15, at 17, filed Mar. 24, 2011 (Doc. 115)(" Jury Instruction"),[1] is for a violation of 18 U.S.C. §§ 1153 and 113(a)(3), Assault with a Dangerous Weapon, for Romero's assault on Friday with a Rossi SA .410 shotgun, serial number S41 SP 212624, with intent to do bodily injury.

---

[1]The Jury Instruction contains the same five Counts, verbatim, as are set forth in the Indictment, but, the Jury Instruction orders the Counts differently.  Cf. Indictment at 1-3, with Jury Instruction No. 15, at 17-18.  Jury Instruction No. 15 states: "Mr. Romero is on trial before you upon an indictment brought by the grand jury charging as follows."  Instruction No. 15, at 17.  When referring to the order of the Counts as set forth in the Jury Instruction, the Court identifies the Counts as "Jury Instruction Count X."

See Indictment at 1.  Count 2 in the Indictment, Jury Instruction Count 4, is for a violation of 18 U.S.C. §§ 1153 and 113(a)(6), Assault Resulting in Serious Bodily Injury, for Romero having assaulted Friday, which resulted in serious bodily injury to Friday.  See Indictment at 2; Jury Instruction No. 15, at 18.  Count 3 in the Indictment, Jury Instruction Count 5, is for a violation of 18 U.S.C. § 942(c)(1)(A)(i), Use of a Firearm in Relation to a Crime of Violence, for Romero using the Rossi SA .410 shotgun in relation to a crime of violence, specifically the assault on Friday described in Counts 1 and 2 of the Indictment, and Jury Instruction Counts 3 and 4.  See Indictment at 2; Jury Instruction No. 15, at 18.  Count 4 in the Indictment, Jury Instruction Count 1, is for a violation of 18 U.S.C. § 1153 and § 1111, First Degree Murder, for Romero having killed Friday willfully, deliberately, maliciously, and with premeditation by shooting him with the Rossi SA .410 shotgun.  See Indictment at 2; Jury Instruction No. 15, at 17.  Count 5 of the Indictment, Jury Instruction Count 2, is an indictment for Romero having used the Rossi SA .410, a firearm, during the first degree murder of Friday, described in Count 4 of the Indictment, Jury Instruction Count 2, a violation of 18 U.S.C. § 924(c)(1)(A)(C)(i).  See Indictment at 2-3; Jury Instruction No. 15, at 17.

Romero pled not guilty to each count in the Indictment on May 19, 2009.  See Clerk's Minutes of Detention/Arraignment - Gila Courtroom, filed May 19, 2009 (Doc. 16).  This case was designated as a complex case on May 13, 2010, pursuant to 18 U.S.C. § 3161(h)(7)(B)(ii), because of the "complexity of the facts in this case, the nature of this prosecution, and the sheer volume of discovery."  Order Designating a Complex Case, filed May 13, 2010 (Doc. 60).  A trial was held from March 21, 2011 through March 24, 2011.  See Notice of Jury Trial, dated Mar. 21, 2011 (Doc. Entry 100); Verdict, filed Mar. 24, 2011 (Doc. 118).

Romero filed three motions to suppress evidence in this matter.  See Motion to Suppress Defendant's April 16, 2009 Statement and Memorandum in Support, filed Nov. 9, 2009 (Doc. 30);

Defendant's Motion to Suppress Evidence Due to Lack of Probable Cause in Search Warrant Affidavit, filed Nov. 9, 2009 (Doc. 31); Defendant's Motion to Suppress Evidence Due to Unconstitutional Consensual Entries to Personal Bedroom, filed Nov. 9, 2009 (Doc. 33). The Court denied these motions. The Court denied these motions, and admitted Romero's confessions and all evidence acquired during the consensual search of his house and warrant-authorized search of his vehicle. See Memorandum Opinion and Order, filed Aug. 20, 2010 (Doc. 70).

At trial, Romero contested several aspects of the United States' case. First of all, he contested whether he had committed first-degree murder. Romero repeatedly argued that he was drunk, and was acting stupidly and in self-defense, and that he had not premeditated the killing of Friday. See Transcript of Trial (taken Mar. 21, 2011) at 255:6-10 (Bustamante)("Mar. 21 Tr."); Transcript of Trial (taken Mar. 22, 2011) at 39:29-40:18 (Bustamante, Buie)("Mar. 22 Tr.")(Romero pointing out that the use of the term "murder weapon" is a legal conclusion and not a fact).[2] Romero contended that he was too drunk to form the requisite mens rea to commit first-degree murder, as he was too drunk to have premeditated killing Friday. See Mar. 22 Tr. at 115:19-116:24(Bustamante, Willow)(Romero questioning Willow regarding how much alcohol Romero consumed the night of Friday's death and how intoxicated Romero appeared). Romero also contended that all those socializing with Romero on April 10, 2009, were highly intoxicated, and that Madrid had made threats to Romero and his friends, Willow and Sanchez, regarding a failed purchase of cocaine Romero orchestrated. See Mar. 22 Tr. at 118:5-119:4 (Bustamante, Willow)(Romero questioning Willow whether he and the others were intoxicated on April 10, 2009);

---

[2]The Court's citations to the transcripts of the trial and hearing refer to the court reporter's original, unedited versions. Any final transcripts may contain slightly different page and/or line numbers.

Mar. 22 Tr. at 120:3-125:21 (Bustamante, Willow)(Romero contending that Romero, Willow, Sanchez, Madrid, and Friday had all consumed a large amount of alcohol, and that Madrid had begun threatening Romero and his friends). Romero contended that Madrid's threats to Romero and his friends were lethal. See Mar. 22 Tr. at 129:4-130:4 (Bustamante, Willow)(Romero refreshing Willow's recollection with a previous statement in which Willow relates that Madrid made lethal threats to Romero and Sanchez). Romero attempted to argue that Friday made threats to Romero as well. See Mar. 22 Tr. at 132:3-134:4 (Bustamante, Willow)(Romero questioning Willow whether Friday made threats to Romero while Romero). Romero contended that Friday became angry and was yelling at Romero after Romero dropped off Madrid. See Mar. 22 Tr. at 135:18-136:18 (Bustamante, Willow). Romero further raised the question whether Madrid had threatened to shoot Romero. See Mar. 22 Tr. at 148:4-18 (Bustamante, Willow). Romero raised similar questions in his cross-examination of Sanchez, and refreshed Sanchez' recollection with his previous statements describing Madrid as "belligerent drunk" when he met Romero and his friends at the Sonic. Mar. 22 Tr. at 245:11-21 (Bustamante, Sanchez).

Romero also challenged whether he was an Indian, and thus, whether he was subject to the jurisdiction of a federal court. See Mar. 21 Tr. at 256:3-16 (Bustamante). Romero questioned the United States' evidence that he self-identified as a Native American, see Mar. 22 Tr. at 16:10-17:1 (Bustamante, Tager), and whether Romero's previous interactions with tribal court proved that he was an Indian, see Mar. 22 Tr. at 16:10-17:1 (Bustamante, Tager). See also Mar. 22 Tr. at 160:15-161:14; id. at 162:3-5 (Bustamante, Garcia)(Romero pointing out that his former employer, to whom Romero self-identified as a Native American, has no verification process to determine the ethnicity of applicants). Romero also pointed out that he is not enrolled in any Indian Tribe. See Mar. 22 Tr. at 37:5-10 (Bustamante, Tager). Romero also contested whether the crime occurred on Indian land,

another requirement for federal jurisdiction over the case.  See Mar. 21 Tr. at 295:8-296:2 (Bustamante, Martinez)(Romero questions whether the government's evidence regarding the location of the incident was definitively on Indian land, or, rather, in "no man's land").

Romero did not object at trial to the admission of his confession to the FBI agents, but objected to the admission of transcripts of his statement into evidence.  See Transcript of Trial (taken Mar. 23, 2011) at 293:13-294:12 (Ortega, School, Court, Bustamante)("Mar. 23 Tr."); Mar. 23 Tr. at 294:16-295:13 (Ortega, Court, Bustamante).  Romero questioned, however, whether the statement could have been the result of manipulation of the prompting of FBI agents who were questioning him.  See Mar. 24 Tr. at 71:2-14 (Bustamante, Scholl).

At the close the United States' case, Romero moved for a directed verdict on the assault charge, on the first-degree murder, and on the charge for use of a firearm in relation to first-degree murder.  See Mar. 24 Tr. at 102:19-103:17 (Bustamante, Court).  Romero argued that the United States had failed to present sufficient evidence for a jury to find that he shot Friday twice, and also argued that the first shot at Friday could have come from anywhere, and, thus, Romero contended that he could not have created an apprehension of being shot in Friday because he shot him after he was already shot.  See Mar. 24 Tr. at 101:1-20 (Bustamante).  Romero argued that the United States had also failed to present sufficient evidence that he premeditated the murder, as Romero argued that the killing occurred too quickly and under the influence of too much alcohol for the United States to show that Romero premeditated killing Friday.  See Mar. 24 Tr. at 101:21-102:17 (Bustamante, Court).  Lastly, Romero argued that, because he believed the United States had failed to show sufficient evidence that he committed first-degree murder, the charge of  of a firearm in relation to first-degree murder should also be given a directed verdict.  See Mar. 24 Tr. at 102:19-103:17 (Bustamante, Court).  The Court found that there was ample evidence to support a jury finding that

-8-

Romero assaulted Friday and murdered Friday in the first-degree with the use of a firearm. <u>See</u> Mar. 24 Tr. at 107:5-109:4 (Court).

Regarding the Jury Instructions, the United States argued, outside the presence of the jury, that the Jury Instruction should reflect that Romero may be guilty of violation 18 U.S.C. § 924(c), even if the jury acquits him of first-degree murder and finds him guilty of second-degree murder instead. <u>See</u> Mar. 24 Tr. at 109:14-115:5 (Barth, Court, Ortega). The Court stated that the United States Court of Appeals for the Tenth Circuit has determined that a conviction under 18 U.S.C. § 924(c) is a distinct offense, and, thus, the jury instructions should relate that Romero need not be convicted of first-degree murder to be convicted of using a firearm in relation to the commission of crime of violence. <u>See</u> Mar. 24 Tr. at 116:8-118:16 (Court)(relying on <u>United States v. Hill</u>, 971 F.2d 1461, 1464 (10th Cir. 1992)); <u>id.</u> at 119:11-120:22 (Court, Ortega). The Court stated that in <u>United States v. Hill</u>,

> the defendant was acquitted on every count of the predicate drug-trafficking offense, nonetheless the Court found that [the] defendant need not be convicted of the underlying crim[e] in order to be convicted of 924(c). In fact a defendant need not even be charged with the underlying crime to be convicted under 924(c), because the evidence was sufficient for a rational trier [] to[] find that Hill was guilty of the predicate offense, the fact that a jury didn't find him guilty was irrelevant. So, looking in at [<u>Hill</u>], it says the defendant need not be charged with the underlying crime to be convicted.

Mar. 24 Tr. at 117:17-118:2 (Court). The Court also found that the Tenth Circuit pattern jury instructions allow a jury to find a conviction under 18 U.S.C. § 924(c) if the jury found Romero guilty of either first- or second- degree murder, and the Court accordingly amended the Jury Instructions to follow the <u>Tenth Circuit Pattern Jury Instructions Criminal</u>, § 2.45, 153-154 (2005)(Using/Carrying a Firearm During Commission of a Drug Trafficking Crime or Crime of Violence). <u>See</u> Mar. 24 Tr. at 121:13-122:22 (Court, Ortega)(referring to Jury Instruction No. 24.).

In his closing statements, Romero argued to the jury that he lacked the mens rea, as a "drunk" and "young, scared kid," to commit first-degree murder, second-degree murder, or voluntary manslaughter.  Mar. 24 Tr. at 217:10-13 (Bustamante).  See Mar. 24 Tr. at 220:25-221:4 (Bustamante).  Romero also argued that he did not assault Friday, as Romero argued to the jury that he did not fire the first shot that hit Friday, so he could not have put him in apprehension of being shot.  See Mar. 24 Tr. at 221:5-221:20 (Bustamante).

The jury found Romero not guilty of first-degree murder.  See Verdict ¶ 1 at 1.  The jury instructions directed the jury that, "[i]f you unanimously find Mr. Romero not guilty [of first-degree murder] . . . then you must determine whether Mr. Romero is guilty or not guilty of murder in the second degree."  Jury Instruction No. 18, at 22.  The jury found Romero guilty of second-degree murder.  See Verdict ¶ 1a, at 1.

Regarding Jury Instruction Count 2, the charge that Romero used "a firearm during and in relation to any crime of violence for which a person may be prosecuted in a court of the United States," the instruction directed the jury to determine whether the United States proved beyond a reasonable doubt that Romero was guilty of the crime, if the jury determined either that Romero committed the "crime of first degree murder" "or . . . the crime of murder in the second degree."  Jury Instruction No. 21, at 116.  The jury found Romero guilty of "using a firearm during and in relation to a crime of violence . . . as charged in [Jury Instruction] Count 2 . . . ."  Verdict ¶ 2, at 1.

The jury also found Romero guilty of Jury Instruction Count 3, Assault With a Dangerous Weapon.  See Verdict ¶ 3, at 1.  The jury found Romero guilty of Jury Instruction Count 4, Assault Resulting in Serious Bodily Injury.  See Verdict ¶ 4, at 2.  The jury, lastly, found Romero guilty of using a firearm in relation to a crime of violence as charged in Jury Instruction Count 5, specifically, while he committed Assault with a Dangerous Weapon and Assault Resulting in Serious Bodily

Injury.  See Verdict ¶ 5, at 2.  See also Jury Instruction No. 26, at 33 (directing the jury to find Romero guilty of a violation of 18 U.S.C. § 942(c)(1), if the jury finds that Romero "committed the crime of assault with a dangerous weapon" or "committed the crime of assault resulting in serious bodily injury," if the jury also finds that Romero "used or carried a firearm . . . during and in relation to" either crime of assault).

The USPO reports that Romero is not eligible for a reduction to his sentence based upon acceptance of responsibility, under U.S.S.G. § 3E1.1, application n. 2, because Romero proceeded to trial and was convicted by a jury.  See PSR ¶ 26, at 11.  The USPO recommends a total sentence of 595 months for Romero for his five counts of conviction.   See PSR at 23.

On October 31, 2011, Romero filed his Objections to PSR.  Romero asserts that he initiated plea negotiations with the United States "[o]n multiple occasions," but that the United States rebuffed every offer to settle.  Objections to PSR at 2.  Romero asserts that the only plea agreement he was offered was to first-degree murder, with a natural life sentence.  See Objections to PSR at 2.  Romero states that, on March 17, 2011, the United States offered a plea agreement of fifty years to Romero, which he did not accept.  See Objections to PSR at 2.

Romero requests the Court to vacate Count 5 of the Indictment.  See Objections to PSR at 1.  Romero asserts that he was indicted for a violation of 18 U.S.C. § 924(c)(1)(A)(C)(i), for having knowingly used and carried a firearm -- the Rossi SA .410  -- during the commission of first-degree murder.  Romero contends that, because he was convicted of second-degree murder, not first-degree murder, the Court should vacate Count 5 of the Indictment.  See Objections to PSR at 2-3.

Romero objects to ¶¶ 21-24 of the PSR, arguing that the paragraphs "can in no way be construed as Offense Behavior."  Objections to PSR at 3.  Romero argues that the paragraphs, containing information regarding Romero's interaction with Maestas, and the letter he sent while

incarcerated to Creeper and Bubba, will "greatly affect Carl's classification status in the Federal Bureau of Prisons." Objections to PSR at 3. Romero argues that he will be viewed immediately as a security threat at any facility where is incarcerated. Romero asserts that the paragraphs provide only "salacious details about the alleged character of Carl Romero." Objections to PSR at 3. Romero asserts that the excerpts from a letter "allegedly written by Carl Romero," contained in those paragraphs, "even if written by Carl Romero, and even all [sic] details in the letters [sic] are accurate, the letters [sic] can in no way be construed as offense behavior." Objections to PSR at 3.

Romero also requests the Court to "reject the opinion of Federal Probation . . . that Carl Romero has not accepted responsibility and grant a three (3) level reduction for acceptance of responsibility." Objections to PSR at 1. Romero asserts that he accepted responsibility. Romero points to his admittance to FBI agents that he shot Friday, and that he related the detail of the crime to the agents. See Objections to PSR at 2. Romero argues that it is "inapt to grant Carl Romero a three (3) level reduction had he pled to first-degree murder . . . . [because he] would have received a three level reduction while serving a natural life sentence." Objections to PSR at 3. Romero asserts that he did not deny killing Friday, and, rather, he only denied having committed first-degree murder. See Objections to PSR at 3-4.

Romero quotes from U.S.S.G. § 3E1.1, application note 2, in his argument:

> Conviction at trial, however, does not automatically preclude a defendant from consideration of such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial . . . . In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

Objections to PSR at 4. Romero contends that he never denied causing Friday's death and that, rather than asserting his constitutional right to remain silent, he spoke openly with law enforcement

about the circumstances leading to Friday's death.  Objections to PSR 4.  Romero asserts that the statements he made to law enforcement agents were consistent with the United States' witnesses at trial.  Romero argues that he exercised his right to trial "because the government gave him no choice.  A plea offer to first-degree murder and a natural life sentence, or to a fifty (50) year sentence ensured this case would proceed to trial."  Objections to PSR at 4.  Romero argues that he never denied an essential element of guilt and, on that basis, requests a three-level reduction for acceptance of responsibility.  Objections to PSR at 4.

The United States filed its response to Romero's Objections to PSR on November 9, 2011.  Response to Motion to Vacate Count 5 and to Sentencing Memorandum, filed Nov. 9, 2011 (Doc. 134)("Response").  The United States asserts that Count 5 of the Indictment, Jury Instruction Count 2, "is valid and should not be dismissed."  Response at 4.  The United States asserts that Romero has failed to cite to any authority in his argument for vacating Count 5 of the Indictment, Jury Instruction Count 2.  The United States argues that Romero's argument is "unavailing," as he asserts that he cannot be convicted of using a firearm in relation to a crime of violence because he was acquitted of first-degree murder.  Response at 4.  Pointing to the statute underlying Count 5 of the Indictment, Jury Instruction Count 2 -- 18 U.S.C. § 924(c), the United States argues that the statute extends liability to a defendant who used a firearm during the commission of a crime of violence.  See Response at 4-5.  The United States asserts that the jury was instructed, "upon extensive arguments by the parties regarding the final jury instructions," that second-degree murder is a crime of violence, just as is first-degree murder.  Response at 5.  The United States points to the jury having convicted Romero of second-degree murder, and also finding that Romero violated the crime set forth in Jury Instruction Count 2, charging the Use of a Firearm in Relation to a Crime of Violence.  The United States argues, thus, that "there is no basis . . . for the Court to dismiss [the

charges set forth in Jury Instruction] Count 2, based upon Defendant's current request." Response at 6.

The United States also argues that the "PSR correctly recommends no adjustment for acceptance of responsibility." The United States contends that "acceptance of responsibility adjustment after trial are 'very rare.'" Response at 6 (quoting United States v. Tom, 494 F.3d 1277, 1281 (10th ir. 2007)). The United States asserts that the Tenth Circuit has approved a reduction only after trial in one reported case, United States v. Gauvin, 173 F. 3d 798 (10th Cir. 1999). The United States asserts that, in the "rare instance when a two-level reduction is applied after trial," the basis for the reduction is primarily the defendant's pre-trial statements and conduct. Response at 6 (citing U.S.S.G. § 3E1.1, application n. 3).

The United States asserts that the standard applied to determine whether Romero is entitled to such a reduction is a preponderance of the evidence. See Response at 6 (citing United States v. McMahon, 91 F.3d 1394, 1396-97 (10th Cir. 1996)). The United States posits that a "defendant's admission of wrongdoing at trial is insufficient, standing alone, to entitle him to an adjustment for acceptance of responsibility." Response at 7 (citing United States v. Benally, 149 F.3d 1191 (10th Cir. 1998)(unpublished)). The United States contends that a defendant who challenges the factual elements of his guilt at trial is not entitled to an adjustment for acceptance of responsibility. See Response at 7 (citing United States v. Portillo-Valenzuela, 20 F.3d 393, 394-95 (10th Cir. 1994)).

The United States asserts that, although Romero admitted that he shot Friday, his confession was not immediate. The United States contends that Romero initially lied to the law enforcement officers, and told the officers that he dropped Madrid and Friday off at a residence, and only confessed after agents confronted the truth of his statements. See Response at 7. The United States argues that Romero was "not forthcoming with law enforcement until he was confronted with the

-14-

truth and had no choice but to tell what really happened." Response at 8. The United States contends that such statements do not fulfill the requirements of U.S.S.G. § 3E1.1 for acceptance of responsibility, "which requires that a defendant 'clearly demonstrates acceptance for his offense.'" Response at 8 (quoting U.S.S.G. § 3E1.1). The United States argues that, under U.S.S.G. § 3E1.1 application note 1(A), a primary consideration whether to grant the reduction is a defendant's truthful admittance of the conduct comprising the offenses of conviction, which the United States asserts Romero did not do. The United States, thus, argues that Romero is not entitled to a reduction for acceptance of responsibility. See Response at 8.

The Court held a sentencing hearing on November 10, 2011. See Transcript of Hearing (taken Nov. 10, 2011)("Tr."). The Court began by addressing Romero's objection to ¶¶ 21-24 of the PSR. See Tr. at 6:22-24 (Court). The Court explained that those paragraphs, which detail Romero's "Offense Behavior Not Part of Relevant Conduct," PSR at 7, do not "impact in any way upon the offense level," Tr. at 6:22-7:4 (Court). Romero stated that he agreed that the paragraphs do not impact the offense level, but asserted that the information has "gr[ave] impact [on] Mr. Romero's chances at a decent classification when he goes to prison." Tr. at 7:5-8 (Bustamante). Romero asserted that the paragraphs describe events from his past, which may or may not have occurred, and that have nothing to do with the behavior for which he was convicted. See Tr. at 7:9-14 (Bustamante). Regarding the letters which the USPO included in the PSR from Romero, Romero argued that the letters do not discuss any possible witnesses in the case. See Tr. at 7:15-18 (Bustamante). Romero asserted that the paragraphs will only signal to the Bureau of Prisons that Romero could be a threat to the facility, causing him to receive a higher classification than he currently faces. See Tr. at 7:15-23 (Bustamante). The Court noted that ¶ 21 refers to an incident that was admitted at trial, in a redacted form. See Tr. at 7:24-25 (Court). The Court inquired

whether Romero had any objections to that paragraph, and Romero admitted that he "could live with that one," because it was already let in at trial.  Tr. at 8:2-6 (Court, Bustamante).  The Court noted that the first part of ¶ 22 refers to the same incident as ¶ 21, and Romero admitted that he does not have a strong objection to the first portion of ¶ 22 being admitted.  See Tr. at 8:9-14 (Court, Bustamante).

The United States stated that it believes that all of the information in ¶¶ 21-24 of the PSR should remain, "because they give a full picture of who Mr. Romero is."  Tr. at 8:17-20 (Ortega).  The United States agreed that the paragraphs do not describe relevant conduct, but asserted that some of the paragraphs refer to the same weapon -- a shotgun -- that Romero used during the homicide.  See Tr. at 8:22-9:3 (Ortega).  Regarding the portions of ¶ 22 that refers to a letter from Romero, the United States suggested that the letter "explains a little bit about how Mr. Romero thin[k]s and who he is and at least what he was contemplating," before he committed the crime.  Tr. at 9:4-7 (Ortega).  The United States agreed, however, that the letter could have an impact on his classification with the Bureau of prisons, and on that basis, the United States stated that it did not have any objection to the letter being redacted from the PSR.  See Tr. at 9:7-12 (Ortega).  Romero stated that his objection is to the inclusion of the bottom half of ¶ 22, as well as ¶¶ 23-24, which refer to the letter, in the PSR.  See Tr. at 9:15-26 (Bustamante).

The Court then inquired of the United States what its position is to Romero's objection to ¶ 26 and ¶ 34 of the PSR, in which the USPO states that Romero is not entitled to an adjustment in his sentence for acceptance of responsibility, because Romero proceeded to trial.  See Tr. at 9:17-21(Court).  The United States stated that, once a defendant "takes the Government to trial . . . he or she is not entitled to acceptance of responsibility."  Tr. at 9:25-10:2 (Ortega).  The United States asserted that the Sentencing Guidelines provide "that for true acceptance of responsibility it must

require that a defendant clearly demonstrates acceptance for his offense." Tr. at 10:3-5 (Ortega). The United States pointed out that Romero did not testify at trial, and, thus, the United States asserted that the Court must rely on the testimony of the United States' witnesses at trial regarding whether Romero truly accepted responsibility for his actions. See Tr. at 10:12-15 (Ortega). The United States argued that Romero was "not forthcoming when first confronted by the FBI agents who investigated these crimes," in part because Romero did not relate his story until after the victim, Friday, was found deceased. Tr. at 10:15-19 (Ortega). The United States also pointed to Romero having told the FBI agents that he dropped both Friday and Madrid off at a home, when he actually only dropped Madrid off and then killed Friday after. See Tr. at 10:19-22 (Ortega). The United States asserted that "due to the dishonesty and the direction that he took the agents on initially . . . the Government does not believe that he has accepted responsibility and should not benefit from this guidelines." Tr. at 10:23-11:1 (Ortega).

The Court noted that, in a few opinions, the Tenth Circuit has focused on whether the United States was "put to the burden of proof at trial because the defendant has denied the essential factual elements of guilt." Tr. at 11:2-6 (Court). The Court noted that, at trial, Romero "fought the Government pretty hard on the location of the crime and you had to go to some considerable effort to establish that element, that it occurred on the reservation." Tr. at 11:11-14 (Court). The United States added that it also had to prove at trial the essential element of whether Romero was an Indian under federal law. See Tr. at 11:20-23 (Ortega).

Turning to Romero, the Court pointed out that the Tenth Circuit opinions on acceptance of responsibility "seem to focus a great deal on pretrial statements and conduct." Tr. at 12:1-2 (Court). The Court inquired of Romero what the "primary pretrial statements and conduct would be that would . . . entitle Mr. Romero to [] acceptance of responsibility." Tr. at 12:2-5 (Court). Romero

responded that, when FBI agents arrived at his home, they were let in voluntarily, and Romero was cooperative with the agents.  See Tr. at 12:6-8 (Bustamante).  Romero asserted that he only made one denial, when he did not know what the agents were talking about, but after that his statements were truthful.  See Tr. at 12:10-13 (Bustamante).  Romero posited that he is facing the sentence he is because he did not keep silent when the agents questioned him, and he "told them exactly what happened[] and his statements . . .allowed them to continue their investigation."  Tr. at 12:11-17 (Bustamante).  Romero asserted that the only issue which was fought at trial was whether Romero committed first-degree murder, and that the only reason he proceeded to trial was because the United States would only offer a plea to first-degree murder with the acceptance of a natural life sentence. See Tr. at 12:19-22 (Bustamante).  Romero posited that, "when you're backed into that corner there's nothing else you can do but go to trial."  Tr. at 12:22-24 (Bustamante).  Romero asserted that he admitted that, when the crime was committed, "[I] stood read[]y [] I was angry, I loaded the gun, I fired the gun and then I reloaded the gun."  Tr. at 13:2-4 (Bustamante).  Romero asserted that he was indicted for first-degree murder because he supplied all of the elements of that crime.  See Tr. at 13:5-8 (Bustamante).

The Court inquired of Romero what his response is to the United States' position that Romero refused to concede, and put the United States to the burden of proof regarding the location of the crime and whether Romero was an Indian.  See Tr. at 13:9-11 (Court).  Romero pointed to the Sentencing Guidelines, U.S.S.G. § 3E1.1, application n. 2, and argued that going to trial does not automatically preclude Romero from the reduction.  See Tr. at 13:13-14 (Bustamante).  Romero contended that the United States should be held to its burden of proof if trial ensues, and Romero argued that whether the crime occurred on Indian land is an "element but it's not a criminal element."  Tr. at 13:17-20 (Bustamante).  Romero contended that stating or conceding that the crime

occurred on Indian land has nothing to do with his criminal responsibility, especially in light of his admittance to causing Friday's death.  See Tr. at 13:23-14:1 (Bustamante).  Romero contended that he has been consistent about the circumstances of the crime.  See Tr. at 14:3-4 (Bustamante).

Romero also contended that it would not make sense for him to receive the natural life sentence with a 3-level reduction for acceptance of responsibility.  See Tr. at 14:10-13 (Bustamante).  Romero explained that, "throughout this case . . . until the very end of the case the Government's position was he can plead to first-degree murder," which would have given Romero a life sentence. Tr. at 14:17-21 (Bustamante).  Romero argued that, had he pled as the United States wanted, the USPO would have given him a 3-level reduction for acceptance of responsibility, and then he would "have gone with this packet to Bureau of Prisons and he would have died in prison." Tr. at 14:20-25 (Bustamante).  Romero argued that it is "just unworkable . . . that if you accept the Government's offer you get a natural life sentence but you're rewarded by getting a three-level reduction under the guidelines." Tr. at 14:25-15:3 (Bustamante).  Romero argued that such a predicament is why, "in this situation the guidelines shouldn't really apply," and he should not be precluded from receiving a reduction for acceptance of responsibility. Tr. at 15:4-6 (Bustamante).     The United States stated that the FBI agent who interviewed Romero "does agree that the statement made by Mr. Romero did narrow the investigation and does help them focus their efforts on where they needed to go." Tr. at 15:11-15 (Ortega).  The United States thus asserted that Romero's position is correct in that Romero's statement, "though initially dishonest, once it was finally perfect and included all the information, I think did assist law enforcement." Tr. at 15:15-18 (Ortega).  Nonetheless, the United States asserted that, looking solely at U.S.S.G. § 3E1.1, "it doesn't seem to recommend acceptance under these circumstances where pretrial statements may contain some [truths] and some [mis]truths or half truths," and, thus, whether to grant Romero's request for a reduction under that provision was

up to the Court's discretion.  Tr. at 15:18-24 (Ortega).  The United States stated that it opposes a reduction.  See Tr. at 15:24-25 (Ortega).

Romero responded that the United States' position places a "pretty high standard . . . on a defendant[] under a lot of pressure, who's only 18 years old."  Tr. at 16:3-5 (Bustamante).  Romero contended that, if the Sentencing Guidelines work as the United States argues they do, "every time someone walks . . . into court under oath at a[n] arraignment and says I'm not guilty they shouldn't get" the reduction.  Tr. at 16:5-8 (Bustamante).

The Court then turned to Romero's request that the Court vacate Count 5 of the Indictment. See Tr. at 16:12-16 (Court).  Romero stated that Count 5 was tied, by the Indictment, to a first-degree murder conviction, and, because Romero was acquitted of first-degree murder, that count should be vacated.  See Tr. at 16:21-171 (Bustamante).  Romero admitted that the jury instructions may have allowed for a finding different than that which is outlined in the Indictment.  See Tr. at 16:25-17:1 (Bustamante).

The United States responded that both the statutory language of 18 U.S.C. § 924 (c)(1)(A)(C)(i), which provides for an enhancement to a sentence for any person who uses or carries a firearm during the commission of a crime of violence, as well as the remainder of the statute, which provides various terms of sentencing that may be imposed depending on how the firearm was used, counsel that Count 5 should not be vacated.  See Tr. at 17:3-10 (Ortega).  The United States also asserted that for "purposes of this entire section of the § 924(c) statute[,] the term 'crime of violence' is defined as an [offense] that is a felony that has [as] an element the use[,] attempted use[,] or threatened use of physical force against the person or property of another."  Tr. at 17:11-19 (Ortega).  The United States asserted that the Court's Jury Instructions track the language of 18 U.S.C. § 924(c) "precisely," and allowed the jury to consider whether Romero had committed a first

-20-

or second-degree murder with the use of a firearm.  Tr. at 17:20-18:1 (Ortega).  The United States

asserted that the Jury Instructions allowed the jury to convict Romero of second-degree murder and

a violation of 18 U.S.C § 924(c).  See Tr. at 18:1-12 (Ortega).  The United States posited that the

jury convicted Romero of second-degree murder, with the use of a firearm, under the Court's

specific instructions.  See Tr. at 18:11-15 (Ortega).  The United States pointed out that the Jury

Instruction has the violation of 18 U.S.C. § 924(c) during the commission of first-degree murder

listed as Count 2, and not Count 5.  See Tr. at 19:6-13 (Ortega).  Romero asserted that his argument

remains the same, regardless of the order of the Counts in the Indictment.  See Tr. at 19:15-18

(Bustamante).

   In closing, the Court granted Romero leave to supplement his sentencing memorandum.  See

Tr. at 20:5-8 (Ortega, Court).  The Court stated that it would issue an opinion on Romero's

objections before the parties reconvened for sentencing, and that variance arguments could be

addressed at the sentencing hearing.  See Tr. at 20:8-14 (Ortega, Court).  The Court inquired what

exactly occurred at the plea negotiations, and Romero confirmed that he was offered a plea

agreement to the charge of first-degree murder, with a natural life sentence.  See Tr. at 20:18-24

(Court, Bustamante).  The Court inquired if, at any point, there had been a plea offer for a sentence

of fifty years, and Romero confirmed that four days before the trial commenced, he was offered a

plea agreement to second-degree murder charges with a sentence of fifty years.  See Tr. at 20:25-

21:10 (Court, Bustamante).  The United States confirmed that Romero had been offered a plea

agreement with a fifty-year sentence.  See Tr. at 21:25-22:5 (Ortega).

## LAW REGARDING DISPUTES TO THE PRESENTENCE REPORT

   "No limitation shall be placed on the information concerning the background, character, and

conduct of a person convicted of an offense which a court of the United States may receive and

-21-

consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  Similarly, the

Sentencing Guidelines provide that, "[i]n determining the sentence to impose within the guideline

range, or whether a departure from the guidelines is warranted, the court may consider, without

limitation, any information concerning the background, character and conduct of the defendant,

unless otherwise prohibited by law."  U.S.S.G. § 1B1.4.  Additionally,

> [w]hen any factor important to the sentencing determination is reasonably in dispute,
> the parties shall be given an adequate opportunity to present information to the court
> regarding that factor.  In resolving any dispute concerning a factor important to the
> sentencing determination, the court may consider relevant information without
> regard to its admissibility under the rules of evidence applicable at trial, provided
> that the information has sufficient indicia of reliability to support its probable
> accuracy.

U.S.S.G. § 6A1.3(a).

In calculating an appropriate sentence, the guidelines consider a defendant's "offense of

conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a different

meaning is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1 application n.1(H).

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity --
> depends for its success upon judicial efforts to determine, and to base punishment
> upon, the real conduct that underlies the crime of conviction.  That determination is
> particularly important in the federal system where crimes defined as, for example,
> "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article
> or commodity in commerce, by . . .extortion," . . . can encompass a vast range of
> very different kinds of underlying conduct.

543 U.S. at 250-51 (quoting 18 U.S.C. § 1951(a))(emphasis in original).  "We have never doubted

the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range."

543 U.S. at 232 (citing Williams v. New York, 337 U.S.C 241, 246 (1949)).  The Supreme Court

discussed a court's discretion to review information at sentencing which is not permissible at trial

in Williams v. New York:

Probation workers making reports of their investigations have not been trained to prosecute but to aid offenders.  Their reports have been given a high value by conscientious judges who want to sentence persons on the best available information rather than on guesswork and inadequate information.  To deprive sentencing judges of this kind of information would undermine modern penological procedural policies that have been cautiously adopted throughout the nation after careful consideration and experimentation.  We must recognize that most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination.   And the modern probation report draws on information concerning every aspect of a defendant's life.  The type and extent of this information make totally impractical if not impossible open court testimony with cross-examination.  Such a procedure could endlessly delay criminal administration in a retrial of collateral issues.

337 U.S. at 249-250.  "The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the guidelines."  United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *4 (D.N.M. June 26, 2012)(Browning, J.).

Section 1B1.3 provides that the base offense level under the guidelines "shall be determined" based on the following:

(1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2) solely with respect to offenses of a character for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

-23-

(4) any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  A court may consider, as relevant conduct, actions that have not resulted in a conviction.  Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct.  The court may rely upon reliable hearsay information, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.). Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review."). The evidence and information upon which the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 (stating that a court may rely on relevant information when resolving a dispute concerning a factor important to sentencing, even if the information is not admissible at trial, "provided that the information has sufficient indicia of reliability to support its probable accuracy.").

In Witte v. United States, 515 U.S. 389 (1995), the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and in a 1991 attempt to import marijuana.  See 515 U.S. at 392-93.  In March 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See 515 U.S. at 392-93. At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  See 515 U.S. at 392-93.  The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the Double Jeopardy Clause's prohibition against multiple punishments.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir.1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Circuit Courts of Appeals, including the Tenth Circuit, that had previously considered this question. See United States v. Witte, 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir.1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401. The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense."  515 U.S. at 402.  Sentencing

enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress'
policy judgment "that a particular offense should receive a more serious sentence within the
authorized range if it was either accompanied by or preceded by additional criminal activity." Witte
v. United States, 515 U.S. at 403.

In United States v. Watts, 519 U.S. 148 (1997), the Supreme Court, in a per curiam opinion,
relied upon the Witte v. United States holding and upheld, against a double-jeopardy challenge, a
sentencing judge's use of conduct for which the defendant had been acquitted. In reaching its result
in United States v. Watts, the Supreme Court noted that its conclusion was in accord with every
Circuit Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit --
and that each had previously held that a sentencing court may consider conduct for which the
defendant had been acquitted, if the government establishes that conduct by a preponderance of the
evidence. See 519 U.S. at 149 (citing, among other authorities, United States v. Coleman, 947 F.2d
1424, 1428–29 (10th Cir.1991)). The Supreme Court began its analysis in United States v. Watts
with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the
background, character, and conduct of a person convicted of an offense which a court of the United
States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C.
§ 3661. See United States v. Watts, 519 U.S. at 151. According to the Supreme Court, 18 U.S.C.
§ 3661 embodies the codification of "the longstanding principle that sentencing courts have broad
discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect
of the sentencing court's discretion." United States v. Watts, 519 U.S. at 151-52.

The Court has previously overruled a defendant's objections to the information in a
presentence report, under the section entitled "Offense Behavior Not Part of Relevant Conduct,"
where the defendant argued that the information is not pertinent to sentencing and "takes into

consideration uncharged allegations that other witnesses made." United States v. Sandoval, 506 F. Supp. 2d 582, 593 (D.N.M. 2007)(Browning, J.). The Court explained that "it is proper for the Court to consider this information to ascertain [the defendant] Sandoval's life and background." 206 F. Supp. 2d at 593. The Court noted that the USPO maintained that the information had sufficient "indicia of reliability," and that the information was necessary to fully gauge Sandoval's conduct within the brief time period during the charged offenses were committed. 206 F. Supp. 2d at 593. Based upon U.S.S.G. § 1B1.4, 18 U.S.C. § 3661, United States v. Watts, and Witte v. United States, the Court overruled Sandoval's objection and considered the information. See United States v. Sandoval, 206 F. Supp. 2d at 593.

## LAW REGARDING RULE 32

Rule 32 of the Federal Rules of Criminal Procedure provides that a court must, at sentencing, "for any disputed portion of the presentence report or other controverted matter -- rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). To invoke a district court's rule 32 fact-finding obligation, a defendant is required to make "specific allegations" of factual inaccuracy. United States v. Rodriguez-Delma, 456 F.3d 1246, 1253 (10th Cir. 2006). Accord United States v. Jim, No. CR 10-2653, 2012 WL 2574807, at *23 (D.N.M. June 22, 2012)(Browning, J.). Defendants have "an affirmative duty to make a showing that the information in the PSR was unreliable and articulate the reasons why the facts contained therein [were] untrue or inaccurate." United States v. Rodriguez-Delma, 456 F.3d at 1253. "The fact that a defendant has objected to the ultimate conclusions drawn by the PSR, however, does not necessarily imply that a 'controverted matter' exists." United States v. Rodriguez-Delma, 456 F.3d at 1253 (citing United States v. Murray, 82 F.3d 361, 363 (10th Cir.1996)).

-27-

## LAW REGARDING ACCEPTANCE OF RESPONSIBILITY

A defendant is entitled to a 2-level reduction in his offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). Upon the United States' motion, a defendant may be entitled to an additional 1-level reduction if the United States asserts that the defendant has assisted authorities in its investigation or prosecution "by timely notifying the authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." U.S.S.G. § 3E1.1(b). The reduction for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1 application n. 2.

    1. In determining whether a defendant qualifies [for an acceptance of responsibility reduction under U.S.S.G. § 3E1.1(a)], appropriate considerations include, but are not limited to, the following:

        (A) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility;

        (B) voluntary termination or withdrawal from criminal conduct or associations;

        (C) voluntary payment of restitution prior to adjudication of guilt;

        (D) voluntary surrender to authorities promptly after commission of

the offense;

(E) voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;

(F) voluntary resignation from the office or position held during the commission of the offense;

(G) post-offense rehabilitative efforts (e.g., counseling or drug treatment); and

(H) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

U.S.S.G., § 3E1.1 application n. 1.

A defendant who exercises his right to trial and is convicted is not automatically precluded from receiving an acceptance-of-responsibility adjustment. See U.S.S.G. § 3E1.1 application n. 2; United States v. Wooten, 377 F.3d 1134, 1146 (10th Cir.2004). When a defendant goes to trial to litigate and preserve issues not related to factual guilt, such as the constitutionality of a criminal statute or the applicability of a particular statute to the defendant's conduct, he may still be eligible for an adjustment based on his pre-trial conduct and statements. See United States v. Salazar-Samaniega, 361 F.3d 1271, 1280-81 (10th Cir.2004). "The Application Notes clearly indicate that a guilty plea alone may not be enough to qualify for a reduction, and that the absence of a guilty plea will not bar a reduction." United States v. Collins, 511 F.3d 1276, 1281 (10th Cir. 2008). Nevertheless, the Tenth Circuit has explained that, although possible, "[o]ur cases make . . . clear that acceptance of responsibility adjustments after trial are very rare." United States v. Sims, 428 F.3d 945, 961 (10th Cir.2005).

A district court's decision to deny an adjustment for acceptance of responsibility to a defendant is reviewed for clear error. See United States v. Sarracino, 340 F.3d 1148, 1173 (10th Cir.2003). The Guidelines recognize that the sentencing court "is in a unique position to evaluate

a defendant's acceptance of responsibility," and, therefore, the district court's determination that a defendant is not entitled to an adjustment for acceptance of responsibility "is entitled to great deference on review."  U.S.S.G. § 3E1.1 application n. 5.  See United States v. Loza, 184 F. App'x 772, 775 (10th Cir.2006)("We give 'great deference' to the district court's determination whether a defendant accepted responsibility.").

"While it is certainly possible for a defendant to accept responsibility and go to trial, these circumstances are rare."   United States v. Foghorn, No. CR 03-2365 JB, 2007 WL 1302649, at **2-3 (D.N.M. Feb. 21, 2007)(Browning, J.).  The Court has previously found that a defendant who "conceded all material facts, but . . . his defense at trial was that his actions did not cause the death of [the victim]," was not entitled to a reduction for his acceptance of responsibility.  2007 WL 1302649, at * 4.  The defendant in United States v. Foghorn was convicted of second-degree murder and kidnaping.  2007 WL 1302649, at *2.  Regarding his conviction for kidnaping, Foghorn, at trial, "admitted many of this actions regarding seizing and moving [the victim], [but] he argued at trial that he . . . did not kidnap [the victim] for an improper purpose."  2007 WL 1302649, at * 5.  Because Foghorn asserted that the United States had failed to establish beyond a reasonable doubt that he had kidnaped the victim for some purpose or benefit, and thus required the United States to prove his factual guilt at trial, the Court found that he was not entitled to a reduction for his acceptance of responsibility regarding the kidnaping charge.  See 2007 WL 1302649, at * 5.

With respect to his conviction for second-degree murder, Foghorn did not "contest the United States' facts regarding the brutal treatment of [the victim] at his hands," but did contest whether his actions resulted in the death of the victim.  2007 WL 1302649, at *5.  The Court found that Foghorn's testimony at trial was not "sufficiently comprehensive to cover all the elements of the crimes with which he was charged."  2007 WL 1302649, at * 6.  Further, Foghorn's admission

-30-

came late in the prosecutorial process, and Foghorn continued to assert that his actions did not cause the victim's death -- a "factual element that the United States must establish to convict a defendant for murder." 2007 WL 1302649, at 6.  Foghorn continued to assert, through post-trial motions, that his actions did not cause the victim's death.  The Court found that Foghorn's actions "required the United States to prove his factual guilt and refused to take full responsibility for the offense of which is was convicted," and was thus not entitled to a reduction in his offense level for acceptance of responsibility.  2007 WL 1302649, at * 6.

The Tenth Circuit has found that a district court did not clearly err by denying a defendant a reduction for acceptance of responsibility, where the defendant pled not guilty to charges, even though the defendant confessed pretrial and did not attempt to retract his confession.  See United States v. Portillo-Valenzuela, 20 F.3d 393, 394 (10th Cir. 1994).  The Tenth Circuit noted that the defendant, Portillo-Valenzuela, had formally pled not guilty, and thereby, "forced the government to prove his factual guilt at trial."  20 F. 3d at 394 ("Portillo-Valenzuela's plea and insistence on trial 'brought into question whether he manifested a true remorse for his criminal conduct.'" (quoting United States v. Ochoa–Fabian, 935 F.2d 1139, 1143 (10th Cir.1991), cert. denied, 503 U.S. 961 (1992)).  The Tenth Circuit, in making its decision, looked to precedent from the United States Court of Appeals for the Eighth Circuit, in United States v. Davila, 964 F.2d 778, 784 (8th Cir. 1992), cert. denied, 506 U.S. 964 (1992), where the Eighth Circuit upheld a district court's denial of the reduction because the defendant had pled not guilty on all counts, and thus forced the government to prove his guilt, even though the defendant confessed pretrial and offered to cooperate.  See 20 F.3d at 394.

The Tenth Circuit explained that the question to answer, when determining whether to grant a defendant a reduction for his or her acceptance of responsibility after the defendant has proceeded

to trial, "is not whether he actively asserted his innocence, but whether he 'clearly demonstrate[d]' acceptance of his guilt." United States v. Portillo-Valenzuela, 20 F.3d at 394, (quoting U.S.S.G. § 3E1.1(a)). "Pleading not guilty and requiring the government to prove guilt at trial demonstrate denial of responsibility, regardless of how easily the government can prove guilt." 20 F.3d at 394-95. The Tenth Circuit noted that U.S.S.G. § 3E.1.1 application n. 2 does not preclude a defendant who proceeds to trial from receiving the reduction, but also noted that a defendant's choice to plea not guilty is a factor which may be considered in determining whether he or she accepted responsibility. See 20 F.3d at 395 (stating that application note 2 "does not suggest that in some or all cases the court may not consider whether the defendant pleaded not guilty and went to trial"). The Tenth Circuit determined that denying Portillo-Valenzuela the reduction was thus not clear error, because he pled not guilty and proceeded to trial, regardless of the weight of evidence presented against Portillo-Valenzuela. See 20 F.3d at 395 ("We therefore do not need to consider the extent of the government's evidence at trial.").

The Tenth Circuit has upheld a district court's grant of a reduction for acceptance of responsibility in one reported case. In United States v. Gauvin, the Tenth Circuit found that a district court did not err in granting the reduction where the defendant, Gauvin, "admitted all of the conduct with which he was charged [and] . . . simply disputed whether his acknowledged factual state of mind met the legal criteria of intent to harm or cause apprehension" 173 F.3d at 806. Gauvin was convicted, by a jury, on charges of assault with a dangerous weapon and assault on a federal officer. See 173 F.3d at 801. Gauvin's argument at trial was based on his theory that "he did not intend, while drunk and scared, to cause injury to others." 173 F.3d at 806. Gauvin also "contended that his drunkenness rendered him incapable of forming the requisite mens rea." 173 F. ed at 806. The district court stated, in granting the reduction, that Gauvin was "entitled to pursue

the theory that he did all these things on which the charges were based, but the one thing he didn't do is try to use his car to hurt the officers."  173 F.3d at 806 (internal alterations omitted).  The Tenth Circuit found that Gauvin's defense was essentially an argument that the statute under which he was charged did not apply to his conduct.  The Tenth Circuit stated that its affirmation of the district court's decision rested "in part on the fact that Mr. Gauvin went to trial only to contest the legal element of intent."  173 F.3d at 806.  On the other hand, the Tenth Circuit reiterated that the reduction for acceptance of responsibility after trial should only be given in rare circumstances, and the Tenth Circuit stated that it "might not have reached the same decision" had it decided whether to grant Gauvin the reduction.  173 F.3d at 806.  Nevertheless, "in light of the deference afforded the sentencing judge," the Tenth Circuit found that the district court did not err in granting Gauvin a reduction for acceptance of responsibility.  173 F.3d at 806.

The Tenth Circuit has since limited its holding United States v. Gauvin by clarifying the court's rationale in upholding the reduction.  In United States v. Collins, the Tenth Circuit noted that a defendant was correct in stating that "Gauvin stands for the proposition that a defendant's admission of guilt at trial up to the point of the asserted defense can earn the offense level reduction," but also noted that United States v. Gauvin "does not establish that the district court must grant an offense level reduction under these circumstances."  511 F.3d at 1280 (emphasis in original)(internal citations omitted).  The Tenth Circuit qualified its decision in United States v. Gauvin by pointing out that "on appeal, the government had to establish that the district court committed clear error in granting the adjustment . . . .  And we must always bear in mind that 'the sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility' and is entitled to 'great deference on review.'"  511 F. 3d at 12881 (quoting United States v. Hamilton, 413 F.3d 1138, 1145 (10th Cir. 2005))(internal alterations omitted).

-33-

The Tenth Circuit has recently discussed the limitation of <u>United States v. Gauvin</u>'s holding:

> As a threshold matter, in <u>Gauvin</u>, we merely accorded the district court the requisite deference in upholding its decision to grant the two-level reduction.  We did not indicate that other sentencing courts would be obliged to reach the same conclusion on similar facts.  In other words, giving other sentencing courts the same degree of deference, we might well uphold their decisions on similar facts to deny the acceptance-of-responsibility adjustment. . . . Indeed, we emphasized in Gauvin that we ourselves "might not have reached the same decision" as the district court.

<u>United States v. McGehee</u>, 672 F.3d 860, 877 (10th Cir. 2012)(quoting <u>United States v. Gauvin</u>, 173 F.3d at 806).  The Tenth Circuit further explained: "[I]n <u>Gauvin</u>, we emphasized that the defendant had 'admitted to all the conduct with which he was charged' . . . we stated that his argument was essentially a challenge to the applicability of the statute in question to his conduct."  <u>United States v. McGehee</u>, 672 F.3d at 878.  Similarly, the Tenth Circuit has emphasized that, in <u>United States v. Gauvin</u>, Gauvin went to trial to dispute whether his acknowledged factual state of mind, while "drunk and scared," made him culpable of the charged offense -- assault -- which requires an "intent to harm or cause apprehension."  <u>United States v. Salazar-Samaniega</u>, 361 F.3d 1271, 1280-81 (10th Cir. 2004).

In <u>United States v. McGehee</u>, the Tenth Circuit noted that the defendant, McGehee, "did not admit to all of the conduct in the indictment, and he did not seek only to preserve issues that do not relate to factual guilt."  672 F.3d at 878 (internal citation omitted).  The Tenth Circuit determined that McGehee did not accept responsibility, even though he "presumably create[ed] a somewhat easier path for the government in terms of evidence presentation by his several stipulations," because he stipulated to a laboratory test of narcotics found on him and his prior felony conviction in relation to his charges for possession with an intent to distribute cocaine, and the use of a firearm during the commission of a drug-trafficking crime.  672 F.3d at 864-65, 878.  Nonetheless, because McGehee did not admit his guilt to two of the three Counts charged in an indictment, and because

McGehee moved for acquittal on all three counts after the United States presented its evidence at trial, the Tenth Circuit found that United States v. Gauvin was factually distinguishably and its precedent did not apply to McGehee's appeal.  See 672 F.3d at 878.  The Tenth Circuit also stated that, had McGehee "fully admitted his guilt as to Counts One and Three at trial," the determination to grant a reduction for acceptance of responsibility would have been based upon his pretrial statements and conduct.  672 F.3d at 878 (citing United States v. Hutchinson, 573 F.3d 1011, 1032 (10th Cir.2009), and United States v. Eaton, 260 F.3d 1232, 1237 (10th Cir.2001)(internal quotation marks omitted)).  "Simply put, an admission of guilt at trial does not suffice to mandate an award of the acceptance-of-responsibility reduction."  United States v. McGehee, 672 F.3d at 878.  In conclusion, the Tenth Circuit noted that, because

> Mr. McGehee went to trial, did not stipulate to all of the factual elements of any count of conviction, and indeed held the government to its ultimate burden on each count . . . we conclude with no difficulty that the court did not err in denying Mr. McGehee an offense-level reduction for acceptance of responsibility.

672 F.3d at 878.  Thus, a defendant who goes "to trial not to preserve a legal issue but to test the government's evidence" is not entitled to a reduction for his or her acceptance of responsibility.  United States v. Allen, 129 F.3d 1159, 1167 (10th Cir. 1997).

**RELEVANT LAW REGARDING 18 U.S.C. § 924(c)**

Section 924(c)(1)(A)(C)(i) of United States Code Title 18 provides:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--

> (i) be sentenced to a term of imprisonment of not less than 5 years;

-35-

(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

. . . .

(C) In the case of a second or subsequent conviction under this subsection, the person shall--

(i) be sentenced to a term of imprisonment of not less than 25 years.

18 U.S.C. § 924(c)(1)(A)(C)(i).  Section 924(c) of Title 18 of the United States is intended to punish criminals who use firearms during and in relation to certain crimes.  See United States v. Barrett, 496 F.3d 1079, 1098 (10th Cir. 2007).

Although 18 U.S.C. § 924(c)(1) "appears to be a penalty enhancement statute," the Tenth Circuit has held that the section creates distinct offenses, and is not only an enhancement statute. United States v. Hill, 971 F.2d at 1464.  The Tenth Circuit explains:

> Section 924 is entitled "Penalties," and its remaining subsections set forth penalties for firearms offenses.  Section 924(c)(1) provides that its penalty is "in addition to the punishment" provided by the underlying crime, and a conviction under § 924(c)(1) requires proof that the defendant committed the underlying crime of violence or drug trafficking crime.  United States v. Munoz-Fabela, 896 F.2d 908, 910 (5th Cir.), cert. denied, 498 U.S. 824 . . . (1990); United States v. Hunter, 887 F.2d 1001, 1003 (9th Cir.1989)(per curiam), cert. denied, 493 U.S. 1090 . . . (1990). See also H.R. Rep. No. 495, 99th Cong., 2d Sess. 10, reprinted in 1986 U.S.C.C.A.N. 1327, 1335 (construing earlier version of § 924(c) as requiring "proof of the defendant's commission of the [underlying] crime").

United States v. Hill, 971 F.2d at 1463-64.  Although the Tenth Circuit noted that some circuits have characterized 18 U.S.C. § 924(c) as an "enhancement statute," the Tenth Circuit nonetheless affirmed its earlier finding that 18 U.S.C. § 924(c) is intended to create a distinct offense and not an enhancement.  United States v. Hill, 971 F.2d at 1464 (citing Busic v. United States, 446 U.S. 398, 405 (1980); Eckert v. Tansy, 936 F.2d 444, 449 (9th Cir.1991); United States v. Henning, 906

-36-

F.2d 1392, 1399 (10th Cir.1990), cert. denied, 498 U.S. 1069 (1991); United States v. Sherbondy, 865 F.2d 996, 1010 n. 18 (9th Cir.1988)). "We believe that our recent characterization . . . of § 924(c) as a 'distinct' offense rather than 'merely a sentencing enhancement provision' is a correct interpretation of the statute." United States v. Hill, 971 F.2d at 1464(citing United States v. Abreu, 962 F.2d 1447 (10th Cir. 1992)) .

The Tenth Circuit found that the weight of authority supports ruling that 18 U.S.C. § 924(c) creates "distinct offenses rather than being merely a sentencing enhancement provision." United States v. Hill, 971 F.2d 1464 (citing United States v. Abreu, 962 F.2d at 1451(internal quotation marks omitted) for its distinction between conflicting authority and application of principles of lenity and strict construction to determine that 18 U.S.C. § 924(c) creates distinct offenses, and is not an enhancement provision)(citing Simpson v. United States, 435 U.S. 6, 10 (1978); United States v. Martinez, 924 F.2d 209, 211 n. 2 (11th Cir.)(per curiam), cert. denied, 502 U.S. 870 (1991); United States v. Munoz-Fabela, 896 F.2d at 910; United States v. Hunter, 887 F.2d at 1003). Looking to the statute's language, the Tenth Circuit was persuaded by the "statutory language which provides that the underlying offense need only be one for which the defendant 'may be prosecuted in a court of the United States,' and provides for a greater sentence for a 'second or subsequent conviction under this subsection.'" United States v. Hill, 971 F.2d at 1464 (quoting 18 U.S.C. § 924(c)(1)). See also United States v. Scott, 785 F. Supp. 2d 1065, 1066 (D.N.M. 2011)(Browning, J.)(discussing that because 18 U.S.C. § 924(c) is a distinct offense, a defendant remains culpable for the underlying crime of violence during and in relation to which he used a firearm even if charges under 18 U.S.C. § 924(c) are dismissed).

## ANALYSIS

The Court finds that it has no sound basis to grant Romero what he requests in his Objections

to the PSR.  Romero contends that ¶¶ 21-24 of the PSR should be removed, because the information in those paragraphs is not part of the crimes of which he was convicted, and because the information in those paragraphs may subject him to less-favorable treatment by the Federal Bureau of Prisons. Romero does not dispute the factual accuracy of the information in these paragraphs, and thus, he does not move the Court to rule on disputed information under rule 32 of the Federal Rules of Criminal Procedure.  Additionally, the Supreme Court has guided district courts to consider a wide array of information relating to a defendant's background and characteristics when sentencing the defendant, and the Court finds that the information in those paragraphs is within the scope of facts relevant to sentencing Romero.  To the extent that the information in ¶¶ 21-24 of the PSR could subject Romero to less-favorable treatment while incarcerated, perhaps the Federal Bureau of Prisons should be aware of this information from Romero's past when determining how to protect the public while Romero serves his sentence.  Regarding Romero's assertion that he accepted responsibility and is thus entitled to a reduced sentence under U.S.S.G. § 3E1.1, the Court finds that Romero did not take the government to trial only to contest issues unrelated to factual guilt.  The Court thus finds that he has not accepted responsibility.  Lastly, Romero is incorrect in arguing that Count 5 of the Indictment should be vacated because he was not convicted of the underlying crime of violence set forth in that Count in the Indictment.  Criminal culpability for using a firearm in relation to a crime of violence is a distinct offense, and he need not be convicted of the indicted charge to be convicted under Count 5.  Accordingly, Romero's objections are overruled, and his requests are denied.

## I. THE COURT WILL OVERRULE ROMERO'S OBJECTION TO ¶¶ 21-24 OF THE PSR.

Romero objects to ¶¶ 21-24 of the PSR, because they "can in no way be construed as Offense

Behavior" and will "greatly affect Carl [Romero's] classification status in the Federal Bureau of Prisons." Objections to PSR at 3. The paragraphs to which Romero refers fall under the section of the PSR entitled "Offense Behavior <u>Not</u> Part of Relevant Conduct." PSR at 7 (emphasis added). The information is thus not part of Relevant Conduct, but is part of his Offense Behavior. Romero does not provide grounds for the Court to strike this information from the PSR by only arguing that the paragraphs "simply provide alleged salacious details about the alleged character of Carl Romero." Objections to PSR at 3.

Romero's aggression towards other individuals, and the murders he may have attempted to orchestrate while incarcerated, is "information concerning the background, character, and conduct" of Romero. 18 U.S.C. § 3661. <u>See</u> U.S.S.G. §1B1.4 ("In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."). These paragraphs in the PSR provide the Court with valuable information into Romero's personality and characteristics, information which is useful to the Court in determining a proper sentence. The Supreme Court intends for district courts to consider a defendant's real conduct when effectuating Congress' purposes set forth in the Sentencing Guidelines. <u>United States v. Reyes-Vencomo</u>, 2012 WL 2574810, at *4 (citing <u>United States v. Booker</u>, 543 U.S. at 250-51). The Supreme Court has recognized that 18 U.S.C. § 3661 is an embodiment of the "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion." <u>United States v. Watts</u>, 519 U.S. at 151-52.

Further, the Court has overruled a similar objection in the past, when a defendant argued that the Court should not consider the information in a presentence report entitled "Offense Behavior

Not Part of Relevant Conduct." United States v. Sandoval, 506 F. Supp. 2d at 593. In that case, the Court found that consideration of the defendant's life and background was proper, even though the USPO did not consider that the information was "Relevant Conduct," for determining an appropriate sentence for the defendant. 506 F. Supp. 2d at 593. Similarly, Romero's conduct while incarcerated, especially as it relates to his attempts to orchestrate the murder of certain persons, is important information for the Court to consider in determining a proper sentence for Romero. Although this information is unrelated to the crimes with which Romero was charged and convicted, this information informs the Court of Romero's overall aggressiveness and disposition, which informs the Court's discretion at the sentencing stage. Although Romero contends that consideration of the information will subject him to worse treatment by the Federal Bureau of Prisons, this information proves only that he may need to be treated differently while incarcerated. See Tr. at 7:5-8 (Bustamante)(Romero contending that the information regarding these letters could have a "gr[ave] impact [on] Mr. Romero's chances at a decent classification when he goes to prison."). If Romero sent a letter, while incarcerated, to contacts outside the Sandoval County detention center, and in that correspondence requested assistance in murdering individuals, the Federal Bureau of Prisons would be justified treating Romero in such a way as to ensure that he is not able to threaten or attempt to harm those outside of prison while incarcerated.

Nor has Romero disputed the factual veracity of ¶¶ 21-24 of the PSR such as to require the Court to "rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). The closest Romero comes to challenging the veracity of these paragraphs are his statements that the "paragraphs include details of letters allegedly written by Carl Romero," and that "[e]ven if written by Carl Romero, and even [if] all details in the letters are accurate," the paragraphs

-40-

should not be included in the PSR.  Objections to PSR at 3 (emphasis added).  These remarks do not

satisfy Romero's "affirmative duty to make a showing that the information in the PSR was

unreliable and articulate the reasons why the facts contained therein [were] untrue or inaccurate."

United States v. Rodriguez-Delma, 456 F.3d at 1253.  Romero has pointed to no facts which call into

question the accuracy of ¶¶ 21-24 of the PSR.  Further, Romero's objections to the conclusions in

the PSR, that he is not entitled to a reduction for acceptance of responsibility, for example, "does

not necessarily imply that a 'controverted matter' exists."  United States v. Rodriguez-Delma, 456

F.3d at 1253 (citing United States v. Murray, 82 F.3d 361, 363 (10th Cir.1996)).  Romero has not,

thus, disputed the information in these paragraphs.

        The most serious reservation that the Court has about not sustaining the objection is that the

United States did not have a problem with taking out the discussion of the prison letter, so that no

one strongly objections to part of ¶ 22, and ¶¶ 23-24 being removed from the PSR.  The reason that

Court does not go along with the argument of the parties is that society's interests overrules the

parties' consensus.  While the Court often defers to the United States on what should be included

in a PSR, the Court believes that Bureau of Prisons should know about the conduct.  The Court does

not want Romero to be threatening murder out of  a Bureau of Prison's cell and committing other

future crimes.  The Court has a role to protect the public.  Thus situation is not one where the

defendant sneaked some alcohol into the jail cell that might affect his classification; Romero sending

a letter could get people killed.  While the Court does not want to make his prison sentence more

difficult than it would already be, the Court also is not convinced the information should be deleted.

Finally, given the grievousness of the crime for which Romero was convicted, his classification may

already be harsh, and the consideration of the letter might have little impact on his ultimate

classification.

Accordingly, the Court overrules Romero's objection to ¶¶ 21-24 of the PSR.  As was noted at the hearing, the activities outlined in ¶ 21 and the beginning of ¶ 22 were admitted at trial, and, Romero conceded that he does not have a strong objection to that information remaining in the PSR. See Tr. at 8:2-14 (Court, Bustamante).  Additionally, because the Congress has made a policy judgment that a wide range of information relating to a defendant's background and characteristics may be considered by a sentencing court, the Court will not strike the paragraphs for their lack of relation to Romero's charged offenses.  Further, Romero has not contested the veracity of the information in ¶¶ 21-24.  The Court thus overrules Romero's objection to the inclusion of ¶¶ 21-24 in the PSR, and will consider the information.

## II.   ROMERO IS NOT ELIGIBLE FOR A REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY.

Romero's case is not one of those "rare" cases where a defendant may take the government to trial and still qualify for a reduction because of the defendant's acceptance of responsibility. U.S.S.G. § 3E1.1 application n. 2.  Romero did not admit to every factual element of the charged offenses and take the government to trial only on the issue of mens rea, and has, thus, not accepted responsibility for his actions.  See United States v. Gauvin,173 F.3d at 806.

Looking to Romero's pretrial conduct, Romero complied with the authorities, and confessed to shooting Friday.  See Objections to PSR at 2 ("Romero admitted to law enforcement he had shot Mr. Friday after a night of heavy drinking and a verbal argument over money owed . . . ."); Mar. 22 Tr. at 36:10-37:23 (FBI agent Mark Buie describing Romero as "complaint" before his arrest and noting that Romero did not attempt to hide the homicide weapon from the authorities).  These actions could be considered evidence that Romero accepted responsibility by "truthfully admitting the conduct comprising the offense(s) of conviction" and by having provided "voluntary assistance

-42-

to authorities in the recovery of the" weapon of the offense. U.S.S.G. § 3E1.1 application n. 1(A), (E).

On the other hand, Romero pled not guilty to all of the charges in the Indictment on May 19, 2009.  See Clerk's Minutes of Detention/Arraignment - Gila Courtroom, filed May 19, 2009 (Doc. 16).  Romero contends that his attempts to initiate plea negotiations were "rebuffed by the government."  Objections to PSR at 2.  Romero contended that the United States only offered him a plea to first-degree murder, which would have included a life sentence, until just before the trial. See Tr. at 14:17-21 (Bustamante).  At the hearing, Romero admitted that he was given an offer to plea to second-degree murder with a fifty-year sentence, four days before trial.  See Tr. at 20:25-21:10 (Court, Bustamante).  Romero did not accept any of these plea agreements.  Although Romero argues that the United States "rebuffed" his attempts to negotiate a plea agreement, Romero could have accepted the plea to second-degree murder, or he could have attempted to enter a conditional plea that preserved other arguments for trial.  See United States v. March, 999 F.2d 456, 463-64 (10th Cir. 1993)(finding that a defendant's desire to plea was not "rebuffed" by the government, where a plea was offered, but the defendant did not accept the agreement because he wanted to contest his confession at trial).  Although pleading not guilty and proceeding to trial does not preclude Romero from receiving the requested reduction, the Court may consider his refusal to plea in weighing whether he accepted responsibility.  See United States v. Portillo-Valenzuela, 20 F.3d at 395 (stating that application note 2 "does not suggest that in some or all cases the court may not consider whether the defendant pleaded not guilty and went to trial").  Because Romero did not plea to second-degree murder, one of the offenses on which he was convicted, pleading not guilty before trial weighs against finding that he accepted responsibility.

Further, Romero attempted to suppress his confession, and the evidence the United States'

obtained from his home and vehicle.  See Motion to Suppress Defendant's April 16, 2009 Statement

and Memorandum in Support, filed Nov. 9, 2009 (Doc. 30); Defendant's Motion to Suppress

Evidence Due to Lack of Probable Cause in Search Warrant Affidavit, filed Nov. 9, 2009 (Doc. 31);

Defendant's Motion to Suppress Evidence Due to Unconstitutional Consensual Entries to Personal

Bedroom, filed Nov. 9, 2009 (Doc. 33).  The Tenth Circuit has affirmed a district court's denial of

a reduction under U.S.S.G. § 3E1.1 where a defendant confessed pretrial, but pled not guilty to his

charges, even though the defendant did not attempt to retract his confession at trial.  See United

States v. Portillo-Valenzuela, 20 F.3d at 394.  Romero's actions at trial are similar to those of the

defendant in United States v. Portillo-Valenzuela.  Romero confessed pretrial, but pled not guilty,

even after being offered multiple plea agreements.  Romero did not object to the admission of his

confession to FBI agents at trial, but he did seek to suppress the testimony before trial, and he

objected to the admission of transcripts of his statement.  See Mar. 23 Tr. at 293:13-294:12 (Ortega,

Scholl, Court, Bustamante).  Romero also questioned whether his statement was the result of

manipulation or another form of coercion by the FBI agents interviewing him.  See Mar. 24 Tr. at

71:2-14 (Bustamante, Scholl).  Romero did not attempt to redact his confession at trial.

        Other arguments which Romero made at trial go more to a challenge of the "applicability

of a statute to his conduct."  U.S.S.G. 3E1.1 application n. 2.  Romero contested whether the Court

had jurisdiction over his conduct, by calling into question whether the United States proved that he

is an Indian and that the shooting of Friday occurred on Indian land.  Romero questioned whether

the United States' evidence that he self-identified as a "Native American" to a former employer was

sufficient to prove that Romero is an Indian.  Mar. 22 Tr. at 160:15-161:14; id. at 162:3-5

(Bustamante, Garcia).  Romero also pointed out that he is not enrolled in any Indian Tribe.  See Mar.

22 Tr. at 37:5-10 (Bustamante, Tager).  Additionally, Romero contested the sufficiency of the

United States' evidence that Friday's death occurred on Indian land.  See Mar. 21 Tr. at 295:8-196:2 (Bustamante, Martinez).  Theses arguments at Court, however, go more towards whether Romero conduct falls within the Court's jurisdiction, and are not arguments made regarding the factual elements of his guilt.[3]  Romero's advocacy that he is not within the Court's jurisdiction, as a federal court of limited jurisdiction, shows that one reason he went to trial was to challenge "issues that do not relate to factual guilt."  U.S.S.G. 3E§1.1 application n. 2.  These are not, however, the only arguments which Romero made at trial.

Romero also contested, at trial, whether he had the requisite mens rea to commit not only first-degree murder, but also second-degree murder and voluntary manslaughter.  Romero argued, in his opening statements, that he acted "stupidly," "drunkenly," and in "self-defense" when he shot Friday.  Mar. 21 Tr. at 255:6-10 (Bustamante).  Romero continued to assert, throughout the trial, that he was too drunk to premeditate killing Friday.  See Mar. 22 Tr. at 115:19-116:24 (Bustamante, Willow).  Romero attempted to bring out evidence that Madrid made lethal threats to Romero and his friends over the course of the evening, and that Madrid threatened to shoot Romero, which would support his theory that Romero acted in self-defense.  See Mar. 22 Tr. at 120:3-125:21 (Bustamante, Willow); id. at 129:4-130:4 (Bustamante, Willow); id. at 148:4-18 (Bustamante, Willow); id. at 245:11-21 (Bustamante, Sanchez).  Romero also attempted to elicit testimony that Friday became threatening towards Romero at the end of the evening.  See Mar. 22 Tr. at 132:3-134:4 (Bustamante, Willow); id. at 135:18-136:18 (Bustamante, Willow).  The Tenth Circuit has emphasized that, when

---

[3]Section 1152 of Title 18 of the United States Code provides: "Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country."  18 U.S.C.A. § 1152

it affirmed a district court's grant of a reduction for acceptance of responsibility post-trial, the court was persuaded because the defendant went to trial only to dispute whether his acknowledge state of mind made him culpable of assault, because the defendant asserted that he was too "drunk and scared" to form the specific "intent to harm or cause apprehension." United States v. Salazar-Samaniega, 361 F.3d at 1280-81.

Romero's arguments at trial, however, were not limited to whether he could premeditate the killing of Friday. In United States v. Tom, 494 F.3d 1277 (10th Cir. 2007), the Tenth Circuit distinguished United States v. Gauvin and affirmed the district court's denial of a reduction for acceptance of responsibility, because the defendant sought "acquittal on both first- and second-degree murder charges on grounds that the governemtn had failed to present sufficient evidence to overcome its burden of proof beyond a reasonable doubt that he lacked the mens rea requisite for each of these crimes." United States v. Tom, 494 F.3d at 1281. Although the defendant, Tom, admitted at trial that he was responsible for the death of his son, Tom challenged whether he had the general intent to kill his son. See 494 F.3d at 1281-82. Similarly, here, although Romero admitted to shooting Friday, he challenged the government's evidence that he had the mens rea to commit either first- or second-degree murder, or voluntary manslaughter, and argued to the jury in his closing arguments that he should be acquitted of all of those crimes. See Mar. 24 Tr. at 217:10-13 (Bustamante). Additionally, Romero asserted in his closing arguments that he did not assault Friday, as Romero contended that he did not fire the first shot into Friday, and thus, Romero argued that he could not have put Friday into apprehension of being shot because, as Romero asserted, he shot after any period of apprehension would have transpired. See Mar. 24 Tr. at 221:5-221:20 (Bustamante). Romero's arguments at trial are more similar to those in United States v. Tom, than those in United States v. Gauvin, and the Court thus finds that Romero did not go to trial only to

assert whether his state of mind fell within the definition of the charged offenses.  See U.S.S.G. § 3E1.1 application n. 2.

Lastly, Romero made a motion for directed verdict at the close of trial, arguing that the United States had failed to put forth sufficient evidence to find him guilty of first-degree murder, use of a fire-arm in relation to first-degree murder, and assault.  See Mar. 24 Tr. at 102:19-103:17 (Bustamante, Court); id. at 101:1-20 (Bustamante).  The Court denied these motions and stated that the United States had put forth "ample" evidence that Romero could be found guilty of the charged offenses.  See Mar. 24 Tr. at 107:5-109:4 (Court).  Making a motion for a directed verdict at the close of trial shows that Romero did more than "preserve issues that do not relate to factual guilt" and that he put "the governemtn to its burden of proof at trial."  U.S.S.G. § 3E1.1. application n.2.  Romero choose to plead not guilty, and to challenge whether the United States had sufficient evidence to convict him of his charged offenses.  Romero, thus, does not qualify for a reduction to his sentence for his acceptance of responsibility.

## III.    THE COURT WILL NOT VACATE INDICTMENT COUNT 5, JURY INSTRUCTION COUNT 2.

Romero requests that the Court vacate Count 5 of the Indictment, Jury Instruction Count 2.  See Objections to PSR at 1.  Romero contends that, because he was indicted for the use of a firearm in relation to first-degree murder, and he was ultimately convicted of second-degree murder, this Count should be vacated.  See Objections to PSR at 2-3.

This issue was dealt with at trial, although the United States raised the issue, not Romero, and the Court found that the Tenth Circuit categorizes 18 U.S.C. § 924(c) as a distinct offense.  See Mar. 24 Tr. at 116:8-118:16 (Court)(relying on United States v. Hill, 971 F.2d 1461).  Indeed, Romero admitted at the sentencing hearing that the Jury Instructions provided for a finding that he

-47-

was culpable of using a firearm in relation to a crime of violence, even if he was acquitted of first-degree murder.  See Tr. at  16:25-17:1 (Bustamante)(stating that, in regards to his motion to vacate Count 5 of the Indictment, "I understand the instructions say something different").

The Tenth Circuit considers a charge under 18 U.S.C. § 924(c) a distinct offense and not merely an enhancement statute.  See United States v. Hill, 971 F.2d at 1464 (the Tenth Circuit explaining that the weight of authority supports its holding that 18 U.S.C. § 924(c) creates "distinct offenses rather than being merely a sentencing enhancement provision").  Accordingly, the Court explained at trial that the Tenth Circuit holds that a "defendant need not be charged with the underlying crime to be convicted" under 18 U.S.C. § 924(c).  Mar. 24 Tr. at 117:17-118:2 (Court)(citing United States v. Hill, 971 F.2d at 1464-1465).  The Tenth Circuit and other circuits have recognized that a defendant may be convicted under 18 U.S.C. § 924(c) for having used a firearm in relation to the commission of second-degree murder.  See United States v. Swallow, 109 F.3d 656, 656-57 (10th Cir. 1997)(affirming a defendant's conviction under 18 U.S.C. § 924(c) for having used a firearm during the commission of second-degree murder); United States v. Julian, 633 F.3d 1250, 1256 (11th Cir. 2011)(recognizing that a defendant may violate 18 U.S.C. § 924(c) by committing second-degree murder with a firearm).  Thus, even though Romero was not charged with second-degree murder, he may still be convicted for using a firearm in relation to a crime of violence because the jury found him guilty of second-degree murder.

The Court will therefore not vacate Count 5 of the Indictment.  The Tenth Circuit holds that a defendant may be liable under 18 U.S.C. § 924(c) regardless whether the underlying crime of violence was a crime upon which the defendant was indicted.[4]  This issue was dealt with at trial, and

---

[4]Romero does not argue that second-degree murder is not a crime of violence.  See Objections to PSR at 1-7.  Romero did not raise an objection at trial to second-degree murder being

the Court fashioned the Jury Instructions to be consistent with the Tenth Circuit's holding in United States v. Hill. Cf. Jury Instruction No. 22, with Tenth Circuit Pattern Jury Instructions Criminal, § 2.45, p. 153-54 (2005).

The Court will overrule Romero's objections to ¶¶ 21-24 of the PSR, because Romero has not contested those paragraphs' factual accuracy, and the Court should consider Romero's background and characteristics in sentencing him. The Court also finds that Romero's conduct does not show that he accepted responsibility for his actions, and accordingly, the Court finds that he is not entitled to a reduction in his sentence under U.S.S.G. 3E1.1. Further, the Court will not vacate Count 5 of the Indictment, because Romero need not have been indicted on second-degree murder to be culpable under 18 U.S.C. § 924(c)(1)(A)(C)(i), a distinct offense.

**IT IS ORDERED** that Defendant Carl Ernesto Romero's Objections to Presentence Report and Motion to Vacate Count 5, 18 U.S.C. § 924(c)(1)(A)(C)(i) Firearm Count or in the Alternative Motion for Variance, filed Oct. 31, 2011 (Doc. 132), are overruled and denied.

_____
UNITED STATES DISTRICT JUDGE

---

a crime of violence such that he may be convicted under 18 U.S.C. § 924(c)(1)(A)(C)(i) for using a firearm while committing second-degree murder. See Mar. 24 Tr. at 119:7-124:23 (Court, Ortega, Bustamante). Accordingly, the Court's analysis is limited to the arguments which Romero presented in his Objections to the PSR, specifically, that Count 5 of the Indictment, Jury Instruction Count 2, should be vacated because he was acquitted of first-degree murder. See Objections to PSR at 1, 3.

*Counsel:*

Kenneth J. Gonzales
   United States Attorney
Roberto D. Ortega
Rumaldo R. Armijo
   Assistant United States Attorneys
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Edward O. Bustamante
Albuquerque, New Mexico

   *Attorney for the Defendant*